**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GÉRARD SILLAM and ALDRIC SAULNIER,

                          Plaintiffs,

    -against-

LABATON SUCHAROW LLP,
CHRISTOPHER J. KELLER, and
LAWRENCE A. SUCHAROW,

                         Defendants.

Civil Action No.

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Gérard Sillam and Aldric Saulnier, by their undersigned attorneys, bring this Complaint against Labaton Sucharow LLP, Christopher J. Keller, and Lawrence A. Sucharow and allege as follows:

## NATURE OF THE ACTION

1.     This case arises from the crooked methods of Defendant Labaton Sucharow LLP ("Labaton"), its Chairman, Defendant Christopher J. Keller ("Keller"), and its Chairman Emeritus, Defendant Lawrence A. Sucharow ("Sucharow"), to solicit European investment funds as plaintiffs for securities class actions.

2.     Since 2006, Labaton has used Plaintiff Gérard Sillam ("Sillam"), a French businessman and a nonlawyer, as an important source of lucrative client referrals. Labaton agreed to pay Sillam referral fees for his work. At Keller's direction, Labaton arranged to pay these fees to Sillam through Sillam's French attorneys – first Jean Marc Descoubes, and then Plaintiff Aldric Saulnier ("Saulnier").

3.     Plaintiffs, who are French, did not know that this referral fee arrangement violated the New York Rules of Professional Conduct, which states: "A lawyer or law firm shall not share legal fees with a nonlawyer."

4.      Upon information and belief, Defendants, a New York law firm and two New York lawyers respectively, knew that this arrangement amounted to an ethical violation.

5.      Although Sillam made many successful referrals to Labaton, Labaton balked at paying Sillam the full amount of fees owed to him.

6.      The Plaintiffs believed that they had settled their dispute with Labaton at the end of 2009 when they executed a series of settlement agreements with Labaton. According to the 2009 settlement, Labaton paid Plaintiffs $550,000 and granted the Plaintiffs a 15% interest in any fees paid by any of Sillam's referrals who engaged Labaton within the following five years.

7.      Pursuant to the 2009 settlement, Labaton agreed to certify semiannually whether any of Sillam's referrals had retained Labaton. Thereafter, from 2011 through 2015, Keller repeatedly certified to Plaintiffs that none of Sillam's referrals had retained Labaton since the 2009 settlement.

8.      In 2015, Labaton proposed that Plaintiffs essentially forfeit their rights under the 2009 settlement for a one-time payment of $99,999.99. Plaintiffs relied to their detriment upon Defendants' repeated certifications that none of Sillam's referrals had engaged Labaton since the 2009 settlement and agreed to sign a 2015 settlement agreement.

9.      Defendants' certifications were lies.

10.     Contrary to Defendants' repeated representations, some of Sillam's referrals retained Labaton and, upon information and belief, Labaton has received substantial fees from these clients.

11.     By fraudulently inducing Plaintiffs to sign away their rights in 2015, Labaton and Keller have defrauded Plaintiffs out of substantial compensation.

12.     By transmitting Keller's false certification in 2015 with actual knowledge of its fraudulent contents, Sucharow aided and abetted that fraud.

## THE PARTIES

13.     Plaintiff Gérard Sillam is a French businessman who lives and works in Paris, France. Sillam is a citizen of France.

14.     Plaintiff Aldric Saulnier is a French attorney who lives and works in Paris, France. Saulnier is a citizen of France.

15.     Defendant Labaton Sucharow LLP is a law firm whose core practice is the representation of plaintiffs in class action lawsuits. Many of Labaton's cases allege violations of the federal securities laws. Indeed, Labaton's website boasts about the firm's "leading position within the securities class action bar." Labaton is registered as a limited liability partnership with the State of New York.

16.     Defendant Christopher J. Keller is an attorney with Labaton Sucharow LLP, where he serves as Chairman. Upon information and belief, Keller is a citizen of New York.

17.     Defendant Lawrence A. Sucharow is an attorney with Labaton Sucharow LLP, where he serves as Chairman Emeritus. Upon information and belief, Sucharow is a citizen of New York.

## JURISDICTION AND VENUE

18.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because Sillam and Saulnier are both citizens of France; Labaton, Keller, and Sucharow are all citizens of New York; and the amount in controversy exceeds $75,000.

19.     The Court has personal jurisdiction over Labaton because it is registered as a limited liability partnership with the State of New York, and its headquarters are located in New York. The Court has personal jurisdiction over Keller because, upon information and belief, he lives and works in New York. The Court has personal jurisdiction over Sucharow because, upon information and belief, he lives and works in New York.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because (a) all Defendants are residents of the Southern District of New York, and (b) a substantial part of the events giving rise to Plaintiffs' claim occurred in the Southern District of New York.

## FACTUAL BACKGROUND

### Labaton Proposes an Unlawful Referral Fee Arrangement to Sillam

21.     In the 1990's, Sillam worked as a consultant for Refco in Paris, France, where he introduced Refco to business partners and brokered certain deals for Refco.

22.     In the course of his work for Refco, Sillam made contacts with the managers of many European investment funds.

23.     In 2005, Sillam filed lawsuits in France and the United States against Refco, related entities, and related individuals alleging unpaid commissions and fraud. Sillam's lawsuits garnered attention in the American press, such as the *Chicago Tribune*, *Wall Street Journal*, and *Washington Post*.[1] Consequently, Sillam began to hear from other individuals seeking to share information about the Refco matter.

---

[1]     Refco's former CEO Phillip R. Bennett ultimately pleaded guilty to charges of securities fraud and was sentenced to sixteen years in prison.

24.     One individual put Sillam in touch with Labaton attorney Mark Arisohn. Sillam planned to meet with Arisohn the next time Sillam traveled to New York, in early November 2005.

25.     On or about November 3, 2005, Sillam attended a meeting with Mark Arisohn at Labaton's office in New York, New York. Defendant Keller also attended the meeting. During this meeting, which had initially focused on the Refco case, Keller first broached the possibility that Sillam could refer European investment funds to Labaton.

26.     Following the November 3, 2005 meeting, Sillam emailed Arisohn to say that he was "interested in finding for your law firm large european institutions which were defrauded in stock markets, and [he] would need further details from Mr. Keller about this issue."

27.     Keller then arranged a second meeting to take place several days later at Labaton's office in New York. Sillam, Keller, and Jennifer Tetefsky, Labaton's director of business development, attended this meeting.

28.     During the meeting, Keller expressed great interest in Sillam's professional network – in particular, Sillam's contacts at investment funds regulated by the European Union ("UCITS funds"). These UCITS funds owned many securities that traded on U.S. exchanges and, accordingly, Keller viewed them as potential plaintiffs in securities class actions filed in the United States.

29.     Because he wanted to retain Sillam's contacts as clients, Keller proposed a referral agreement to Sillam. According to Keller's proposed arrangement, Sillam would work for Labaton as an independent contractor whose sole job was to refer UCITS funds to Labaton. In exchange for Sillam's efforts, Labaton would pay Sillam a

referral fee equal to 15% of the total fees paid to Labaton in connection with any matter for which Labaton represented a client referred by Sillam.

30.     Keller instructed Sillam to retain a lawyer, who would collect the referral fees on Sillam's behalf. Keller did not explain to Sillam why a lawyer was needed; he simply told Sillam that this was how Labaton handled this type of arrangement.

31.     Sillam, a French businessman, is not an American lawyer. Thus, Sillam did not know – and had no reason to know – that the referral fee arrangement proposed by Keller violated the New York Rules of Professional Conduct.

32.     However, Sillam understands now that the purpose of Keller's proposed arrangement, including the use of a lawyer to receive Sillam's referral fees, was to obscure the nature of a referral arrangement between Labaton and Sillam, a nonlawyer.

33.     Following the second meeting at Labaton's office, Sillam heeded Keller's instruction and found a lawyer, Jean Marc Descoubes ("Descoubes"), to act as an intermediary for the payment of referral fees from Labaton to Sillam. Descoubes had served as Sillam's attorney for many years before 2005, including in connection with the Refco matter.

34.     As contemplated by Keller, Labaton and Descoubes formalized a referral fee arrangement by letter agreement dated February 21, 2006 (the "Descoubes Agreement"). The Descoubes Agreement provided, in relevant part, as follows:

> a.     "This letter is intended to memorialize the manner in which the Descoubes firm and Labaton Sucharow & Rudoff LLP ('Labaton Sucharow') will co-venture securities class action and other representative litigation on behalf of clients obtained principally through the efforts of your firm and its relationships. These clients will be referred to herein as 'Descoubes Clients.'"

6

b.    "We have generally agreed that Descoubes would receive 15% of the net attorneys' fee Labaton Sucharow ultimately earns in a case in which a Descoubes Client is appointed as the Lead Plaintiff. Under the Securities Laws of the United States, Lead Plaintiffs in securities class actions may be a single entity or a 'group' consisting of up to 5 separate entities. In the event that a Descoubes Client is grouped with a non-Descoubes Client(s) and that group is collectively appointed as a Lead Plaintiff, then the referral fee would be reduced to reflect the relative client contribution."

c.    "Labaton Sucharow shall also pay Descoubes all reasonable out-of-pocket expenses that are directly related to the performance of the above-referenced services, given that reasonable evidence of such expenditures is provided to Labaton Sucharow."

35.    At the time it was executed, Labaton did not expect any client referrals from Descoubes. Indeed, Descoubes had not even met any Labaton attorneys at that point. Rather, Labaton expected client referrals from Sillam, and Labaton knew that the true purpose of the Descoubes Agreement was to facilitate the payment of referral fees from Labaton to Sillam.

36.    Thereafter, on or about April 25, 2006, Labaton and Sillam executed a separate agreement (the "Sillam Agreement"). The Sillam Agreement provided, in relevant part:

a.    "Gérard Sillam shall provide to Labaton Sucharow his personal assistance and expertise, in directly or indirectly facilitating Labaton Sucharow's representation of foreign institutional investors who, as the result of Gérard Sillam's efforts become clients of Labaton

7

Sucharow ('Client(s)'), and consulting on behalf of Labaton Sucharow in relation thereto."

> b.     Labaton agreed to pay Sillam a "success fee" for each investment fund client secured by Sillam's efforts. For investment funds holding more than $2 billion in U.S. securities, Sillam would receive "a maximum success fee of $30,000 if an exclusive engagement letter is obtained in favor of Labaton Sucharow to monitor Client's portfolio which includes Labaton Sucharow having regular access to the Client's portfolio." For investment funds holding between $1 billion and $2 billion, the success fee would be "reduced pro rata."

> c.     Labaton also agreed to pay Sillam an additional success fee "in the event that Client is appointed Lead Plaintiff as defined by the Private Securities Litigation Reform Act of 1995 ('PSLRA') and Labaton Sucharow is appointed Lead Counsel as defined by the PSLRA." Sillam would earn a minimum success fee of $65,000 for any case in which Labaton was appointed to be sole Lead Counsel, and a minimum success fee of $30,000 for any case in which Labaton was appointed to be co-Lead Counsel.

> d.     Labaton agreed to pay Sillam $6,000 per month (later increased to $7,500 per month), which would be credited against any of the success fees described above.

> e.     Finally, Labaton agreed to pay Sillam's "reasonable out-of-pocket expenses" related to his services for Labaton.

37.     On or about May 1, 2008, Descoubes assigned all interests and rights in the Descoubes Agreement to Saulnier, another French attorney with whom Sillam had a

longstanding relationship. Like Descoubes, Saulnier is not an American attorney. Thus, Saulnier did not know – and had no reason to know – that the arrangement among Labaton, Sillam, and Descoubes violated New York's Rules of Professional Conduct.

### Sillam Refers Numerous European Clients to Labaton

38.     Once the referral arrangement was in place, Sillam arranged dozens of meetings across Europe between Labaton lawyers and managers of leading UCITS funds.

39.     Sillam also organized a conference in Paris to promote Labaton's efforts on or about March 21, 2007. Dozens of French asset managers, with trillions of dollars in combined assets under management, attended the conference. Sillam secured media coverage of the conference in *Les Echos*, a French financial newspaper.

40.     In all, Sillam successfully arranged for meetings between Labaton and the following funds: AXA Investment Managers; IXIS Asset Management (now Natixis Global Asset Management); Crédit Agricole S.A.; Crédit Agricole Asset Management; BNP Paribas Asset Management; Société Générale Asset Management; AGF Asset Management (now Allianz Global Investors France); Allianz SE; La Banque Postale Asset Management; CM-CIC Asset Management; CM-CIC Gestion; AGIRC-ARCCO; KBC Asset Management; Fortis Investments; PeterCam S.A.; Bank Delen; Bank Degroof; Dexia Asset Management; ING Investment Management; Gruppo BBVA; BBVA Gestion; Pensplan Invest SGR; Eurizon Capital S.A.; Eurizon Capital SGR S.p.A.; Sanpaolo Am Lux; Sanpaolo IMI Asset Management; Groupama Asset Management; MMA France; Banque Luxembourg; CPR Asset Management; HSBC France; and VP Bank (collectively, the "Referred Clients").

41.     These high-value referrals resulted in many successful engagements for Labaton.

42.     For instance, following Sillam's introduction, AGF Asset Management, Eurizon Capital SGR S.p.A., Eurizon Capital S.A., Fortis Investments, and PeterCam S.A. retained Labaton to represent them in connection with a major securities class action against Vivendi, S.A. in the Southern District of New York: *In re Vivendi*, No. 02 Civ. 5571 (S.D.N.Y.).

43.     Labaton filed separate actions against Vivendi on behalf of AGF Asset Management, S.A., Eurizon Capital SGR S.p.A., Eurizon Capital S.A., and PeterCam S.A. in 2007 and 2008 in the Southern District of New York. *See* Case Nos. 07-CV-11305, 07-CV-11483, 08-CV-00418, 08-CV-02056.

44.     Moreover, Labaton was successful in obtaining exclusive engagements with AGF Asset Management, Fortis Investments, and Eurizon Capital to monitor those funds' portfolios. Pursuant to the Sillam Agreement, Labaton paid Sillam a success fee of $30,000 per client, *i.e.* $90,000 in total.

45.     Labaton was also retained by other Referred Clients, including AGF Asset Management, AXA Investment Managers, Bank Degroof, Eurizon Capital, and PeterCam S.A. to file proofs of claims in connection with class action lawsuits. Upon information and belief, Labaton charged no fees to file proofs of claims for these funds in the first year, and thereafter earned between 4% and 10% of these funds' total recoveries.

46.     Finally, Labaton represented other Referred Clients in connection with litigation against Royal Dutch Shell in the Netherlands.

47.     Upon information and belief, Labaton earned millions of dollars in fees as the direct result of Sillam's referrals.

48. All the while, Labaton acknowledged that its methods were questionable.

49. On a walk in Luxembourg in 2007, Defendant Sucharow specifically confided in Sillam that Labaton was "probably breaking several laws in several countries." Sucharow's colleague, Eric Belfi, was present for this conversation. Sillam understood Sucharow to mean that Labaton lawyers, who were not licensed to practice law in Europe, were meeting with European fund managers outside the presence of any European lawyers. Sillam also understood that some European countries prohibit attorneys from affirmatively soliciting clients, as Labaton was doing.

***Labaton Attempts To Reduce Plaintiffs' Fees, Sillam Sues in France, and the Parties Settle***

50. Not long after Sillam formalized his referral fee arrangement with Labaton, Labaton began insisting that Sillam reduce his fee.

51. For example, in an email exchange from February 28 to March 1, 2007, Sillam wrote to Labaton attorneys Lawrence Sucharow and Eric Belfi that he was concerned about Labaton reducing a portion of Sillam's fee so that Labaton could pay fees to another European referral source named Pietro. Pietro claimed half of Plaintiffs' referral fees, not because he had earned them, but because he asserted that certain referred clients were located in his "territory." Defendant Sucharow, then Chairman of Labaton, acknowledged Sillam's right to his referral fee but asked him to reduce his fee in the following email dated March 1, 2007:

> I awoke this morning to your disturbing email. I'm sorry these discussions have affected you so emotionally. First, you have the complete right to insist on your full fee, BUT I would ask that you reconsider. Not every situation fits into a neat package or contract. While you don't believe that Pietro can be helpful in closing the deal you helped bring about, we believe that he very well may be, and the clients are so large and important why should you or we

take that unnecessary risk (certainly not for misplaced pride). Our proposal does not ask you to give up virtually much of anything. As to Shell, you give up nothing. We are paying the additional 5 percent to secure Pietro's assistance. As for client maintenance and possible future business, we think [*sic*] that 7-1/2 percent for Pietro is fair, and we have offered to pay 2/3 of that asking only that you contribute 1/3 or 2-1/2 percent. If we are right we pay a bit more but we all share in those substantial benefits, if we are wrong my firm has overpaid a bit and you are underpaid only a little bit. I ask you to reconsider. We have offered to bear most of the cost to benefit us all. We are asking you to share a small portion of that in these unique circumstances. In the end the decision is yours, but it makes a lot of business sense to us to try to moderate everyone's views and accommodate everyone's feelings. You are both important business partners for us and friends.

52.     Labaton also resisted its obligation to pay Plaintiffs lucrative referral fees and contract bonus in connection with the *Vivendi* class action.

53.     Thereafter, Sillam filed a complaint in Paris, France, alleging his entitlement to referral fees and asserting that Labaton had defrauded him.

54.     Ultimately, Plaintiffs and Labaton managed to settle their disputes at the end of 2009. In essence the Plaintiffs agreed to limit their future referral fees in exchange for a lump sum payment.

55.     Specifically, the parties executed two settlement agreements: one among Labaton, Saulnier, and Saulnier's legal representative (the "Saulnier Settlement"); and a second among Labaton, Sillam, and Sillam's legal representatives (the "Sillam Settlement," and together with the Saulnier Settlement, the "Settlement Agreements").

56.     The relevant terms of the Saulnier Settlement were as follows:

a.      Labaton agreed to pay Saulnier 30% of the gross contingency fees earned by Labaton in connection with its representation of the following clients in the *Vivendi* class action: "All AGF and/or Allianz clients"; "All Eurizon clients"; "All FORTIS clients" and "All

12

Petercam clients." Labaton further guaranteed that this payment to Saulnier "shall not be below $150,000.00," and that Saulnier would be entitled to this minimum amount immediately upon settlement or verdict in the *Vivendi* class action.

b.      Labaton agreed to pay Saulnier 15% of the gross fees earned by Labaton in any matter in which Labaton was engaged to represent any of the Referred Clients, listed in Exhibit 1 to the Saulnier Settlement as "Potential Clients," within five years from the date of the Saulnier Settlement.

c.      Labaton agreed to produce "verifiable documents" concerning "Labaton's fee structure (hourly/flat fee or contingency fee rate) for each of the matters in which Labaton represents any of the Potential Clients during The Five-Year Term."

d.      Labaton further agreed to provide to Saulnier's counsel with "a full list of any matters pending (or contemplated) in which Labaton represents any of the Potential Clients anywhere in the world as of the date of execution of The Settlement, and if so, a complete description of the matter for which Labaton has been retained in each instance as well as the payment arrangement (hourly/flat fee/contingency), as well as a good-faith estimate by Labaton of potential damages and legal fees to be generated by each such case."

e.      Labaton further agreed to provide Saulnier's counsel with a semiannual "verified declaration disclosing whether any of The Potential Clients have retained Labaton regarding any potential litigation or actual litigation anywhere in the world during the previous six

months, and if so, a complete description of the matter for which
Labaton has been retained in each instance, as well as a good-faith
estimate by Labaton of potential damages and/or legal fees to be
generated by its representation of Potential Clients."

        f.      Labaton further agreed that Labaton's failure "for a second
time or greater" to report a matter for which Labaton had been retained
by one of the Referred Clients, then "that said failure shall result in an
increase of interest for [Saulnier] from 15% (fifteen percent) to 30%
(thirty percent)" for the unreported representation.

        g.      Saulnier waived and released all claims against Labaton,
including any claims arising out of the Descoubes Agreement, and
specifically including any interest in fees earned by Labaton in
connection with litigation against Royal Dutch Shell.

57.     To further Labaton's clear effort to hide its violations of the New York
Rules of Professional Conduct, the Saulnier Settlement also included a curious
confidentiality clause that purported to preclude Saulnier from making "any disparaging
remarks" about Labaton "to French or US federal or state regulators, members of the
French or US federal or state judiciary, or any Bar Association."

58.     In connection with the Settlement Agreements, Labaton attorneys also
demanded that Sillam declared under penalty of perjury that he had deleted all
documents relating to his relationship with Labaton. Sillam refused.

59.     Labaton further agreed to pay $400,000 to Sillam pursuant to the Sillam
Settlement. In exchange, Sillam agreed to dismiss his lawsuit against Labaton, which
had been pending in a French court. Sillam further waived and released all claims

14

against Labaton, including any claims arising out of the Sillam Agreement executed in 2006.

**_Following Execution of the Settlement Agreements, Defendants Lie About Labaton's Continuing Work for Certain Referred Clients_**

60.    Following execution of the Settlement Agreements, Defendants took multiple affirmative steps to conceal their engagements with certain Referred Clients.

61.    Specifically, as required by the Saulnier Settlement, Keller periodically submitted to Plaintiffs a declaration stating: "Since the execution of the Agreement, Labaton Sucharow has not been retained by any 'Potential Clients' as defined in 'Exhibit No. 1' of the Agreement, attached hereto."

62.    Keller signed declarations to this effect on January 21, 2011, on June 9, 2011, on February 14, 2012, on July 16, 2013, and on July 8, 2015 (collectively, the "Keller Declarations"). The most recent declaration signed by Keller was dated July 8, 2015 (the "July 2015 Keller Declaration").

63.    On July 8, 2015, Sillam emailed Defendant Sucharow to request that he arranged for "the last affidavit of the 5 years period" to be sent directly to Maître Saulnier. Sucharow replied: "Done." Upon information and belief, Sucharow then caused Keller to sign the July 2015 Keller Declaration. Thereafter, Sucharow sent the July 2015 Keller Declaration to Plaintiffs.

**_Plaintiffs Sign the Universal Settlement Agreement in Reliance on Labaton's Deception_**

64.    Shortly after Labaton submitted the July 2015 Keller Declaration, Labaton induced Plaintiffs to execute a new settlement agreement (the "Universal Settlement Agreement") on August 15, 2015, on the basis of Defendants' lies in the July

2015 Keller Declaration and all preceding declarations. Sillam, Saulnier, Keller, and Stocker all signed the Universal Settlement Agreement on August 15, 2015.

65.     The Universal Settlement Agreement effectively terminated Plaintiffs' rights under the Settlement Agreements in exchange for (a) $99,999.99, and (b) assignment of Labaton's separate interest in certain fees owed to Labaton in connection with a litigation filed in Milan, Italy (the "Saipem litigation").

66.     Thereafter, Plaintiffs and Labaton executed an amendment to the Universal Settlement Agreement dated August 23, 2016 (the "2016 Amendment"), which provided for payment of €5,000 to Sillam in exchange for Plaintiffs' agreement to relinquish their interest in the Saipem litigation.

67.     Plaintiffs would not have executed either the Universal Settlement Agreement or the 2016 Amendment had they known that Labaton, in fact, represented certain Referred Clients following execution of the Settlement Agreements.

68.     Plaintiffs did not learn the truth until recently because Labaton falsely represented to Plaintiffs – both orally and in the written Keller declarations – that Labaton had not represented certain Referred Clients following execution of the Settlement Agreements.

*Plaintiffs Discover Labaton's Deception*

69.     Following execution of the Universal Settlement Agreement, Sillam learned that Defendants had repeatedly lied to Plaintiffs. Contrary to Defendants' numerous representations, including five separate declarations from Keller, Labaton was, in fact, representing certain Referred Clients following execution of the Settlement Agreements.

70.     On or about November 7, 2017, Sillam learned from a representative of AXA Investment Managers that Labaton has filed proofs of claims in class actions on AXA Investment Managers' behalf continuously from 2006, when Sillam first connected AXA Investment Managers to Labaton, to the present day.

71.     In or about November 2017, Sillam learned from a representative of Degroof PeterCam (a merger of Bank Degroof and PeterCam) that Labaton has been filing proofs of claims in class actions on Degroof PeterCam's behalf for a number of years to the present day.

72.     Plaintiff has only recently discovered additional matters in which Labaton has represented certain Referred Clients – none of which were disclosed in Keller's declarations, which stated falsely that "Labaton Sucharow has not been retained by any 'Potential Clients' as defined in 'Exhibit No. 1' of the Agreement."

> a.      Labaton represented Allianz Global Investors France, S.A. (formerly known as AGF Asset Management, S.A.), Eurizon Capital SGR S.p.A., and Eurizon Capital S.A. in an action against Guillaume Hannezo in the Southern District of New York. Labaton commenced the case in 2009, and the case settled in 2012.
>
> b.      Labaton represented KBC Asset Management NV in a class action against Corinthian Colleges, Inc. and related defendants. In 2010, Keller himself moved for appointment of KBC as a lead plaintiff, and for appointment of Labaton as co-lead plaintiff's counsel.
>
> c.      Labaton represented KBC Asset Management NV in a class action against Bank of America Corp. and related defendants. In 2011, Keller himself moved for appointment of KBC as a lead plaintiff, and for appointment of Labaton as co-lead plaintiff's counsel.

17

d.      Labaton represented KBC Asset Management NV in a class action against Weight Watchers International and related defendants. In 2014, Keller himself moved for appointment of KBC as a lead plaintiff, and for appointment of Labaton as co-lead plaintiff's counsel. The Court granted the motion on June 9, 2014.

e.      Labaton represented KBC Asset Management NV in an action against Rackspace Hosting, Inc. and related defendants. Labaton commenced the case in 2017, and the case was dismissed on February 5, 2019.

73.     Because the proof of claim process is not public, despite his best efforts, Sillam has been unable to obtain additional information concerning the extent of Labaton's work for Referred Clients since the Settlement Agreements in 2009.

74.     Upon information and belief, Labaton has been engaged by other Referred Clients and has received substantial fees.


***Labaton Owes Plaintiffs 30% of Its Fees***

75.     Because Labaton has consistently concealed its ongoing work for certain Referred Clients, the terms of the Saulnier Settlement would have required Labaton to pay 30% of the gross fees earned by Labaton in any matter in which Labaton was engaged to represent any of the Referred Clients within five years of December 31, 2009.

76.     Upon information and belief, Labaton has concealed from Plaintiffs that it has earned millions of dollars from Referred Clients since 2009.

77.     For instance, upon information and belief, AXA Investment Managers alone has over $100 billion in U.S. securities under management, and based on

statistical averages, has recovered a minimum average of $70 million per year by filing proofs of claims in class actions.

78.     Upon information and belief, Labaton charged a contingency fee of at least 4% for its work to file proofs of claims on AXA Investment Managers' behalf, which amounts to $14 million in fees over five years ($2.8 million per year).

79.     Plaintiffs would have been entitled to 30% of those fees, or $4.2 million, under the terms of the Settlement Agreements.

80.     Plaintiffs were fraudulently induced to give up these valuable rights by signing the 2015 Universal Settlement Agreement.

81.     Six defendants, including Labaton Sucharow LLP and Mr. Christopher Keller, are also defendants in France in two criminal cases. The first one, for fraud, forgery and aggravating circumstances, has now resulted in a criminal trial scheduled on October 15, 2021. The second criminal case is related to Mr. Sillman's December 20, 2017 claim for fraud in organized gang, forgery, and use of inaccurate certificates, in which French police are currently investigating and have interviewed Mr. Sillam and Saulnier.

**FIRST CAUSE OF ACTION**
**(Fraudulent Inducement against Labaton and Keller)**

82.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

83.     Each of the Keller Declarations, including the July 2015 Keller Declaration, declared: "Since the execution of the [Global Settlement Agreement and Full Waiver and Release executed on December 31, 2009], Labaton Sucharow has not been retained by any 'Potential Clients' as defined in 'Exhibit No. 1' of the Agreement, attached hereto." As alleged in the foregoing paragraphs, that statement was false.

84.     Keller made these false statements as an agent of Labaton and in the course of the performance of his duties for Labaton.

85.     Labaton and Keller knew that this statement was false at the time it was made.

86.     Labaton and Keller made this false statement with the intention of inducing Plaintiffs to sign the Universal Settlement Agreement.

87.     Plaintiffs signed the Universal Settlement Agreement in reliance on this statement, and Plaintiffs' reliance on the statement was reasonable.

88.     As the result of Labaton's and Keller's fraudulent inducement, Plaintiffs gave up their valuable rights set forth in the Settlement Agreements.

**SECOND CAUSE OF ACTION**
**(Negligent Misrepresentation against Labaton and Keller)**

89.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

90.     Pursuant to the Settlement Agreements, Labaton and Keller had a duty to provide correct information to Plaintiffs in the Keller Declarations. In particular, Labaton and Keller were aware that the sole purpose for the Keller Declarations was to enable Plaintiffs to determine whether Labaton was in compliance with the Settlement Agreements.

91.     Each of the Keller Declarations, including the July 2015 Keller Declaration, declared: "Since the execution of the [Global Settlement Agreement and Full Waiver and Release executed on December 31, 2009], Labaton Sucharow has not been retained by any 'Potential Clients' as defined in 'Exhibit No. 1' of the Agreement, attached hereto." As alleged in the foregoing paragraphs, that statement was false.

20

92.     Keller made these false statements as an agent of Labaton and in the course of the performance of his duties for Labaton.

93.     Labaton and Keller knew or should have known that this statement was false at the time it was made.

94.     Plaintiffs signed the Universal Settlement Agreement in reliance on this statement, and Plaintiffs' reliance on the statement was reasonable.

95.     As the result of Labaton's and Keller's negligent misrepresentation, Plaintiffs gave up their valuable rights set forth in the Settlement Agreements.


### THIRD CAUSE OF ACTION
**(Aiding and Abetting Fraudulent Inducement against Sucharow)**

96.     Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

97.     Each of the Keller Declarations, including the July 2015 Keller Declaration, declared: "Since the execution of the [Global Settlement Agreement and Full Waiver and Release executed on December 31, 2009], Labaton Sucharow has not been retained by any 'Potential Clients' as defined in 'Exhibit No. 1' of the Agreement, attached hereto." As alleged in the foregoing paragraphs, that statement was false.

98.     Sucharow knew that this statement in the July 2015 Keller Declaration was false at the time it was made.

99.     As mentioned above, in 2007, Defendant Sucharow specifically confided in Sillam that Labaton was "probably breaking several laws in several countries." Sucharow's colleague, Eric Belfi, was present for this conversation. Sillam understood Sucharow to mean that Labaton lawyers, who were not licensed to practice law in Europe, were meeting with European fund managers outside the presence of any

European lawyers. Sillam also understood that some European countries prohibit attorneys from affirmatively soliciting clients, as Labaton was doing.

100.    Sucharow knew that this statement was made with the intention of inducing Plaintiffs to sign the Universal Settlement Agreement. As can be shown in an email dated July 29, 2015, to Gerard Sillam from General Counsel Stocker stating  *"Your e-mail of July 22 to our president, Lawrence <u>Sucharow</u>, was sent to me for investigation and response [...]"*

101.    Sucharow substantially assisted in perpetuating this fraud by (a) causing Keller to sign the July 2015 Keller Declaration and (b) sending the July 2015 Keller Declaration, which he knew to be false, to Plaintiffs.

102.    Plaintiffs signed the Universal Settlement Agreement in reliance on this statement, and Plaintiffs' reliance on the statement was reasonable.

103.    As the result of such fraudulent inducement, Plaintiffs gave up their valuable rights set forth in the Settlement Agreements.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment:

1.      Awarding Plaintiffs compensatory damages in an amount to be

determined at trial; and

2.      Awarding Plaintiffs punitive damages in an amount to be determined at

trial; and

3.      Granting such other and further relief as the Court deems just and proper.


## DEMAND FOR A JURY TRIAL


Plaintiffs demand a jury trial.


Dated: New York, New York
        August 6, 2021

                              CZIK LAW PLLC




                    By:_____
                              Steven J. Czik, Esq.
                              401 Greenwich Street
                              New York, N.Y. 10013
                              Telephone: 212.413.4462
                              Email: steven@cziklaw.com


                              *Attorneys for Plaintiffs Gérard Sillam and*
                              *Aldric Saulnier*