# EXHIBIT L

# FAX

Date   1 August 2021

VEUILLEZ REMETTRE CE DOCUMENT A / *PLEASE DELIVER THE FOLLOWING PAGES TO*:

NOM / *NAME*:  **LABATON  SUCHAROW LLP Law Firm,**

LABATON SUCHAROW LLP Law Firm 140 Broadway, New York  NY 10005, USA _____

Télécopie / *Fax*:  **+1 212 818-0477**_____

De / *From:* Sophie LARROQUE, Avocat au Barreau des Hauts de Seine _____

Courriel / *Email*: sophielarroque00@gmail.com_____

Téléphone / *Phone*:  +33 (0)1.55.46.50.50_____

Nombre total de pages / *Number of pages including cover sheet:*_ 29 (vingt-neuf)_____

**MESSAGE:**

Please find **enclosed** direct summons « *citation* » in English, notified by French huissier de justice, Me LOTTE and Me DUHAMEL, to appear before the XIII/2nd Correctional Chamber of the Paris Court of Justice, [Tribunal Judiciaire] Parvis du Tribunal de Paris 75859 PARIS Cedex 17 France, on October 15, 2021 at 1:30 p.m. French Time

*Veuillez trouver ci-joint la citation directe en anglais notifiée par huissier de justice, Me LOTTE et Me DUHAMEL, à comparaître devant la XIII/2ème Chambre correctionnelle du Tribunal de Paris, Parvis du Tribunal de Paris 75859 PARIS Cedex 17 France, le 15 octobre 2021 à 13h30 heure française.*

Les informations et les pièces jointes sont destinées à l'usage exclusif de la personne ou de la société nommée sur cette feuille de transmission.

Si vous n'êtes pas le destinataire indiqué / ou si vous recevez ce fax par erreur, toute révision, diffusion, distribution ou copie de ces informations est strictement interdite. Si vous avez reçu ces informations par erreur, veuillez contacter immédiatement l'expéditeur et détruire immédiatement la page de garde et les pièces jointes. Merci.

*The information and attachments are intended only for the sole use of the individual or entity named on this transmission sheet.*

*If you are not the intended recipient / or receive this fax in error, any review, dissemination, distribution or copying of this information is strictly prohibited. If you have received this information in error, please contact the sender immediately and destroy the cover page and attachments immediately. Thank you.*

1, place de la République - 92300 Levallois-Perret – France - Tel. +33 (0)1.55.46.50.50

Toque PN 111 - email : sophielarroque00@gmail.com

**To the President and Councillors composing the XIII/2nd Correctional Chamber of the Paris Court of Justice [_Tribunal Judiciaire de Paris_]**

---

### DIRECT SUMMONS TO APPEAR BEFORE THE COURT OF PARIS
### _CITATION A PREVENU_
### _DEVANT LE TRIBUNAL CORRECTIONNEL DE PARIS_

---

The year Two Thousand Twenty One and the

At the request of:

**Mr. Gérard Sillam**, born on August 27, 1960 in Sousse (Tunisia), residing at 181 rue de la Pompe, 75116 in Paris, of French nationality; and

**Mr. Aldric Saulnier**, lawyer, born June 24, 1943 in Fontainebleau (Seine-et-Marne), residing at 18 avenue Daumesnil, 75012 in Paris, French nationality.

**Plaintiffs - _Parties civiles_**

With Lawyer - _Ayant pour Avocat_

**Maître Sophie Larroque**
French Attorney - Avocat au Barreau des Hauts-de-Seine
1, place de la République - 92300 Levallois-Perret
Tél. : +33(0)1.55.46.50.50
Court Box _Toque_ : PN111
Email : sophielarroque00@gmail.com

Domiciled at her Law Firm - _Élisant domicile en son Cabinet_

J'ai, huissier de justice, soussigné      _I, bailiff, undersigned_

2

**Given subpoena to**:

- **Labaton Sucharow LLP Law firm**, 140 Broadway, New York, NY 10005, USA;

- **Mr. Christopher J. Keller**, Attorney, domiciled in Labaton Sucharow LLP Law firm, 140 Broadway, New York, NY 10005, USA;

- **Mr. Lawrence Sucharow**, Attorney domiciled in Labaton Sucharow LLP Law firm, 140 Broadway, New York, NY 10005, USA;

- **Mr. Eric J. Belfi,** Attorney domiciled in Labaton Sucharow LLP Law firm, 140 Broadway, New York, NY 10005, USA;

- **Mr. Michael P. Canty**, Attorney domiciled in Labaton Sucharow LLP Law firm, 140 Broadway, New York, NY 10005, USA;

- **Mr. Michael W. Stocker**¸ Attorney  domiciled at 1075 S Manzanita Ave, Palm Springs, CA 92264-5121, USA;

- **Mr. Michael W. Stocker, spouse Dark**¸ attorney at law, domiciled at California Advocates for Nursing Home Reform, 650 Harrison Street, 2nd Floor, San Francisco, CA 94107, United States of America.

**In the presence of Mrs., Mr. Prosecutor [*Madame, Monsieur le Procureur de la République*]**

Or being and talking to

**To have to appear before the XIII/2nd Correctional Chamber of the Paris Court of Justice, [*Tribunal Judicaire*] Parvis du Tribunal de Paris 75859 PARIS CEDEX 17 on**

**October 15, 2021 at 1:30 p.m. French Time**

In order to respond, as defendants, to the facts set out below, and in particular:

- *- To have in Paris, New York, in any case on the national territory and since time not prescribed, between January 21, 2011 and August 17, 2015, committed a swindle to the prejudice of Mr. Gerard Sillam and Mr. Aldric Saulnier, by abuse of true quality and association of wrongdoers, in this case by issuing false attestations intended, on the one hand, to defeat the contractual commitments binding them to Mr. Sillam and Mr. Saulnier and, on the other hand, to lead the latter to renounce the agreements entered into and, in particular, the contractual commissions provided for.*
- *Facts provided for and punishable under Articles 313-1 et seq. of the French Penal Code*

- *To have in Paris, New York, in any case on the national territory and since time not prescribed, between January 21, 2011 and August 17, 2015; committed acts of forgery and use of forgeries to the prejudice, always, of Messrs. Gérard Sillam and Aldric Saulnier, by abuse of true quality and association of wrongdoers, in this case, by issuing and using false attestations in order to evade their contractual obligations to lead Messrs. Sillam and Saulnier to renounce the signed agreements concluded and in particular the contractual commissions provided for.*

  *Facts provided for and punishable under Articles 441-1 et seq. of the French Penal Code.*

You are required to appear personally at this hearing alone or assisted by an attorney, or to be represented by an attorney (Articles 390 and 411 of the French Code of Criminal Procedure).

If you wish the assistance of an attorney, you can either choose one or ask the President of the Bar Association [*Bâtonnier de l'ordre des avocats*] or the President of the Court of Justice [*président du tribunal judiciaire*]   to appoint a court-appointed attorney [*avocat commis d'office*]. The costs of your lawyer will be at your expense, unless you meet the conditions for access to legal aid [*aide juridictionnelle*]. You also have the possibility of benefiting, if necessary free of charge, from legal advice in a structure for access to the law (article 390 paragraph 2 of the French Code of Criminal Procedure).

You must appear at the hearing in possession of proof of your income as well as your tax or non-tax opinions, or communicate them to the lawyer who will represent you (article 390 paragraph 3 of the Code of Criminal Procedure).

If you feel that you are unable to attend the hearing and if you are not represented by a lawyer, you must send a letter to the President of the Tribunal explaining the reasons for your absence. You should include all supporting documents with your letter. If at the hearing your reasons are accepted by the Tribunal, a new summons will be sent to you for a later hearing. Otherwise, the case will be heard in your absence and that of a representative. You must remind in all correspondence of the date, time and place of the hearing to which you are summoned (Article 411 of the French Code of Criminal Procedure).

The fixed procedural fee [*droit fixe de procédure* ] due pursuant to Article 1018 A, 3° of the French General Tax Code may be increased if you do not appear personally at the hearing or if you are not tried under the conditions provided for in the first and second paragraphs of Article 411 of the French Code of Criminal Procedure (Article 390 paragraph 4 of the French Code of Criminal Procedure).

\*\*\*

## SUMMARY - *PLAISE AU TRIBUNAL*

### I.    Background - Rappel des faits

1. On November 3, 2005, Gérard Sillam, the French business contributor, was introduced to the U.S. law firm Labaton Sucharow LLP (hereinafter referred to as "Labaton") at a meeting held in New York with Mark Arisohn and Christopher J. Keller, both partners of Labaton.

2. Mr. Sillam was known as a business contributor following the publication of press articles in the Wall Street Journal and the Washington Post; Mr. Keller therefore quickly discussed a partnership with Mr. Sillam, who wanted to include European institutional clients, in particular French institutional clients, in his firm's client portfolio.

3. The project consisted, for Mr. Sillam, in recommending Labaton to European investment funds with which he had already been doing business for several years.

4. A second meeting was organized by Mr. Keller, this time in the presence of Ms. Jennifer Tetefsky, Labaton's Director of Business Development.

   On this occasion, Mr. Keller reiterated his keen interest in Mr. Sillam's professional network, and in particular in UCITS investment funds (funds managing several billion assets, regulated by several European directives).

   5. In the United States, class action law firms pay millions of dollars in commissions to referring attorneys for referrals to major clients, such as institutional clients [*les clients institutionnels*].

   These referral agreements help avoid competition with other firms and also provide for the Lead Counsel role in the class action lawsuits, who will receive a double-digit percentage of the compensation for all class members. This role could only be obtained if his client represents the most important prejudice, so the role proposed to Mr. Sillam, which was to introduce the world's largest management companies [*sociétés de gestion* ] to the Labaton law firm, allowed him to secure his future appointment as Lead Counsel.

   Bare referral [recommendation said to be direct] is when lawyers pay exclusively to be introduced to a client, without the introducer having to do any work other than that introduction.

6. In order to reassure Mr. Sillam and to give their agreement a semblance of legality, Mr. Keller told him that a lawyer had to represent him in order for him to benefit from the planned commissions. The law firm Labaton, which specializes in class action lawsuits, claimed that this was an obligation of the New York Bar.

   Mr. Sillam learned many years later that this requirement was in fact contrary to the professional rules of the New York Bar.

   It was under these conditions that Jean Marc Descoubès, a Paris attorney, was chosen to represent Mr. Sillam.

7. On February 21, 2006, Labaton sent a letter signed by Mr. Christopher Keller to Mr. Descoubès, attorney at law, which constituted a Bare referral agreement [*contrat de recommandation directe]*, with a copy to Mr. Sillam.

It is intended that Mr. Descoubès would receive a commission if Labaton was Lead Counsel (**Exhibit No.1**).

Labaton then proposed and then drafted another agreement called the "Consulting Agreement" signed on April 25, 2006 directly with Mr. Sillam, in order to facilitate the representation of foreign investors (**Exhibit No. 2**).

Specifically, Mr. Sillam was to benefit from:

- a commission of US$30,000 if he signed a contract for a portfolio of securities invested in the U.S. markets representing at least US$2 billion in assets;

- a commission set in proportion to the sums in dispute in the event of the signature of a contract relating to a portfolio of securities invested in the U.S. markets representing between $1 and $2 billion in assets;

- a commission of US$15,000 for signing a contract relating to a portfolio of securities invested in the U.S. markets representing at least US$1 billion in assets.

The agreement also provided for an additional fee if the contributed client became a "lead plaintiff" in a U.S. class action; in such a case, if Labaton was named "lead counsel" in the U.S. class action, Mr. Sillam would receive US$65,000, and only US$30,000 if Labaton was named "co-lead counsel".

In addition, the agreement provided for non-refundable monthly advances of an initial amount of US$6,000, which was later increased to US$7,500, as well as the reimbursement of certain professional expenses upon production of receipts.

Finally, the agreement provided for the payment by Labaton of a 15% referral fee [*commission* ] on all sums received by it for representing or advising clients introduced by Mr. Sillam without any time limit.

8. One year later, on March 1, 2007, an exchange of e-mails between Mr. Sillam and Labaton's lawyers confirmed that the former had brought to the latter a pool of institutional clients for group shares. Mr. Sillam exchanged several times with Mr. Eric Belfi: *"This deal was based on the fees Labaton Sucharow will get: 15% for me and 5% for him on RDS case, and 12.5% for me and 7.5% for him for litigations regarding other cases. I accepted this. Is it ok? Can I know that now?"*.

The Président of Labaton Law Firm, Mr. Sucharow expressly acknowledged the real nature of the agreements on the commissions dues to Mr. Sillam, on the same day : « *You have the complete right to insist on your full (referral) fee* », with copy sent to Mr. Keller and  Mr. Eric Belfi, (**Exhibit No. 3**).

9. Within the framework of these agreements, Mr. Sillam organized in several countries a large number of interviews between Labaton and prospects such as:

- AXA INVESTMENT MANAGERS (AXA-IM)
- IXIS ASSET MANAGEMENT later renamed NATIXIS GLOBAL ASSET MANAGEMENT
- CREDIT AGRICOLE S.A.
- CREDIT AGRICOLE ASSET MANAGEMENT (CAAM)
- BNPPARIBAS ASSET MANAGEMENT
- SOCIETE GENERALE ASSET MANAGEMENT (SGAM)
- AGF ASSET MANAGEMENT renamed ALLIANZ GLOBAL INVESTORS France
- ALLIANZ SE
- LA BANQUE POSTALE ASSET MANAGEMENT (LBPAM)
- CM-CIC ASSET MANAGEMENT
- CM-CIC GESTION
- AGIRC-ARCCO (Caisses de Retraites complémentaires françaises)
- KBC ASSET MANAGEMENT
- FORTIS INVESTMENTS
- PETERCAM
- BANK DELEN
- BANK DEGROOF
- DEXIA ASSET MANAGEMENT (DEXIA-AM)
- ING INVESTMENT MANAGEMENT
- GRUPPO BBVA
- BBVA GESTION
- PENSPLAN INVEST SGR
- EURIZON CAPITAL S.A.
- EURIZON CAPITAL SGR SpA.
- SANPAOLO AM LUX
- SANPAOLO IMI ASSET MANAGEMENT
- GROUPAMA ASSET MANAGEMENT
- MMA FINANCE
- BANQUE DE Luxembourg
- CPR ASSET MANAGEMENT
- HSBC France
- VP BANK.

The total amount managed by all these companies directly or through their collective investment funds was more than 5,000 billion euros of assets.

Mr. Sillam also organised conferences in the interest of the Labaton firm by organising media coverage in the daily newspaper Les Echos, in which he was presented as the representative for Europe of the Labaton firm (**Exhibit No 4**).

10. On June 11, 2008, Mr. Descoubès' rights were then transferred to Mr. Aldric Saulnier, Attorney at Law in Paris, who was also unaware of the ethical rules of the New York Bar, which Labaton had been careful not to bring to his attention, as it had done previously (**Exhibit No 5**).

11. In 2009, a dispute arose between Mr. Sillam and the law firm Labaton, which did not pay the commissions provided for, concerning a commission due in connection with a Vivendi case, in addition to a dispute as to the duration of the 2006 contract.

12. On December 30, 2009, Labaton proposed an out-of-court settlement by which Mr. Sillam abandoned his lawsuit against payment of US$400,000, but the 30% commission provided for in the Vivendi case was renewed for a period limited to 5 years, in addition to a 15% commission calculated on all amounts invoiced by Labaton to the clients presented and for any reason whatsoever (**Exhibits No. 6 and 7**).

On December 31, 2009, Labaton obtained Mr. Saulnier's signature to the same agreement.

Labaton recognized that it had thus been able, exclusively thanks to Mr. Sillam, to create professional relationships with a first-rate French and international institutional clientele, since it manages investment funds (Organismes de Placements Collectifs en Valeurs Mobilières, known as "OPCVM") that are among the largest in the world due to the size of the sums under management.

In addition, under the terms of this settlement agreement, Labaton was required to describe exhaustively, in semi-annual sworn affidavits, all amounts received, date by date, and relating to all these authorized activities (and to communicate all detailed information and documents such as, among others, all copies of contracts with clients entered into, invoices issued by Labaton and methods of calculation); and this, before the legal proceedings, during the legal proceedings **and especially after** the legal proceedings.

In the case of representation of a post-litigation clientele, claim administrators are responsible for distributing among all the members of the class action, the result obtained, following a class action settlement, which is the most common case, or a court decision that has become final. The collection of compensation marks the end of the **legal proceedings**.

In addition, the 15% commission would be increased to 30% in the event of inaccuracy or absence of at least 2 out of 12 consecutive half-yearly sworn affidavits, or in the event of imperfect or incomplete communication on the detailed activity of Labaton in relation to the clients presented and on the invoicing of fees of any kind.

13. For nearly 6 years, Labaton produced sworn statements indicating that he had not been solicited by any of the clients brought in; no new commission was paid to Mr. Sillam.

This is how on January 21, 2011, June 9, 2011, February 14, 2012, July 16, 2013, and July 8, 2015, Labaton Sucharow provided no less than five affidavits indicating that *"since the signing of the agreement (December 30, 2009) Labaton Sucharow has not received any provisions from potential clients"* (**Exhibits No 8 to 12**).

To each certificate was attached, on a single typed page, the list of customers presented by Mr. Sillam.

Another Labaton partner, Mr. Michael W Stocker, wrote to Mr. Sillam in an e-mail dated July 29, 2015 in the following terms:

*"Dear Gerard:*

*I am a partner and legal counsel of Labaton Sucharow LLP. Your e-mail of July 22 to our president, Lawrence Sucharow, was sent to me for investigation and response. I have investigated your allegations and have determined, based on the facts below, that they are without merit.*

*The facts are as follows:*

*1.     Keller's affidavit dated July 8, 2015, which covers the five-year period following the December 31, 2009 comprehensive settlement agreement, is accurate in all respects.*

*2.     None of the clients listed in Exhibit 1 to the Global Settlement Agreement is a client that we represent in the Vivendi European Case.*

*3.     The Vivendi case in the United States is closed (dismissed on Morrison-related grounds) for all of our clients. The clients we represented have not received any recoveries, and we have not received any fees or even reimbursement of our costs.*

*Please share this factual information with Maître Saulnier, as we do not have his contact information, and let me know if you have any other concerns.*

*Michael Stocker"*, (**Exhibit No 14**).

14. On August 17, 2015, Labaton decided to terminate the contract by signing a universal waiver agreement with Mr. Sillam and renouncing any new commission or reciprocal action.

This agreement provided for the payment of a lump-sum final payment of US$99,999.99 in consideration of Mr. Sillam's waiver of any claim or action (**Exhibit No 15**).

9

15. Two years later, in 2017, Mr. Sillam discovered through his professional network that several of the clients he had introduced to Labaton had, in fact, entrusted the defense of their interests to him before December 30, 2009, without Mr. Sillam being informed of this fact or paying the related commissions (**Exhibits No 16 to 21**).

Thus, for several years, the law firm Labaton had drawn up false attestations to the detriment of Mr. Sillam in order not to pay him the contractual commissions to which he was entitled, before finally making him agree to a deed in his defense by signing with him a voluntarily reduced memorandum of understanding.

The stratagem consisted in producing a final original summary certificate addressed directly to Paris, to the office of Mr. Saulnier by use of the carrier FEDEX, dated July 8, 2015, with the obvious purpose of determining Mr. Saulnier and Mr. Sillam to sign the contract operating discharge of August 17, 2015 in return for the sum unilaterally set at $99,999.99, (**Exhibits No 13 and 15**).

These facts, constituting forgery and fraud, thus caused considerable harm to Mr. Saulnier and Mr. Sillam, which must now be repaired.

## II. Discussion

### A) The fraud committed by Messrs. Keller, Sucharow, Belfi, Canty, Stocker and the Labaton firm

Under the terms of article 313-1 of the French Penal Code: *"Fraud is the fact, either by the use of a false name or a false quality, or by the abuse of a true quality, or by the use of fraudulent maneuvers, to deceive a natural or legal person and thus to determine it, to its prejudice or to the prejudice of a third party, to hand over funds, securities or any property, to provide a service or to consent to an act operating obligation or discharge".*

It is punishable by five years' imprisonment and a fine of €375,000.

The constituent elements of fraud by abuse of a true quality are, in this matter, perfectly characterized.

A.1 - On the abuse of true quality on the part of Christopher Keller, Lawrence Sucharow
and the Labaton law firm

Professional skills, experience and reputation are some of the elements that give confidence to any interlocutor.

Furthermore, the profession of Lawyer implies knowing the law, designing, reading and rereading any legal act that he or she drafts, which will have a determining role in the crime.

In a decision of October 11, 2006, the criminal division of the Court of Cassation was able to judge:

*"It is thus by abusing his capacity as a lawyer and by employing the fraudulent maneuvers described above that Gracia X... participated, with full knowledge of the facts, in the commission of the offense;*

10

*that it is by a fair assessment of the facts that the court rightly retained the defendant in the links of prevention by considering that both the material and the intentional element of the offence of fraud in an organized gang was constituted in her regard"*, Appeal [*Pourvoi*] No. 05-87713, (**Exhibit No 34**).

Founded in 1963, Labaton, located at 100 Park Avenue in New York City, offers litigation services in the Securities and Class Action areas.

Two meetings were held in November 2005 between Mr. Sillam and Mark Arisohn and Christopher J. Keller, partners of Labaton, followed by a meeting with Ms. Jennifer Tetefsky, Labaton's Director of Business Development, which led to the signing of two contracts on February 21 and April 25, 2006.

Mr. Keller insisted that a lawyer must represent Mr. Sillam in order for him to benefit from the agreed commissions.

It was only later that Mr. Sillam learned that the New York Bar did not require this requirement, which gave a stamp of legal and ethical authenticity to agreements prepared and drafted by the Labaton law firm.

In this way, Mr. Keller and the Labaton law firm signed with a colleague, while in fact working with Mr. Sillam, the recipient of all e-mails and contracts, but without any intention of paying him future commissions, or to the referring attorney.

A.2. - <u>On the fraudulent schemes implemented by Christopher Keller, Lawrence Sucharow and the Labaton law firm</u>

It is legally constant that the material element of the fraud is characterized by maneuvers aimed at deceiving the victim in order to force him to consent to an act operating obligation or discharge.

The material element of the offence can thus result from a positive act, a machination, a staging or any technique intended to deceive others.

The same applies to the production of written documents, since their purpose is to support the lie by confirming it; the written word then corroborates the lie, gives it substance and gives it an appearance of reality.

In this case, after the signature of the first agreement on December 30, 2009, which already concerned an initial deception by Labaton, which then, through the intermediary of Mr. Christopher Keller, drew up five certificates all stating that none of the recommended clients had entrusted the defense of their interests to the firm (**Exhibits No. 8, 9, 10, 11 and 12**).

It is moreover constant that, in contravention of the terms of the December 30, 2009 agreement, Labaton did not produce the certificate relating to its activity prior to December 30, 2009, even though some of the clients certified that Labaton represented them for the filing of claims with the Proofs of Claims with the Claims Administrator designated by the U.S. federal courts. This again materializes the fraudulent intent at the signing of the said contract.

11

It is remarkable to be able to underline from the outset, as an element of context, the dishonest intention of Labaton, characterized in a staggering manner on the occasion of its position on the non-competition clause referred to in the agreements of December 30, 2009, and concerning the prohibition accepted by Labaton not to represent for five years Crédit Agricole or its affiliates when filing proofs of claims (activity known as "post-litigation"). It is in fact constant and obvious that this prohibition did not give Labaton any right to exempt itself from paying the civil parties the commissions due as a result of the fees received.

The stakes are high for the defendants because it is nothing less than trying to make people believe that although they are seasoned international lawyers of the highest level, they do not distinguish between a simple non-competition clause and a waiver by Mr. Saulnier and Mr. Sillam of commission on clients not concerned by it, by the production of 5 successive false assessments over several years!

This level of attempt to conceal crimes is rarely equalled in relations between colleagues, and will not prosper because it cannot deceive the religion of the court.

It constitutes the first concealment of the firm Labaton and its partners including Mr. Michael Canty who expressed them in writing

The second concealment is an attempt to prohibit Mr. Sillam and Mr. Saulnier from bringing the evidence obtained from Michael Canty to trial by signing a worldwide confidentiality agreement in 2019. Mr. Sillam and Mr. Saulnier refused to do so.

In fact, Michael Canty, legal counsel for Labaton, wrote to Sher Tremonte, the U.S. attorney for the plaintiffs, in 2019:

*"As you know, our position remains that these payments are not due to your customers, as the wording of the agreements (of December 2009) explicitly allows Labaton to provide the "proof of claims" service. Labaton is at all times free to undertake and provide assistance at any time with respect to the processing of claims or the filing of claims on behalf of any company - with the exception of Crédit Agricole".*

Under the terms of the same agreements, Labaton was free to provide legal advice and to represent in court the Crédit Agricole companies and their OPCVM funds, as well as all other companies and OPCVM funds introduced by Messrs. Sillam and Saulnier; without being able to discharge its obligations to them.

There was obviously no reason why Labaton should be more "free" not to pay commissions for post-trial activities (filing of proofs of claims) than for representations at trial, especially since it would have had to pay these commissions on the representations of Crédit Agricole during possible representations at trial if they had taken place.

Moreover, this obligation of payment and communication of information by the related half-yearly certificates of honor was explicitly recalled in the deed of December 30, 2009: *"Labaton will provide subsequent verifiable documents to be attached for each instance in which Labaton has been retained by the Potential Client (pre-* **or post-litigation***) representation, c.f. page 4, paragraph C.1* (**Exhibit No. 6**).

In a class action, the post-successful activity after the court proceedings is the filing of claims with the Claims Administrator appointed by the Court, who will then distribute the compensation funds among the class members, i.e., the victims, in proportion to their losses.

It should be emphasized that the status of lawyer is not mandatory to assist a victim in this "post litigation" process, which is an administrative procedure, so that an argument that would try to exude the absence of Mr. Sillam's status as a lawyer to prevent him from collecting his commissions would be totally inoperative and doomed to failure.

It is established that the five attorneys' certificates produced by the law firm Labaton misrepresent the reality insofar as it intervened in several litigations involving clients brought by Mr. Sillam after 2009.

For example:

- Labaton assisted KBC Asset Management NV in Jimmy Elias Karam v. Corinthian Colleges, Inc. et al. 10-CV-6523 (C.D. Cal.) and Hatamian et al. v. Advanced Micro Devices 14-CV-00226 (**Exhibits No. 17 and 18**);

- the firm Labaton assisted KBC Asset Management NV in the In re Weight Watchers Int'l, Inc. Sec. Litigation, No. 14-CV-01997 (S.D.N.Y.), (**Exhibit No. 19**)

- Labaton assisted KBC Asset Management NV in the City of Warwick Municipal Employees Pension Fund et al. v. Rackspace Hosting, Inc. No. 17-CV-03501, (**Exhibit No. 20**);

Furthermore, in a (non-confidential) exchange between Mr. Sillam's U.S. counsel and Labaton on May 16, 2019, Labaton acknowledged having: *"filed claims"* and *"received payment"* from *"institutions listed in the contract between Labaton and* (Mr. Sillam and Mr. Saulnier)", namely (**Exhibit No. 27**):

- AXA Investment Managers
- Crédit Agricole Management
- PeterCam S.A.
- Banque Degroof
- Eurizon Capital SGR S.P.A.

However, all these companies appear in the list of customers allegedly not affected by Labaton, as provided by Mr. Keller, attorney at law (**Exhibits No. 8, 9, 10, 11 and 12**).

Moreover, in an exchange held on the same day between these same persons, Labaton transmitted a summary table of the customers brought in with the details of the "payments" received in this respect (**Exhibit No. 28**).

It can be seen that:

- Labaton assisted AXA Investment Managers in 25 proceedings for **US$657,311.03** received;
- Labaton assisted Bank Degroof in 58 proceedings for **US$ 752,582.00** received;
- Labaton assisted Eurizon Capital SGR S.P.A. in 7 proceedings for **US$ 41,005.18** received;
- Labaton assisted PeterCam in 30 proceedings for **US$11,294.31** received.

This table also shows that Labaton has twice assisted BNP Paribas Asset Management, which is also listed among the clients contributed under the 2006 agreements.

> Labaton, law firm, Mr. Sucharow and Mr. Keller therefore issued false attestations, stating that they had not received or retained any fees from the clients thus brought by Mr. Sillam, even though they knew full well that the firm was simultaneously defending the interests of these same clients before the American courts and that it had received colossal sums in this respect.

Mr. Sillam and Mr. Saulnier had absolutely no means of discovering the fraud, nor of independently establishing the veracity of the attestations of honor established under penalty of perjury, by lawyers.

The abuse of true quality was thus characterized by the fact that the signatory of the false attestations was a lawyer, in this case Mr. Sucharow and Mr. Keller.

It is important to note that in 2019, Mr. Michael Canty and the Labaton law firm will then try to prevent Mr. Sillam and Mr. Saulnier from producing these documents by having them sign, via their American attorney, a worldwide commitment to refrain from producing this evidence in court. Labaton's goal was to "monetize" the production of the documents demonstrating its fraud within the framework of a last-minute attempt at an amicable solution, in exchange for Mr. Sillam's silence on these actions. The civil parties will refuse this offer of active corruption and explicit astute criminality, intended solely to conceal the fraudulent actions of the Labaton firm. They will terminate the mandate of their American attorney, who had transmitted this offer (**Exhibit No. 29**).

This was an attempt to conceal the fraud.

The Labaton law firm seems to be accustomed to this kind of maneuver, since it has been implicated in the United States in a case of secret accounting and over-invoicing of clients, with the payment of a secret commission of more than 4 million dollars along with a

deception of the Federal Court of Boston, which has been verified and documented (**Exhibits No. 21, 22 and 32**).

In this case, Labaton was ordered to pay several million dollars for federal investigations and recently to reimburse its clients fifteen million US dollars.

It should be noted that this sentence was pronounced on the basis of false sworn affidavits signed by Messrs. Sucharow, Keller, Belfi, and Canty which had been produced before the court.

Labaton was also referred by U.S. Federal Judge Mark L. Wolf to disciplinary proceedings for professional sanctions (**Exhibit No. 32**).


### The agreements of February 21, 2006 and April 25, 2006

The Labaton law firm has in fact established 7 other statements under penalty of perjury which now prove to be false in light of the agreements signed in 2006 with Mr. Descoubès and Mr. Sillam.

In the context of another U.S. federal investigation, Labaton law firm produced in court another false sworn statement signed by 7 different witnesses, due to an investigation seriously threatening the continuation of its activity, and of which the following is an extract:

*"...I am not aware of any simple referral agreement between the firm and any law firm or attorney regarding any matter currently or previously pursued by Labaton Sucharow. I understand that a mere referral agreement means an agreement, written or unwritten, under which Labaton Sucharow would share fees with a lawyer or law firm solely because they assisted Labaton Sucharow in obtaining clients".*

However, the 2006 agreement between Labaton and Mr. Descoubès was purely and simply a *Bare Referral Agreement*; Labaton advised and assisted clients brought in as early as 2006, including the Vivendi case and in numerous claims filed with court administrators.

There was no obligation under the 2006 agreements for Mr. Descoubès, an attorney from a French Bar Association, to work on the U.S. cases of clients brought to Labaton and assigned to the firm; he has never done so.

Labaton was required to share fees with another law firm only if the latter assisted it in obtaining clients, which represented a large portion of European equity asset management.

The attorneys who signed these attestations, at least three of whom were actors in this agreement or its extensions, knew this and the attestations on their honor were therefore knowingly false.

Moreover, the 2006 Bare Referral Agreement signed with Mr. Descoubès was perfectly valid until December 29, 2009, i.e. the day before the signature of the agreement of December 31, 2009, which provided for effective work by Mr. Saulnier, who had taken over Mr. Descoubès' commission rights.

The exchanges by e-mail in 2007 between Mr. Lawrence Sucharow and Mr. Eric Belfi on the one hand, and Mr. Gérard Sillam on the other hand are explicit as to the strict nature of the "Bare Referral Agreement", i.e. a simple and only recommendation. Mr. Christopher Keller was provided with a copy of all of these exchanges and therefore cannot claim to be unaware that they constitute the flagrant confirmation in 2007 of the Bare Referral Agreement entered into in 2006 with Mr. Descoubès, which was moreover finalized, proposed, negotiated, drafted, transmitted and signed by Mr. Keller himself.

However, Mr. Keller's certificate, like those of Mr. Belfi and Mr. Sucharow, explicitly state the contrary.

This Bare Referral Agreement, which was valid as such at least in 2006, 2007, 2008 and 2009, demonstrates the falsity of the seven attestations signed by seven partners, all of which were filed with the Federal Court in Boston by Labaton, which expected to lie and deceive him in order to avoid heavy penalties that could be fatal to the firm's business.

This maneuver worked because Labaton and the defendants believed they were "covered" by the confidential arbitration clause in the 2009 agreements. They seem unaware that this arbitration clause is not an obstacle to a criminal action in France.

This is the psychological element of the very serious offence of perjury in the United States. In addition, the offence of "fraud upon the Court" was also committed, i.e. the deception of the court by defrauding the judgment.

It is clear that such actions in court demonstrate the incredible sense of impunity that animated the defendants. Consequently, the production of false attestations to Mr. Saulnier and Mr. Sillam did not seem exceptional.

Labaton did not pay the commissions due on the fees it received when the proofs of claim were filed in 2006, 2007, 2008 and 2009 to Mr. Sillam or Mr. Descoubès, nor to his successor Mr. Saulnier by virtue of this Bare Referral Agreement, with notification accepted by Labaton of the assignment of the commission rights as it results from the signature of all parties to the December 30, 2009 agreements.

**Assessments of Mr. Christopher Keller, Lawyer at Labaton, from 2011 to 2015**

To be punishable, the fraudulent maneuvers must then be carried out prior to or concomitant with the act desired by the perpetrator (Cass. Crim. 31 October 1963, D.1964.42).

It must be noted that this is the case here, since the successive attestations of Mr. Keller, and in particular that of July 8, 2015, were only a prelude to the signature, on August 17, 2015, of the act of renunciation and discharge granted by Mr. Sillam and Mr. Saulnier (**Exhibit No. 15**).

These attestations, which we now know to be totally false, led Mr. Sillam to renounce the contractual commissions to which he was entitled, and thus to grant a discharge, based on the erroneous belief that his clients had never used the services of the Labaton law firm.

The defendants could not therefore contest the manoeuvre insofar as the latter, again customary in this case, voluntarily denied their relations with Mr. Sillam's clients with the sole and unique aim of evading the contractual commissions they knew they owed him.

By way of background, it should be noted that a civil summons was issued to Labaton at the request of one of its former attorneys following a commitment of commissions not respected by Labaton after having been signed by Mr. Keller, and for considerable amounts. Labaton had then argued in court that Mr. Keller was not a partner of the firm at the time he signed it, thus not committing him! The parties then settled and Labaton had compensated the plaintiff before the end of the legal proceedings (**Exhibit No. 33**).

On this second count, the numerous fraudulent manoeuvres discovered in 2017, a material element of the offence is perfectly characterized.

A.3.   On the deed granting discharge by Mr. Sillam and Mr. Saulnier

In order to be punishable, the fraudulent manoeuvres must then be used with the aim of provoking the handing over of a thing or the obtaining of an operative act of obligation or discharge.

Such an act being understood as creating or extinguishing a right to the benefit of the perpetrator and to the detriment of the victim. (Crim. 3 May 2001, Appeal No. 00-85612)

In this case, the agreement signed on August 17, 2015 allowed Labaton to terminate its collaboration with Mr. Sillam at a lower cost, by totally evading its right to a commission for the sum of US$99,999.99, which is modest in view of the interest in dispute.

This agreement [legally it is not a transaction when one reads the preamble, 2nd line] relieves the firm Labaton of any obligation to Mr. Sillam and Mr. Saulnier and prohibits the latter from taking any legal action or pursuing the recovery of his commissions.

It is therefore an extinctive act of law conceived, drafted and proposed by the Labaton law firm to the detriment of Mr. Sillam and Mr. Saulnier.

On this third count, the material element of the offence is perfectly characterized.

A.4. <u>On the guilty intention of Messrs. Keller and Sucharow and the law firm Labaton</u>

The moral element of fraud then presupposes an intention on the part of the perpetrator, characterized by his or her desire to obtain something or a right belonging to the victim; it is assessed sovereignly by the judges on the merits (Cass. Crim. 10 October 1977, Bull. crim. n° 298).

In this case, it is difficult to see what would have led the Labaton law firm to deliberately conceal from Mr. Sillam, in violation of the agreements entered into, the relations maintained with its clients, apart from wanting to evade his right to commission and to obtain his waiver of any proceedings against him on this account.

In fact, the contract signed between the parties was precisely intended to bring Mr. Sillam's client portfolio into contact with the Labaton law firm; it was therefore only for the exclusive benefit of Mr. Sillam that the said law firm produced the disputed attestations in order to obtain a transaction which it knew to be totally unfair and unrepresentative of the rights in dispute.

It is particularly interesting to note that after having led Mr. Sillam to believe that none of his clients had contacted him, Labaton nevertheless wished to terminate their relationship in return for the non-negligible sum of $99,999.99.

The firm knew that it owed Mr. Sillam at least that amount.

Either none of Mr. Sillam's clients actually contacted Labaton, in which case the right to commission is null and void and the agreement should have ended automatically without compensation, or his clients actually contacted the firm and the amount paid as a transaction can only be explained by Labaton's willingness to offer Mr. Sillam a "bone to gnaw".

Labaton's intention seems clear and consisted solely in deceiving Mr. Sillam as to the extent of his right to a commission in order to get out of their agreement at a lower cost and to ask him to waive any subsequent request for payment.

The moral element of the offence is thus, here again, perfectly characterized.

A.5. <u>The criminal association between Messrs Keller and Sucharow and Labaton law firm</u>

Article 450-1 of the French Penal Code provides: *"1. an association de malfaiteurs is any group formed or agreement established for the purpose of preparing, characterized by one or more material facts, one or more crimes or one or more misdemeanors punishable by at least five years' imprisonment. 3. When the prepared offences are crimes punishable by at least five years' imprisonment, participation in a criminal association is punishable by five years' imprisonment and a fine of 75,000 euros".*

18

(Cass. Crim., June 12, 2019, Bull.crim., No. 108 , for a lawyer who had repeatedly sought *"to obtain a different testimony from Mr. S..., not with regard to the truth but with regard to the sole interest of Mr. F..., completely ignoring what the truth could be, and this situation corresponds to the notion of a false statement"* ).

The intention and preparation to commit the offences by the defendants is proven.


A.6.   The loss suffered, as a result, by Mr. Sillam

Finally, fraud presupposes the demonstration of a prejudice, which jurisprudence considers to be established when the thing obtained or the right granted was not freely consented to but extorted by fraudulent means (Cass. Crim. 28 Jan. 2015, no. 13-86.772).

In the present case, it has been previously demonstrated that the consent of Mr. Saulnier and Mr. Sillam to the 2015 transaction was indeed extorted by fraudulent means set up by the law firm Labaton over a period of several years.

Mr. Sillam's waiver of the contractual commissions to which he is entitled has had particularly significant financial consequences since these commissions ranged from 15 to 30% for litigation involving investment funds managing, for the most part, tens or hundreds of billions of euros in assets, these litigation or class actions involving claims of up to hundreds of millions of euros for some of them with a proportional fee for Labaton.

The fraud is therefore perfectly characterized and the prejudice suffered by Mr. Saulnier and Mr. Sillam will be explained at the end of the proceedings.


**B)   Forgery and the use of forgeries committed by Messrs. Keller, Sucharow and Labaton firm**

In addition to the qualification of swindle, the Court will enter in the process of condemnation against the defendants, and will note that they committed several forgeries and that they made use of it.


B.1.   About the false attestations produced by Mr. Christopher Keller. Michael Stocker and the law firm Labaton

According to article 441-1 of the French Penal Code: *"constitutes a forgery any fraudulent alteration of the truth, of such a nature as to cause prejudice and carried out by any means whatsoever, in writing or any other medium of expression of thought which has as its object or may have the effect of establishing proof of a right or a fact having legal consequences".*

Forgery and the use of forgeries are punishable by three years' imprisonment and a fine of 45,000 euros.

Forgery requires the combination of (i) a medium that does not conform to the truth with the aim of proving a right or fact with legal consequences and (ii) the demonstration of actual or potential prejudice.

(i) The written medium is thus understood in its broadest sense as *"any handwritten document"* or any *"printed document"* (Cass. Crim., March 22, 2006, No. 05-83.078; Cass. Crim., May 3, 1901, Bull.crim., No. 140).

This support must, moreover, have a probative value by nature or by destination.

Finally, forgery and the use of forgeries presuppose that harm, actual or potential, is caused to others by the altered document (Cass. Crim., Sept. 6, 2011, no. 10-86.183) and the guilty intention here results sufficiently, whatever the motive of the author, from his or her awareness of having altered the truth in a document likely to establish proof of a right or a fact with legal consequences" (Cass. Crim., May 3, 1995, Gaz. Pal. 1995. 2. Chron. 437).

For an attorney convicted of false attestations and use (Cass. Crim., 6 June 2011, No. 10-85340) and by the judicial judge in matters of settlement, Civ 1, 8 Jan. 2020, No. 16-21.151).

In this case, the attestations drawn up from 2011 to 2015, *"sanctioned by perjury in the United States"* by Mr. Keller were precisely intended to establish the absence of work for the clients presented, the absence of related fees and therefore the absence of any obligation on the part of Labaton to pay the commissions owed to Mr. Sillam.

There is no doubt about the author of the certificates, drawn up and signed by Mr. Keller, sent by e-mail as soon as they were drawn up to the Alfonso Law Firm and to Mr. Saulnier for the last one.

They were provided for in the 2009 contract and had, by their nature, a probative value.

(ii) The resulting damage is then material and moral since Mr. Sillam was unable to enforce his contract and assert his commission rights.

Mr. Keller and Mr. Stocker knowingly issued and sent these false attestations and declarations when they knew full well, in their capacity as partners of the Labaton law firm, that the latter represented the interests of the clients.

For his part, Mr. Sucharow ordered the July 2015 summary certificate to be sent directly to Mr. Saulnier's firm in Paris, France.

The forgery is therefore perfectly constituted.


B.2.   <u>On the use of false attestations produced by Mr. Christopher Keller and the Labaton firm</u>


The use of forgeries implies the existence of a forgery and its use with full knowledge of the facts.

In this case, Mr. Keller, with the complicity of Mr. Lawrence Sucharow, signed the litigious attestations in his capacity as a partner of the law firm Labaton with the sole and unique purpose of transmitting them to Mr. Sillam and Mr. Saulnier in order to avoid honoring their pecuniary commitments.

These attestations were sent by Fedex to Maître Saulnier or by e-mail to their counsel, Maître George Alfonso.

The use of forgeries is therefore, once again, perfectly constituted.

### C) Aggravating circumstance, an organized gang

According to article 132-71 of the French Penal Code, *"An organized gang within the meaning of the law consists of any group formed or any agreement established with a view to the preparation, characterized by one or more material facts, of one or more offences. »*

For attorneys prosecuted for organized crime (Cass. Crim, December 17, 2013, Bull.crim., No. 259 and Cass. Crim, January 8, 1997, No. 96-84922)

It appears from the facts and documents that Messrs Keller, Stocker and Sucharow, as well as the law firm Labaton, acted as an organized gang, which is an aggravating circumstance of the crime. Mr. Eric Belfi's participation in the exchanges by e-mail on March 1, 2007 should also be seen.

### D)   On the application of French criminal law and the absence of prescription

D.1. - According to article 113-2 of the French Penal Code*: "French penal law is applicable to offences committed on the territory of the Republic. An offense is deemed to have been committed on the territory of the Republic when one of its constituent acts has taken place on that territory".*

According to article 113-7 of the same Code: *"French criminal law is applicable to any crime, as well as to any offense punishable by imprisonment, committed by a French person or a foreigner outside the territory of the Republic when the victim is of French nationality at the time of the offense."*

The French Court of Cassation has confirmed the jurisdiction of French criminal law for :

- '*concealment committed in the United Kingdom and fraud committed in France, of which they are only a result and from which it is impossible to separate them'* (Crim., 9 December 1933, Bull. crim. 1933, no. 237);
- '*facts linked together in such a way that the existence of one could not be understood without the existence of the others, and forming an indivisible whole'* (Crim., 20 February 1980, Appeal No. 79-90.347, Bull. crim. 1980, No. 068);
- '*offences committed abroad by a foreigner, forming an indivisible whole with acts of criminal conspiracy committed in France, [...] and in respect of which the French court has jurisdiction'*, Criminal Court, 23 April 1981, Appeal No. 79-90.346, Criminal Court Report 1981, No. 116; and Criminal Court, 27 October 2004, Appeal No. 04-85.187, Criminal Court Report 2004, No. 263 ;

- the *'offences of fraudulent habitual provision of visas [... for France] committed on Bulgarian territory, indivisible from the facts of concealment of a visa unduly obtained and use of the said visa, committed in France by a third person'*, (Crim., 15 March 2006, pourvoi no 05-83.556, Bull. crim. 2006, no 78).

It does not matter which law is provided for in the contract; for the offence to be deemed to have been committed on the territory of the Republic, it is sufficient that one of its constitutive events took place on that territory (Crim. 10 May 2007, pourvoi no.06-88.783, unpublished) *'the contract of 7 June 2000, on the occasion of which the accused embezzled the funds, was concluded and began to be executed in France, the Court of Appeal, which was not required to respond to the inoperative conclusions drawn from the fact that the agreement of 15 May 2000 was signed abroad and subject to British law, justified its decision'* (**Exhibit No. 35**).

This is a principle of public policy; French criminal law prevails over any arbitration clause, as inserted in the 2009 contract [**Exhibit No 7**], (Crim 7 March 2006_inedit, pourvoi 05-80.890, **Exhibit No. 36**).


In this case, Mr Sillam and Mr Saulnier, lawyer at the Paris bar, both of French nationality, were the direct victims of the offences committed by the defendants;

Mr Sillam's first meeting with Mr Sucharow and Mr Belfi took place in June 2006, in France, in the restaurant Noura, avenue Marceau, in Paris;

The first meeting between Mr Sillam and Mr Sucharow and Belfi took place in June 2006 in France at the Noura restaurant on Avenue Marceau in Paris;

The only meeting between Mr Keller and Belfi and Mr Descoubès took place in a café on Avenue des Champs-Elysées in Paris;

Mr Descoubès and Mr Sillam, who live in Paris, received the 2006 contracts from Labaton by Fedex/email, which they signed and returned from Paris [**Exhibit No 1**] ;

Similarly, for the December 2009 contracts that Maitre Saulnier and Mr Sillam received from Labaton, signed and returned from Paris [**Exhibits No  6 and 7**];

The rights of Maitre Descoubès were assigned to Maitre Saulnier by contract governed by French law and the French courts [contract faxed back from Maitre Saulnier's office, **Exhibit No 5**];

In addition, from France, Mr. Sillam :

- organised introductory meetings for his clients with Labaton in France; the majority of the clients introduced are listed in the annex of false certificates [**Exhibits 8 to 12**] ;

- organised, under the aegis of the newspaper Les Echos, conferences that were ALL held in France (**Exhibit 4**).

All communications (telephone calls, emails) between Labaton, Messrs Keller and Sucharow were sent and received by Mr Sillam in France from his email account [sellamgerard@yahoo.fr] and from the French server, [**Exhibits No 2, 3, 12, 13, 14**];

Some Labaton's payments were made to Mr Sillam's account at the Caisse d'Epargne de Paris in France;

The clients in Mr Sillam's portfolio are French companies, for example, AGF Asset Management, HSBC France, La Banque Postale, AGIRC-ARCCO pension funds...

- All the false certificates were sent by Labaton to Mr Sillam and Mr Saulnier in Paris;

- and more particularly, the one dated 8 July 2015, sent by Labaton from its New York offices to Mr Saulnier's office in Paris via Fedex, again at Mr Saulnier's request (**Exhibit No 12**).

This sending was moreover validated by Mr Lawrence Sucharow himself, as evidenced by an exchange of emails on 8 July 2015:

*"Hello Lawrence, Maître Saulnier has asked me to ask you to send him the certificates concerning commissions over the last five years. He asks that these elements be sent to him directly by Fedex"*, to which Mr Sucharow replied on the same day "*It's done*" (**Exhibit No 13**).

- On August 14, 2015, Mr. Sillam's American correspondent and advisor sent him a draft contract in Paris for his signature and that of Maitre Saulnier ;

- On August 15, 2015, Mr. Sillam dates, signs and sends it by fax at 3:28 PM from the « *hôtel Napoléon in Paris* » to Maître Saulnier who dates, signs and returns it at 8:16 PM from his Paris office to the American correspondent. Then, Chris Keller and Michael Stocker sign the contract and Mr. Stocker date it on August, 17, 2015 (**English Exhibit No. 15 B**).

The discovery of the offences took place on 7 November 2017 in France at the offices of AXA Investment Managers in Paris-La Défense, when the Deputy General Counsel told Mr Sillam that "their UCITS had been represented by Labaton since 2006".

Mr Sillam filed a simple complaint against receipt in December 2017 with the Paris Public Prosecutor, who decided to open a preliminary investigation by the F2 section of the Paris Public Prosecutor's Office (**Exhibit No 23**).

The documents show that Labaton assisted AGF ALLIANZ, **Exhibit No 7** (indemnification by Labaton), **Exhibit No 16** (pleading of October 1, 2008), and BNP Paribas Asset Management, Paris (**Exhibit No 27**).

The facts alleged against Labaton and his associates cannot be understood or analysed without each other, and form an "indivisible whole" of the offence being prosecuted. Labaton prepared a long-term staging to be presented to Mr Sillam's clients, Labaton drafted and signed agreements providing for the payment of commissions to Mr Sillam, Labaton signed and provided a series of false certificates over five years with the sole aim of not executing the agreements concluded with Mr Sillam and Maître Saulnier.

French criminal law therefore applies in this case.

### D. 2. - **Absence of prescription**

Article 9-1 paragraph 2 of the French Code of Criminal Procedure provides that the procedural acts start a new limitation period, of a duration equal to the initial period.

And paragraph 3 of the same article postpones the starting point of the *period "to the day on which the offence appeared and was established under conditions allowing the initiation or exercise of public action".*

### D. 3. - **The starting point of the prescription**

The Criminal Chamber of the Court of Cassation has repeatedly ruled that the "statute of limitations in matters of fraud only begins to run from the last remittance, when the fraudulent manoeuvres constitute not a series of separate frauds but a single criminal operation" (Crim, March 9, 2011, Appeal No. 10-82712, unpublished; September 26, 1995, Bull. No. 288; October 23, 1978, Bull. No. 283; July 22, 1971, Bull. No. 237 with abuse of a true capacity as a notary clerk).

The maneuvers consisting in the delivery of five false attestations for "Prospective Clients" from 2011 to 2015, in order to obtain in August 2015 the signature of an agreement containing a waiver of commission rights for these "Prospective Clients" by Messrs. Saulnier and Sillam - constitute a single criminal operation and the last attestation was produced on 29, July 2015.

In addition, by its nature, a class action proceeding is resolved over several years; in the United States, Lead Counsel's final and only proportionate fees are approved by U.S. judges only at the end of the proceeding. It is only at the end of the lawsuit that the amount of the commissions - to be paid by Lead Counsel to the client provider - will be known.

In addition, the various agreements include other fees received after the trial or transaction ("post-litigation"), i.e., all proofs of claim filings. These fees are not collected until the remittance of funds, which can take up to 7 years after the end of the class action.

The prescription will only begin to run on the date of the end of the last proceeding or collection of the fees, either on the result of the trial or transaction, or after the filing of the last proof of claim, and once the Lead Counsel's fees have been approved by the judge in case of trial or transaction, <u>or the collection of the last sums relating to the filing of the proofs of claims, with the amount of the last commissions.</u>

On November 7, 2017, during a meeting held at Axa Investment Managers in La Défense, Mr. Sillam discovered the lies of the Labaton law firm.

This is why Mr. Sillam filed a complaint one month later, on December 20, 2017, with the Paris Public Prosecutor's Office (**Exhibit No. 23**).

The fraud and forgery were then confirmed to Mr. Sillam, when Labaton admitted having attended and received payment from several "potential clients" who had been brought in and were the subject of the disputed certificates (**Exhibits No. 26 and 27**).

He did so with the expectation that he could significantly reduce the amount of a settlement that would avoid prosecution as a result of the fraud discovered in 2017.

The 6-year prescription in correctional matters is therefore not acquired as of the date of this summons because several class action proceedings for "Prospective Clients" are still pending, and Labaton Law Firm will still issue fee notes to the clients presented.

To date, the amount of Mr. Saulnier's and Mr. Sillam's commissions has not yet been determined
.

The prescription for the crime of fraud by abuse of true quality, for fraudulent manoeuvres in an organized gang, will only begin to run at the end of the various lawsuits and collections of funds after the proof of claims deposits conducted by Labaton and the date of the establishment of the last commission entitlement on "Prospective Clients".

The action of Messrs. Sillam and Saulnier is therefore perfectly admissible and the Court will apply the criminal law against the defendants.

The arbitration clause contained in the agreement of 30 December 2009 cannot be invoked against Mr Sillam and Mr Saulnier as this is a criminal action; the principle is that an arbitration clause cannot validly prevent the application of criminal law, which is of public order.

The material element of the offence prosecuted here resides moreover in the transaction signed on August 17, 2015 and not in the agreement of December 30, 2009; the 2015 agreement is therefore naturally excluded from the scope of the aforementioned clause.

**E)  Losses suffered by Mr. Gérard Sillam and by Mr. Aldric Saulnier**

As previously indicated, Mr. Saulnier and Mr. Sillam suffered considerable prejudice in circumstances of exceptional gravity following the infractions committed over several years by Mr. Keller and Mr. Sucharow, as well as by the Labaton law firm.

E.1- Material loss

The assertion of the existence of the prejudice suffered necessarily resulted from the conviction of the defendant, who held that the manoeuvres in question had made it possible to obtain the subsidies within the framework of the agreements [...], and it was incumbent on him to make full reparation after ascertaining the extent of the prejudice (Cass. Criminal Court, Nov. 21, 2018, Appeal *pourvoi* No. 17-86635).

The maneuvers committed by Mr. Sucharow and Mr. Keller, partners of the Labaton law firm, in the context of the 2009 and 2015 agreements:

-   were materialized by the client tables drawn up by Labaton in the course of the proceedings, which they sent to Mr. Saulnier and Mr. Sillam in May 2019, following formal notices in December 2018,

-   demonstrate the presentation of Mr. Sillam's clients and the subsequent payment of fees to the Labaton law firm,

-   demonstrate the willingness of Messrs. Sucharow and Keller and Cabinet Labaton not to knowingly pay the contractual commissions owed to Messrs. Saulnier and Sillam.

The client lists submitted in May 2019 demonstrate the guilt of the defendants and clearly state the existence of the prejudice suffered by Mr. Saulnier and Mr. Sillam and by Mr. Saulnier.

It is incumbent on the defendants to compensate for their entire loss.

The transaction signed on August 17, 2015 has caused Mr. Saulnier and Mr. Sillam to waive the contractual commissions to which he was entitled and which vary between 15 and 30% of the sums in dispute, on disputes involving investment funds managing, for the most part, several tens or even hundreds of billions of euros in assets, several of them managing more than one thousand billion euros in assets.

For this reason, Mr. Saulnier and Mr. Sillam intend, through his American counsel, to launch a civil action in the United States of America with a complete "Discovery" procedure against the Labaton law firm in order to precisely determine the extent of its material loss in order to obtain compensation for its financial losses. They are now seeking an order that the defendants be ordered to pay an advance on the sums to be awarded to them.

This Discovery procedure, which aims to obtain all unpublished documents held by all parties involved, including in particular the claim administrators and clients in the United States, will enable Mr. Saulnier and Mr. Sillam to know the exact amount of unpaid commissions.

These are the documents that Labaton has attempted to hand over only in a truncated form and against a promise of confidentiality and a ban on production in court, an attempt that constitutes the second attempt at concealment by Mr. Canty and Labaton law firm.

As of the date of this subpoena, the client tables submitted in May 2019 show a total of US$1,008,846.54 and €41,005.18 in fees collected by Labaton.

This gives a total of US$1,053,306.42, or the consideration of €970,473,611, as of the date of the subpoena.

The amount of the commissions due to Mr. Sillam on the fees received and acknowledged in writing in 2019 by Labaton is **€uros 291,142.08.**

The other proceedings are in progress, and Labaton will receive fees set by the American judges at the end of the proceedings; it is necessary to wait for an exact calculation of the additional material damages.

Commonly accepted statistical data for U.S. class actions and the characteristics of the agreements entered into, for the total amounts under management, result in an amount of approximately €19 million of additional material damages (See consultation with Cabinet Sher, **Exhibit No. 29**).

Mr. Sillam and Mr. Saulnier are seeking a provision of **€uros 20 million** for material damages.

E.2- The moral prejudice and the personality of the defendants

Mr. Sillam and Mr. Saulnier have also suffered extremely substantial moral damage, which should be quantified at **€uros 5 million**.

Even more than the inconvenience and betrayal he suffered, Mr. Sillam's image was tarnished by the actions of the defendants, who constantly denigrated him in the eyes of his own clients and thus compromised his professional reputation.

After a flourishing career in finance, Mr. Sillam had his client portfolio "plundered" by a partner he trusted and who lied to him for nearly 10 years.

These acts were committed by officers of the court and - in organized gang - in whom Mr. Sillam had placed his trust, (Cass. Crim. 28 June 1988, No. Appeal *pourvoi* 87-81998; Cass. Crim. 9 April 2015, No. Appeal *pourvoi* 13-86112).

It has been amply demonstrated that Christopher Keller, Lawrence Sucharow, Eric Belfi, Michael Canty and Labaton Sucharow LLP acted in concert, with knowledge of the fraudulent nature of the schemes and the "common" goal pursued.

They have favoured their own interests to the detriment of their co-contractors from 2006 until May 2019.

The Court will be able to take a good reading of the decision of the Paris Court of Appeal of June 30, 2006, which ordered one of the world's leading analyst firms to compensate LVMH to the tune of €30 million for having "falsely mentioned an erroneous quality in its weekly reports" for two years.

As of the date of this citation, it is very difficult for him to practice after this considerable trauma, as he no longer manages to trust other American law firms because Labaton has deprived him of its institutional clients.

These tortious actions thus aggravated his already considerable moral damage.

The perpetrators of the torts are seasoned lawyers who abused the trust of their colleagues, Messrs. Descoubès and Saulnier, and of Mr. Sillam.

Mr. Sillam and Mr. Saulnier are seeking compensation of **€uros 5 million** for the moral prejudice.

## FOR THESE REASONS [*PAR CES MOTIFS*]

The Public Prosecutor's Office [*Ministère Public*] heard in its requisitions,

The Court is asked to:

- **DECLARE** this summons admissible and well founded [*recevable et bien fondée la présente citation*], and French Criminal Law applicable;

**As a result,**

- **TO FIND AND JUDGE** Mr. Christopher Keller, Mr. Lawrence Sucharow, Mr. Eric Belfi, Mr. Michael W. Stocker, Mr. Michael Canty and the law firm Labaton Sucharow LLP guilty of having in New York, in Paris, in any case on the French national territory and since time not prescribed, between January 21, 2011 and August 17, 2015, committed an organized fraud to the prejudice of Mr. Gérard Sillam and Mr. Aldric Saulnier, in this case by abuse of their true capacity as a lawyer, by using a series of manoeuvres, by issuing false attestations with the aim, on the one hand, of frustrating the contractual commitments binding them to Mr. Sillam and Mr. Saulnier and, on the other hand, of leading the latters to renounce the agreements entered into and the contractual commissions;

Adding to this, the existence of a criminal association between Messrs. Keller, Stocker, Sucharow, Belfi, and the law firm Labaton, an aggravating circumstance;

- **TO FIND AND JUDGE** Mr. Christopher Keller, Mr. Lawrence Sucharow, Mr. Eric Belfi, Mr. Michael W. Stocker, Mr. Michael Canty, and the law firm Labaton Sucharow LLP guilty of having in New York, in Paris, in any case on the French national territory and since time not prescribed, between January 21, 2011 and August 17, 2015, committed acts of forgery and uses of forgery to the prejudice, again, of Messrs. Gérard Sillam and Aldric Saulnier, in this case, by issuing and using false attestations in order to escape their contractual obligations and to lead Messrs. Sillam and Saulnier to renounce the agreements concluded and in particular the contractual commissions provided for;

- **TO APPLY THE FRENCH CRIMINAL LAW TO THEM**


**And as a result,**

- **DECLARE** that the Plaintiffs Mr. Gérard Sillam and Mr. Aldric Saulnier [constitutions de parties civiles ] are admissible and well founded;

- **CONDEMN** Christopher Keller, Lawrence Sucharow, Eric Belfi, Michael Canty, Michael W. Stocker and Labaton Sucharow LLP jointly and severally to pay Mr. Gérard Sillam and Mr. Aldric Saulnier the provisional sum of euros 20 million for their material loss, on the basis of the customer tables submitted by Labaton in 2019;

- **CONDEMN** jointly and severally Christopher Keller, Lawrence Sucharow, Eric Belfi, Michael Canty, Michael W. Stocker and Labaton Sucharow LLP to pay Mr. Gérard Sillam and Mr. Aldric Saulnier the sum of  euros 5 million for their moral prejudice;

- **CONDEMN** Christopher Keller, Lawrence Sucharow, Eric Belfi, Michael Canty, Michael W. Stocker and Labaton Sucharow LLP jointly and severally to pay Mr. Gérard Sillam and Mr. Aldric Saulnier the sum of euros 15,000 pursuant to Article 475-1 of the French Code of Criminal Procedure

- **CONDEMN** them finally, the full costs [*entiers dépens*].


-

**WITHOUT PREJUDICE  *SOUS TOUTES RESERVES***

Paris, 1, June, 2021