UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: 4/5/2022             │
└─────────────────────────────────┘
```

GÉRARD SILLAM and ALDRIC SAULNIER,

      Plaintiffs,

    -against-

                               No. 21 cv 6675 (CM)

LABATON SUCHAROW LLP,
CHRISTOPHER J. KELLER, and
LAWRENCE A. SUCHAROW,

      Defendants.

## DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS

McMahon, J.:

Plaintiffs bring this action against Defendants Labaton Sucharow LLP ("Labaton"), Christopher J. Keller ("Keller") and Lawrence A. Sucharow ("Sucharow"), asserting claims for fraudulent inducement (Count I) and negligent misrepresentation (Count II) against Labaton and Keller, and aiding and abetting fraudulent inducement (Count III) against Sucharow. Plaintiffs' claims arise from representations that the Defendants allegedly made to induce Plaintiffs' signing the Universal Settlement Agreement on August 15, 2015. (*See* Dkt. No. 1 ("Compl.")).

Defendants move to dismiss Plaintiffs' Complaint on the grounds that Plaintiffs (1) released all claims against Defendants and (2) failed to plead the elements of each of their claims. (Dkt. No. 17 ("Br."); Dkt. No. 24 ("Rep. Br.")).

For the reasons stated below, Defendants' motion is GRANTED in part and DENIED in part.

# BACKGROUND

## I.   Parties

Plaintiff Gerárd Sillam ("Sillam") is a French businessman and a French citizen who lives and works in Paris, France. (Compl. ¶ 13).

Plaintiff Aldric Saulnier ("Saulnier") is a French attorney and a French citizen who lives and works in Paris, France. (*Id.* ¶14).

Defendant Labaton is a limited liability partnership registered in New York and its primary practice is representing plaintiffs in class action lawsuits. (*Id.* ¶15).

Defendant Keller is a New York lawyer and a partner and Chairman at Labaton (*Id.* ¶16), Defendant Sucharow is a New York lawyer and a partner and Chairman Emeritus at Labaton (*Id.* ¶17).

## II.   Labaton Engages Sillam as an Independent Contractor

For purposes of this motion, all well-pleaded facts in the complaint are presumed true.

In 2005, Labaton hired Sillam as an independent contractor. (*Id.* ¶29). The agreed arrangement between Labaton and Sillam was that Sillam would refer its contacts at certain investment funds ("UCITS funds") to Labaton as potential plaintiffs in securities class actions, and Labaton would pay Sillam a referral fee of 15% of the total fees paid to Labaton in connection with any matter for which Labaton represented a client referred by Sillam. (*Id.*).

*The Descoubes/Saulnier Agreement*. Defendant Keller allegedly instructed Sillam to retain a lawyer who would collect the fees on Sillam's behalf. (*Id.* ¶30). Sillam retained Jean Marc Descoubes ("Descoubes") (*Id.* ¶33), and on February 21, 2006, Labaton and Descoubes executed an agreement providing that Descoubes would refer clients and in exchange would receive 15% of the net attorneys' fee Labaton earned when that client was appointed as Lead Plaintiff (the

"Descoubes Agreement"). (*Id.* ¶34). Plaintiffs allege that Labaton did not really expect Descoubes to refer any clients; rather, Labaton expected them from Sillam and that the Descoubes Agreement was only to facilitate payment of referral fees from Labaton to Sillam. (*Id.* ¶35). Descoubes later assigned all his right, title and interest and rights under this agreement to Plaintiff Saulnier. (*Id.* ¶37).

*The Sillam Agreement.* Two months later, on April 25, 2006, Labaton and Sillam executed their own agreement (the "Sillam Agreement"). (*Id.* ¶36). The Sillam Agreement provided that Labaton would pay Sillam a "success fee" for each investment fund client referred by Sillam who ultimately engaged Labaton, as well as an award of additional fees contingent on whether the referral became Lead Plaintiff or retained Labaton as Lead Counsel. (*Id.* ¶36(b-c)). Sillam was also to receive a monthly payment of $6,000 for his services, which amount would be credited against any success fees. (*Id.* ¶36(d)).

## III.    Sillam Refers Dozens of Clients Who Retain Labaton

Sillam began by setting up dozens of meetings for Labaton with many investment fund clients across Europe. (*Id.* ¶38). Sillam also organized a conference in Paris in March 2007 to promote Labaton to various French asset managers and advertised the conference in the French press. (*Id.* ¶39). Plaintiffs referred over a dozen investment funds to Labaton. (*Id.* ¶40).

Five of these referrals retained Labaton to represent them against Vivendi, S.A. in a securities class action that was filed in the Southern District of New York, *In re Vivendi*, No. 02 Civ. 5571 (S.D.N.Y.). (*Id.* ¶42). In addition, five other referred funds retained Labaton to file proofs of claims in connection with other class action lawsuits (*id.* ¶45) and several others retained Labaton to represent them in litigation against the Royal Dutch Shell in the Netherlands (*id.* ¶46).

Three other referred funds exclusively engaged Labaton to monitor their portfolios. (*Id.* ¶¶44-45).

Plaintiffs estimate that Labaton earned millions of dollars in fees as a result of these referrals. (*Id.* ¶47).

## IV. The Arrangement Sours and Plaintiffs Sue Labaton in France

In Spring 2007, the relationship between Labaton and Plaintiffs soured. (*Id.* at ¶50). First, Labaton asked Sillam to take a cut on his fee to "share" a portion with another of Labaton's referral sources, Pietro. (*Id.* ¶51). Next, Labaton allegedly refused to pay Plaintiffs the referral fees and contract bonus associated with the *Vivendi* class action. (*Id.* ¶52).

Sillam filed suit against Labaton in Paris; he sought payment of the referral fees and claimed that Labaton had defrauded him.[1] (*Id.* ¶53). Plaintiffs do not allege that Saulnier also filed suit, and it is unclear whether Saulnier either joined Sillam's lawsuit or filed his own action. However, a settlement in 2009 resolved the fee disputes of both Plaintiffs in this action, Sillam and Saulnier.

## V. The 2009 Settlement

Plaintiffs settled with Labaton on December 31, 2009. (*Id.* ¶54; *see* Dkt. Nos. 16-3, 23-7). As part of the settlement, Plaintiffs executed two agreements, as follows:

*The Saulnier Settlement.* The agreement between Labaton, Descoubes, Saulnier, and the legal representative of Descoubes and Saulnier[2] ("Saulnier Settlement") provided, *inter alia*, that: (1) Labaton would pay Saulnier 30% of the gross contingency fee for referred clients in the *Vivendi* class action (Compl. ¶56(a)); (2) Labaton would pay Saulnier 15% of the gross fee earned in any

---

[1] The Complaint does not offer the substance of Sillam's fraud claims but only states that fraud claims were made.

[2] Saulnier and Descoubes were represented by S. George Alfonso and The Law Offices of S. George Alfonso; together, Saulnier and Descoubes are referred to in the agreement as the "Alfonso Clients." (*See* Dkt. No. 16-3).

matter in which Labaton represented a client referred by Sillam within five years of the agreement (*id.* ¶56(b)); (3) Labaton would produce verifiable documents regarding Labaton's fee structure for every matter in which Labaton represented any of the potential clients during the five-year term, as well as any pending matters where Labaton is representing referred clients (*id.* ¶56(c-d)); and (4) Labaton would provide Saulnier with a semiannual verified declaration disclosing whether any referred clients retained Labaton in any litigation anywhere in the world in the previous six months. (*Id.* ¶56(e)). If Labaton failed to report that it had been retained by a referred client, Saulnier's payment would increase from 15% to 30%. (*Id.* ¶56(f)).

The Saulnier Settlement also set forth "Referral Rules" that would apply ostensibly to comport with the "New York State Bar ethics." (Dkt. No. 16-3, at 2). These "Referral Rules" were that referral fees would only be paid to "referring counsel [Saulnier] upon the satisfaction of two events; 1.) The referring counsel must agree to undertake work or assume responsibility to do designated work as requested and/or assigned by the referred firm (Labaton); and 2.) Such involvement by the referring counsel shall be in each instance, subject to client approval after full disclosure by Labaton of the contemplated referral relationship, and a consideration of options by said client." (*Id.*).

In exchange, Saulnier agreed not to make "any disparaging remarks" about Labaton "to French or US federal or state regulators, members of the French or US federal or state judiciary, or any Bar Association" (Compl. ¶57) and waived and released all claims, against Labaton including claims arising out of the assigned Descoubes Agreement. (*Id.* ¶56(g)).

*The Sillam Settlement.* The agreement between Labaton, Sillam, and Sillam's legal representatives provided that Labaton would pay Sillam $400,000 in exchange for Sillam's dismissing his lawsuit in France and signing a waiver and release of all claims against Labaton,

including any claims arising out of the 2006 Sillam Agreement (the "Sillam Settlement," together with the Saulnier Settlement, the "Settlement Agreements"). (*Id.* ¶59).

## VI.    The Labaton/Keller Declarations

Plaintiffs allege that, despite the Settlement Agreements, Labaton entered into engagements with clients referred by Sillam, and then lied and concealed those engagements to avoid paying Plaintiffs. Specifically, Plaintiffs alleged that Defendant Keller submitted five declarations to Saulnier as agent of Labaton declaring that, "Since the execution of the Agreement, Labaton Sucharow has not been retained by any 'Potential Clients' as defined in 'Exhibit No. 1' of the Agreement, attached hereto" (together, the "Declarations"). (*Id.* ¶61). Keller sent these Declarations to Plaintiffs on January 21, 2011, on June 9, 2011, on February 14, 2012, on July 16, 2013, and on July 8, 2015. (*Id.* ¶62). The five-year period set forth in the Saulnier Settlement ended December 31, 2014, before the last such declaration was sent.

## VII.   The Universal Settlement Agreement

On August 15, 2015, Labaton, Sillam, and Saulnier[3] entered into a new, global settlement agreement, pursuant to which Plaintiffs agreed to relinquish their rights under the earlier Settlement Agreements in exchange for payment in the amount of $99,999.99 (the "Universal Settlement Agreement"). (*Id.* ¶64). The Universal Settlement Agreement included the following release:

> This Universal Settlement includes a release by [Saulnier and Sillam], not just for any and all claims or potential claims which either or both could possibly bring under The Settlements [of 2009], but also includes a release and waiver by [Saulnier and Sillam] regarding any claim or potential claim [Saulnier and Sillam] have or could possibly have against Labaton or any of its partners, agents or representatives . . .

---

[3] Saulnier and Sillam were represented by S. George Alfonso; together, Saulnier and Sillam are referred to in the agreement as the "Alfonso Clients." (*See* Dkt. No.16-6).

> The Parties to this Universal Settlement understand, acknowledge and agree that upon the timely satisfaction of "The Consideration" made by Labaton as set forth herein, [Saulnier and Sillam] shall universally and forever release and waive any claim or potential claim which could possibly be brought in any jurisdiction anywhere in the world for all time arising out of or in any way related to The Settlements, as well as any other claim or potential claim [Saulnier and Sillam] have or could possibly have against Labaton or any of its partners, agents or representatives.

(Dkt. No. 16-6 ("Universal Settlement Agreement"), at 1-2).

A year later, on August 23, 2016, Plaintiffs and Labaton amended the Universal Settlement Agreement, by executing an addendum in which Labaton agreed to pay Sillam €5,000, and Plaintiffs agreed to relinquish their interest in certain fees owed to Labaton in connection with a litigation filed in Milan, Italy. (Compl. ¶¶65-66; Dkt. No. 16-7). Otherwise, the Universal Settlement Agreement "remain[ed] in full force and effect." (Dkt. No. 16-7).

## VIII.   The Alleged Deception

In or about November 2017, Plaintiffs first learned that Labaton had been representing referred clients since the 2009 Settlement Agreements were executed. (Compl. ¶¶70-74). Plaintiffs allege that Defendants were representing referred clients both in filing proofs of claims in class actions and as counsel in five different litigations. (*Id.*). Yet in each of the Declarations, Keller had represented that none of the Plaintiffs' referred clients had retained Labaton from December 31, 2009 (the date of the settlement) through the date of the Declaration. (*Id.* at ¶¶ 70-71).

Plaintiffs learned that the proofs of claims had been filed on behalf of two referred clients from the representatives of these referred clients themselves (*see id.* ¶¶70-71); Plaintiffs allege that they could not have learned about these filings earlier or otherwise because the "proof of claim process is not public" and alleges that "Sillam has been unable to obtain additional information concerning the extent of Labaton's work for Referred Clients since the Settlement Agreements in 2009." (*Id.* ¶73). Plaintiffs do not explain how they learned of the various litigations Labaton was

engaged in on behalf of referred clients; they assert only that they learned of these representations recently. (*Id.* ¶72).

Plaintiffs filed this lawsuit on August 6, 2021, asserting claim of fraudulent inducement, negligent inducement, and aiding and abetting fraudulent inducement. They contend that they would have never entered into the Universal Settlement Agreement, or agreed to the release contained therein, had Defendants not fraudulently and/or negligently misled them into thinking that Labaton had not represented any referred clients by sending the five Keller Declarations. (*Id.* ¶67). Specifically, Plaintiffs allege that the statement, "Since the execution of the [2009 Settlement Agreements], Labaton Sucharow *has not been retained by any 'Potential Clients' as defined in 'Exhibit No. 1' of the Agreement, attached hereto*," which appears in each of the five Declarations, was false, and that Defendants knew that it was false every time it was made. (*Id.* ¶¶ 83, 85, 91, 97-98).

Plaintiffs now seek to recover 30% of fees earned by Labaton for actions filed on behalf of clients they referred to Labaton since 2009 – a sum that Plaintiffs estimate is in the millions.

## IX.    Timeliness of This Action

On March 16, 2022, this Court asked the parties whether Plaintiffs' claims were time barred under New York's six-year statute of limitations for fraud because the Complaint was filed over six years after the execution of the last Keller Declaration (containing the allegedly fraudulent statements). (*See* Dkt. No. 25). Neither party had briefed this question.

In response, both Plaintiffs and Defendants agreed that Plaintiffs' claims are timely under applicable law. (*See* Dkt. Nos. 26, 27). Specifically, they explain that the statute of limitations for "fraudulent inducement of contract" runs from the execution of the document "and when the party alleging fraud has given consideration and thus suffered damage." *Triangle Underwriters, Inc. v.*

*Honeywell, Inc.,* 604 F.2d 737, 748 (2d Cir. 1979); *see also Financial Guar. Ins. Co. v. Putnam Advisory Co.,* No. 12 Civ. 7372 (AT), 2020 WL 264146, at *2 (S.D.N.Y. Jan. 17, 2020) ("A fraudulent inducement claim accrues when the plaintiff enters into the contract or otherwise completes the act that the fraudulent statements meant to induce.") (citing cases). Here, the parties executed the Universal Settlement Agreement on August 15, 2015; thus, the fraud was "completed" on that date and the Plaintiffs had until August 15, 2021 to file their complaint. Their complaint, filed August 6, 2021, is timely.

Plaintiffs and Defendants also point out that the statute of limitations on claims arising under New York law – as here – that had not yet expired as of March 20, 2020 were arguably tolled for the 228-day duration of the Executive Orders, yet another reason why the Complaint is timely. *See, e.g., Citi Connect, LLC v. Local Union No. 3, International Brotherhood of Electrical Workers, AFL-CIO,* No. 20 Civ. 5147 (CM), 2020 WL 5940143, at *4 (S.D.N.Y. Oct. 7, 2020); *Barnes v. Uzu et al.,* No. 20-CV-5885 (KMK), 2022 WL 784036, at *9-10 (S.D.N.Y. Mar. 15, 2022).

The statute of limitations needs no further discussion. I thank the parties for their prompt and informative response to my question.

## STANDARD

In order to "survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). To achieve "facial plausibility," a claim must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). To survive a motion to dismiss, the plaintiff must allege facts that "nudge[] [plaintiff's] claims across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570. Further,

"[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679 (internal citations omitted).

"In determining the adequacy of a claim under Rule 12(b)(6), consideration is limited to facts stated on the face of the complaint, in documents appended to the complaint or incorporated into the complaint by reference, and to matters of which judicial notice may be taken." *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991). The court may consider the full text of documents that are cited in, incorporated by reference in, or "integral" to the complaint. *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 809 (2d Cir. 1996).

## DISCUSSION

Defendants move to dismiss the complaint on two grounds: (1) plaintiffs' claims are released by the Universal Settlement Agreement and thus barred; and (2) plaintiffs fail to plead the elements of their claims for fraudulent inducement, negligent misrepresentation, and aiding and abetting fraudulent inducement. Because the defense of release is not relevant unless plaintiffs have pleaded a potentially viable claim for fraudulent inducement to enter into a contract, I start with that issue.

## I. Plaintiffs State a Claim for Fraudulent Inducement Against Labaton and Keller, as Agent of Labaton

To plead a claim for fraudulent inducement under New York law, Plaintiffs must demonstrate "(1) a material misrepresentation or omission of a fact, (2) knowledge of that fact's falsity, (3) an intent to induce reliance, (4) justifiable reliance by the plaintiff, and (5) damages." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 170 (2d Cir. 2015). Defendants argue that Plaintiffs fail to plead the first, fourth, and fifth elements. (*See* Br. 14).

i.  *Material Misrepresentation or Omission*

Defendants are clearly incorrect when they assert that Plaintiffs have failed to plead a material misrepresentation or omission of fact. Plaintiffs allege that Defendants falsely represented to them, not once but five times, under penalty of perjury, that Labaton had *not* been retained by any referred clients when in fact the firm had been so retained and did in fact represent such clients. (Compl. ¶¶69-80). Defendants contend that the Declarations did not contain misrepresentations because (1) in the alleged federal class actions, Labaton was not retained by a referred client or was not retained during the relevant time period; and (2) "the administrative task of filing of proofs of claim forms does not even constitute the practice of law" so "Labaton was free to engage in claims-filing work for the Potential Clients." (Br. 15–19).

Defendants' arguments are singularly unpersuasive.

First of all, Labaton's assertion that it was not in fact retained to represent any referred clients in federal class actions during the five-year period running from the 2009 Settlement until December 31, 2014 is not an argument that can be entertained on a motion to dismiss. The well-pleaded allegations of the complaint are presumed true for purposes of this motion. The allegation that Labaton was retained to represent clients in four federal securities actions during the period covered by the 2009 Settlement Agreement is a well-pleaded allegation of fact. It is, therefore, presumed true. If it turns out not to be true, Labaton will prevail in this lawsuit – but it cannot get the lawsuit dismissed by alleging that a well-pleaded factual allegation is not true.

Second, whether filing a proof of claim on behalf of a client – administrative task or not – constitutes "the practice of law" raises an issue of fact that cannot be resolved on a motion to dismiss. Moreover, per the terms of the relevant agreements, whether it constitutes the practice of law or not may well be utterly irrelevant. There is no mention of "fees earned from the practice of

law" or any similar limitation in the Settlement Agreements on the type of fees that trigger the Plaintiffs' interest. Rather, per the Saulnier Settlement that was reached in 2009, Plaintiffs retained an interest in "*gross fees* paid to Labaton in *any matter* in which Labaton is engaged to represent any of the 'Potential Clients.'" (Dkt. No. 23-6, at 4) (emphasis added). The same agreement makes it clear that Labaton was to document "each instance in which Labaton has been retained by the Potential Client (*pre or post-litigation*) representation." [sic] (*Id.*) (emphasis added). The filing of a proof of claim is a "matter" that frequently arises "post litigation" and so appears to be encompassed by the Saulnier Settlement, whether it constitutes the practice of law or not. And Plaintiffs specifically allege that Labaton was retained and paid a fee by at least one referred client – AXA Investment Managers – in connection with such a "post-litigation" "matter." To the extent there is any ambiguity about the meaning of the term "matter" – an issue that need not be decided today, because on a motion to dismiss all allegation in the pleading must be construed in favor of the non-moving plaintiff – that ambiguity would have to be construed against the drafter of the Agreement. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 63 (1995) ("a court should construe ambiguous language against the interest of the party that drafted it"). We do not know, from reading the complaint, who drafted the Saulnier Settlement; it could well have been Labaton. That remains to be fleshed out in discovery.

In short, there is absolutely no way that this complaint does not allege a material misrepresentation. That one gets Plaintiffs over the first hurdle.

    ii.   *Reasonable Reliance*

Plaintiffs plead reasonable reliance on the Defendants' alleged misrepresentations.

As a preliminary matter, "The question of what constitutes reasonable reliance is always nettlesome because it is so fact-intensive." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d

91, 98 (2d Cir. 1997). Thus, "whether or not a plaintiff reasonably relied upon a defendant's statements is generally a factual inquiry that cannot be resolved on a motion to dismiss." *See President Container Group II, LLC v. Systec Corporation*, 467 F.Supp.3d 158, 168 (S.D.N.Y. 2020). "In assessing the reasonableness of a plaintiff's alleged reliance," courts "consider the entire context of the transaction, including factors such as its complexity and magnitude, the sophistication of the parties, and the content of any agreements between them." *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 195 (2d Cir. 2003). Where "matters are held to be peculiarly within defendant's knowledge, it is said that plaintiff may rely [on the representations] without prosecuting an investigation, as he had no independent means of ascertaining the truth." *Crigger v. Fahnestock & Co.*, 443 F.3d 230, 234 (2d Cir. 2006) (citation and quotation marks omitted). Equally, a "plaintiff cannot close his eyes to an obvious fraud, and cannot demonstrate reasonable reliance without making inquiry and investigation if he has the ability, through ordinary intelligence, to ferret out the reliability or truth" of the statements. *Id.*

Here, Defendants argue that Plaintiffs' reliance was not reasonable because – by Defendants' account – "Plaintiffs did not trust Labaton" and there was "acrimony and distrust" between the parties, so Plaintiffs "had a heightened duty to investigate" the representations made in the Declarations. (Br. 21). But Labaton signed an agreement pursuant to which it agreed to disclose to Plaintiffs, periodically and under oath, whether it had been retained by clients referred by Plaintiffs. I am certainly not prepared to conclude, on a motion to dismiss, that Plaintiffs were obliged to assume that a well-known American law firm, and specifically a partner in that firm who was a member in good standing of the New York Bar, was not living up to the terms of an agreement freely entered.

Additionally, Keller's Declarations were made under penalty of perjury. (*See* Dkt. No. 23-

8). As a matter of law, it is reasonable to rely on a sworn statement; "[T]o hold that a party cannot as a matter of law rely on a sworn affidavit goes too far." *See G-I Holdings, Inc. v. Baron & Budd*, 238 F.Supp.2d 521, 521 (S.D.N.Y. 2002). I would hope that this were particularly true when the sworn declaration is made by a member of the Bar; it would be sad indeed if it were not. Plaintiffs do point out that they considered the sworn Declarations of attorneys to be particularly trustworthy. (*See* Opp. 18).

It is true that "In certain fact-specific circumstances, of course, even sworn affidavits may not as a matter of law be reasonably relied upon." *G-I Holdings*, 238 F.Supp.2d at 521. But pertinent "red flag[s]" include "the fact that the affiant is a known 'scoundrel.'" *Id.* at 543. It always comes as a great surprise to me when a lawyer turns out to be a "scoundrel," and Defendants do not assert that Keller had such a reputation. And while Defendants attach long email threads to their moving papers in an effort to demonstrate that Plaintiffs were not relying on their sworn statements, those emails are (with one exception) not alluded to in the complaint and so cannot be considered when deciding this motion. *See Subaru Distributors Corp. v. Subaru of America, Inc.*, 425 F.3d 119, 122 (2d Cir. 2005). All this does is underscore why this "issue . . . cannot be determined at this stage of the proceedings." *G-I Holdings*, 238 F.Supp.2d at 543.

Third, Plaintiffs allege that, even exercising due diligence, they could not have learned prior to executing the Universal Settlement Agreement whether Labaton's many representations were false because not all client work is public, so Plaintiffs had little choice but to rely on Defendants' representations and assume, in light of those representations, that Labaton had lived up to its contractual obligations. "While in some cases [the Second Circuit has] found that a plaintiff, in the exercise of reasonable diligence, should have discovered public lawsuits, . . . it does not follow that reasonable diligence will in all circumstances result in discovery of any

lawsuit." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 363 (2d Cir. 2013). "While hindsight shows that the fraud *could* have been discovered, that fact does not support the conclusion that, on reasonable inquiry, the fraud *would* have been discovered." *Id.* (emphasis in original). Plaintiffs admit in their opposition papers that they began to have suspicions about the veracity of the final Declaration in July 2015 – at about the time the Declaration was made – but assert both that they were unable to verify by investigation the extent to which Defendants had been retained by referred clients and that Defendants reassured them that there had been no violations of the 2009 Settlement Agreements. (Opp. 8–9). Plaintiffs plead in the Complaint that they attempted to investigate but "despite [Sillam's] best efforts" were unable to "obtain additional information." (Compl. ¶73). Plaintiffs' allegations and the fair inferences to be drawn therefrom are sufficient to plead reasonable reliance at this stage.

Finally, Defendants argue that Plaintiffs fail to plead reliance because there is no reference to the Declarations in the Universal Settlement Agreement and that agreement contains a complete merger clause; as such, Defendants argue that Plaintiffs cannot now argue reasonable reliance on pre-contractual representations. (Br. 22). They argue that "failure to bind a party to pre-contractual representations is inconsistent with reasonable reliance upon them." (*Id.*).

But as all lawyers should know, "Ordinarily, 'an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made' is insufficient to bar a claim of fraudulent inducement." *President Container Group II*, 467 F.Supp.3d at 168 (quoting *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir. 1993)).

So Plaintiffs have pleaded reasonable reliance on the Defendants' representations in their five sworn Declarations.

### iii.   *Damages*

Defendants also argue that Plaintiffs fail to allege any recoverable damages and have not alleged circumstances justifying punitive damages.

The contention that no damages are alleged is simply silly. Plaintiffs allege, for example, that Labaton charged "a contingency fee of at least 4% for its work to file proofs of claims on AXA Investment Managers' behalf, which amounts to $14 million in fees over five years" – of which, Plaintiffs allege, they should have received at least 30% under the Settlement Agreements, or $4.2 million. (*See* Compl. ¶¶78–79). That is an allegation of actual damages.

Defendants argue that they did not actually receive attorney's fees from any representations of referred clients and insist that proof of claims processing "was not within the scope of" the agreement. (Br. 22-23). But whether Labaton did or did not actually receive "attorneys' fees" raises a question of fact, which cannot be resolved on a motion to dismiss; and whether processing proof of claims falls outside the scope of the agreement is either very much an open question or one that would today likely be resolved against Labaton, since Plaintiffs had a contractual interest in fees generated from "*any matter*" where Labaton was engaged, "*pre or post litigation.*" (Dkt. No. 23-6, at 4) (emphasis added) (for a fuller discussion *see supra* pp. 11-12).

Defendants also argue that Sillam specifically did not have an interest in any fees and should be dismissed as a Plaintiff, because the Sillam Settlement in 2009 terminated "any professional relationship and all obligations, rights and/or duties between The Parties" (Dkt. No. 16-2, at 2), and Sillam has not identified any provision of the 2009 Settlement Agreements that "would have entitled him to any additional compensation from Labaton." (Br. 23). But Plaintiffs' theory is that Sillam retained an interest in Saulnier's fees because, at the very outset of the parties' relationship, Defendant Keller instructed Sillam to retain a lawyer who would collect the fees on

Sillam's behalf, and it is for that reason Descoubes (and then Saulnier)[4] was retained and entered into the referral agreement arrangement with Labaton. (Compl. ¶30). Plaintiffs allege that Labaton did not expect any referrals from Descoubes (later, Saulnier); rather, Labaton expected the referrals to come from Sillam and that the Descoubes Agreement was only to facilitate (or, perhaps, to mask) the payment of referral fees from Labaton to Sillam. (*Id.* ¶35). Thus, Plaintiffs posit that both Sillam and Saulnier had an interest in the fees Labaton owed Saulnier. Plaintiffs have thus pleaded a very fact-specific theory that Sillam did have an interest in Saulnier's fees based on an arrangement between Sillam and Descoubes (and later Saulnier) from the outset. Whether Sillam can recover damages must abide discovery; it may be that his remedy does not lie against Labaton but against Descoubes and/or Saulnier.

As to punitive damages, "the question of whether to award punitive damages is 'an intensely factual,' and is ill suited for dismissal this early in the litigation." *Senior Health Insurance Company of Pennsylvania v. Beechwood Re Ltd.*, 345 F.Supp.3d 515, 533 (S.D.N.Y. 2018) (quoting *George v. Ford Motor Co.*, No. 03 Civ. 7643 (GEL), 2007 WL 2398806, at *5 (S.D.N.Y. Aug. 17, 2007)).

For this reason, Plaintiffs have adequately pleaded a claim for fraudulent inducement, and Count I of the complaint cannot and will not be dismissed.

## II. Plaintiffs State a Claim for Negligent Misrepresentation Against Labaton and Keller, as Agent of Labaton

The motion to dismiss Count II (negligent misrepresentation) is also denied. As Defendants themselves point out, "A negligent misrepresentation claim has similar elements [as fraudulent inducement] except that under certain narrow circumstances involving a special relationship

---

[4] As explained previously, Descoubes later assigned all his interests and rights under the Descoubes Agreement to Plaintiff Saulnier. (Compl. ¶37).

between the parties, the scienter element is replaced with culpable negligence." (Br. 14). Defendants proffer the same in support of dismissing this claim that they advanced in support of their motion to dismiss the fraudulent inducement claim. Those arguments are no more persuasive in the negligence context than they were in the context of outright fraud.

### III.   Plaintiffs Fail to State a Claim for Aiding and Abetting Fraudulent Inducement

Plaintiffs do fail to plead a claim for aiding and abetting fraudulent inducement against Defendant Sucharow. "To establish liability for aiding and abetting fraud under New York law, the plaintiffs must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission." *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014).

While Plaintiffs have more than adequately pleaded fraudulent inducement (as explained above), they fail to plead any facts tending to show that Sucharow either had actual knowledge of the alleged fraud or substantially assisted in its commission.

Plaintiffs must plead that Sucharow had "actual knowledge of the fraud . . ." *See Heinert v. Bank of America N.A.*, 835 Fed.Appx. 627, 630 (2d Cir. 2020) (citing *Lerner v. Fleet Bank, NA.*, 459 F.3d 273, 292–93 (2d Cir. 2006)). "'A failure to allege sufficient facts to support the inference that the alleged aider and abettor had *actual knowledge* of the fraudulent scheme warrants dismissal of the aiding and abetting claim at the pleading stage.'" *Id.* (quoting *Krys*, 749 F.3d at 127) (emphasis added). "Constructive knowledge is insufficient to constitute the knowledge element of an aiding-and-abetting claim." *Id.* (internal alternations and quotation omitted).

Plaintiffs do not plead actual knowledge. Rather, they wish the Court to infer Sucharow had constructive knowledge from the circumstances. Specifically, Plaintiffs allege that Sucharow knew the Declarations were false because, in 2007, Sucharow made statements that Sillam

understood to suggest that Labaton might be engaging in unauthorized activities in Europe. (Compl. ¶ 99). But a statement made in 2007 (assuming it was made and was properly understood) has no bearing on whether Sucharow was aware of allegedly false representations in Declarations made by someone else during the period 2011 and 2015. It is the representations in those declarations that allegedly induced Plaintiffs to agree to the 2015 Universal Settlement Agreement – not anything that happened in 2007.

Plaintiffs also fail to plead any allegations of substantial assistance of the fraud. "[S]ubstantial assistance" in the context of fraud "might include . . . executing transactions or investing proceeds, or perhaps . . . financing transactions." *See Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 48 (2nd Cir. 1978). Plaintiffs allege that Sucharow "substantially assisted in perpetuating this fraud" by "sending the July 2015 Keller Declaration, which he knew to be false, to Plaintiffs." (Compl. ¶101). However, Plaintiffs' Complaint states that *Plaintiff* Sillam emailed Sucharow asking him for the 2015 Declaration and Sucharow responded, "Done" and sent the Declaration. (*Id.* ¶63). From this, Plaintiffs derive their theory of substantial assistance – that Sucharow "caused" Keller to sign the Declaration, and Sucharow sent the false document to Plaintiffs, knowing it was false (after causing Keller to sign it). That theory is completely unsupported by any well-pleaded factual allegation.

Count III is, therefore, dismissed as to Defendant Sucharow.

**IV.    Plaintiffs' Claim of Fraudulent Inducement is Not Barred by the Universal Settlement Agreement But Their Claim for Negligent Misrepresentation Is Barred by the Release**

Having concluded that Labaton and Keller have pleaded two potentially viable claims, we turn to the argument that those claims are barred by the terms of the release contained in the 2015 Universal Settlement Agreement.

That dog won't hunt.

Defendants argue that the Universal Settlement Agreement contains a release of "any and all claims or potential claims which either or both [Saulnier and Sillam] could possibly bring," including the ones Plaintiffs bring here, and thus, the claims are barred. (Br. 1). It is true that this is a broad general release. In fact, about the only claim that this language does not release is a claim that they defendants were fraudulently induced to enter into the Universal Settlement Agreement by the misrepresentations contained in Keller's various sworn Declarations.

Under New York law, which both parties agree controls, a release may be avoided if it were "the product of fraud, duress or undue influence." *Skluth v. United Merch. & Mfr., Inc.,* 163 A.D.2d 104, 106 (1st Dep't 1990). Allegations of fraudulent inducement are sufficient to overcome the language of an unambiguous release where plaintiffs make "specific factual allegations detailing the underlying circumstances of the misrepresentations alleged to warrant the relief sought." *New York City School Constr. Authority v. Koren–DiResta Constr. Co.,* 249 A.D.2d 205, 205 (1st Dep't 1998). The plaintiff must also "demonstrate that [his] reliance upon those representations [were] reasonable. *Id.* (citing *Stuart Silver Assocs. v Baco Dev. Corp.,* 245 AD2d 96, 98 (1st Dep't 1997)). Here, as discussed above (pp. 10-17), Plaintiffs have plead fraudulent inducement, including reasonable reliance. Having so plead, the release may be avoided as to the Plaintiffs' claims of fraudulent inducement.

By contrast, Plaintiffs' negligent misrepresentation claim is released. "'Generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release.'" *U.S. Bank National Association v. BFPRU I, LLC,* 230 F.Supp.3d 253, 267 (S.D.N.Y. 2017) (quoting *Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.,* 17 N.Y.3d 269, 929 N.Y.S.2d 3, 952 N.E.2d 995, 1000, 1001–02 (2011) (quotation marks and citation omitted). In cases with releases much like the one at issue in this case, "courts have interpreted the broad terms of [those]

releases to bar claims for negligent misrepresentation." *See id.* at 268 (citing *Engel v. Deutsche Bank Nat'l Tr. Co.*, 116 A.D.3d 915, 983 (2d Dep't 2014) *and Palmatier v. Lockheed Martin Corp.*, No. 13–cv–133 (DNH), 2014 WL 1466489, at *3–4 (N.D.N.Y. Apr. 15, 2014)). The release cannot be avoided on the negligent misrepresentation claim.

Accordingly, Plaintiffs may proceed on their fraudulent inducement claim (Count I) but not on their negligent misrepresentation claim (Count II).

## CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss is GRANTED to the extent of dismissing Counts II and III in their entirety. It is DENIED insofar as Count I is concerned.

The Clerk of Court is respectfully directed to remove the motion at Docket Number 15 from the Court's list of open motions. This constitutes a written opinion.

Dated: April 5, 2022

_____
U.S.D.J.

BY ECF TO ALL COUNSEL