# EXHIBIT C

MB3KSILC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

GERARD SILLAM, et al.,

                Plaintiffs,

           v.                        21 CV 6675 (CM)(OTW)

LABATON SUCHAROW LLP, et al.,

                Defendants.

------------------------------x
                                  New York, N.Y.
                                  November 3, 2022
                                  10:15 a.m.

Before:

                    HON. ONA T. WANG,

                                  Magistrate Judge

                        APPEARANCES

RAISER & KENNIFF
      Attorneys for Plaintiff
BY:  DOUG M. REDA


GANFER SHORE LEEDS & ZAUDERER LLP
      Attorneys for Defendants
BY:  IRA MATETSKY


ALSO PRESENT:

JAMES CHRISTIE, Labaton Sucharow LLP

1          (Case called)

2          MR. REDA:  Douglas Reda, for the plaintiff, from

3     Raiser & Kenniff, 300 Old Country Road, Mineola, New York.

4          Good morning, your Honor.

5          THE COURT:  Good morning.

6          MR. MATETSKY:  Good morning, your Honor.  Ira

7     Matetsky, from Ganfer Shore, for the defendants, Labaton

8     Sucharow LLP, and with me is James Christie, the assistant

9     general counsel of Labaton.

10         THE COURT:  Great.  Good morning.

11         We are here because, number one, I haven't seen you in

12    a while; number two, I think you had asked for -- may have

13    asked for a somewhat extended discovery deadline, but there are

14    two, as I understand it, outstanding discovery disputes.

15         I'm not hearing oral argument, because I've read your

16    letter, but does somebody want to tell me the status of those

17    disputes?  Are they both still live?  Has anything gotten

18    resolved or gotten closer to resolution?

19         MR. REDA:  Well, Judge, if I may?

20         THE COURT:  Yes, go ahead.

21         MR. REDA:  Do you want me to stand?

22         THE COURT:  You don't need to.  It might be easier to

23    speak into the microphone that way.

24         MR. REDA:  The discovery deadline was extended by

25    Judge McMahon, so that's not an issue.  She extended it, just

1    recently, to the end of February, I believe, and then the two

2    issues that we asked for you to intervene on are still open.

3    One is where the depositions will take place, and also the

4    confidentiality agreements.  We have not made, I don't think,

5    any headway on that.

6            MR. MATETSKY:  I would agree with that, your Honor.

7    Good morning.

8            I thank you for welcoming us.  I don't think we've

9    actually been in front of you before.

10           THE COURT:  No, that's the other reason I wanted to

11   see you.  Now that we're doing more things in person, sometimes

12   it's much more efficient to see each other in person, actually

13   be face to face.  It's a lot easier to take tough positions and

14   not have a fulsome back-and-forth when you're doing it behind a

15   screen or through a telephone.  So, that was part of the reason

16   why.

17           MR. MATETSKY:  I agree with that, your Honor.

18           We haven't even before your Honor virtually in this

19   case before.  This case is assigned to Judge McMahon, who,

20   typically, only sends the referral to the magistrate judge when

21   a dispute arises, and we have actually been able to work out,

22   through the meet-and-confer process, many issues that we're not

23   going to burden your Honor with.

24           As Mr. Reda said, there are two open issues that are

25   kind of blocking us with proceeding with the discovery, which

MB3KSILC

 1    now needs to be completed, by Judge McMahon's order, by

 2    February 28.  One is that we sought the entry of what we

 3    thought was a completely routine confidentiality stipulation in

 4    this case.  We followed your Honor's recommended form from the

 5    Court's website literally verbatim with an addendum at the end

 6    required by Judge McMahon's individual rules.  And we don't see

 7    why that order should not be entered in this case, as it is in

 8    any other case.

 9              I won't go on because the Court said you don't want

10    oral argument, but if you want two more minutes, I can give you

11    that.

12              THE COURT:  What I'm hearing from plaintiffs is that

13    plaintiffs don't believe that a protective order is necessary.

14              Why is that?

15              MR. REDA:  Judge, first, because the judge's rules

16    prevent --

17              THE COURT:  When you say "the judge's rules," you mean

18    my rules or Judge McMahon's?

19              MR. REDA:  No, no, Judge McMahon's rules kind of

20    frowned on that.

21              But, also, we have offered a limited resolution of

22    this, that everything, of course, would be nonpublished and not

23    to be disbursed, and anything that has to do with nonparty

24    personal information — bank accounts, Social Security numbers —

25    would be redacted.

MB3KSILC

```
 1        THE COURT:  That's in my individual practices anyway.

 2   You don't need a motion to seal, you don't need a protective

 3   order.  You should automatically be redacting PII.

 4        What I want to know is what's the issue regarding a

 5   protective order, generally, which I generally don't have a

 6   problem with.  That's different from a sealing order, okay?  I

 7   want to make sure that we are actually talking about the same

 8   thing here.

 9        I'm not talking about a sealing order where there

10   needs to be a higher standard met and a higher burden met to

11   seal and redact documents that are exchanged.  I'm talking

12   about a protective order that just governs the exchange of

13   information, the exchange of documents, so you don't have each

14   other potentially or somebody else potentially publishing

15   documents outside of this proceeding.

16        So, I want to understand — are you having a problem

17   with sealing, which is not the issue here, or are you having a

18   problem with a protective order?

19        MR. REDA:  Well, I guess I have a problem with the way

20   they worded the protective order, that they said if there's a

21   dispute, every time that we can't agree on whether something is

22   confidential or not, we've got to come to you.  To me, that's a

23   waste of time.

24        THE COURT:  You've got to come to me if there's a

25   dispute that you can't resolve among yourselves.
```

MB3KSILC

1          MR. REDA:  Right.

2          And it appears that we already can't resolve even the

3   protective order parts.  I anticipate every time they decide

4   something is confidential and subject to the order, and we

5   don't agree, we're going to be coming here.  I think that our

6   position that we will agree, of course, not to publish anything

7   to anybody, and --

8          THE COURT:  That's the protective order, though.  So

9   what is the dispute?  I don't understand.

10         MR. REDA:  Well, my understanding is that they want

11  more than that.  If all we're talking about is that we won't

12  publish anything to anybody else, and we can redact the --

13         THE COURT:  You want to point me to a particular -- is

14  there a draft or proposed protective order that's on the

15  docket?  Why don't you point me to the specific language that

16  you take issue with.

17         MR. MATETSKY:  What we've used is your Honor's

18  verbatim form.

19         THE COURT:  Do you want to point me to particular

20  language, Mr. Reda, that you believe is not warranted or

21  unsupported?

22         MR. REDA:  I apologize, your Honor, I don't have that

23  document in front of me.

24         THE COURT:  Well, we're here for two discovery-related

25  disputes.  This is one of them.  Are you not prepared to talk

MB3KSILC

1    about it?

2              MR. REDA:  I am, Judge.  I just didn't have the --

3              MR. MATETSKY:  I can hand it to Mr. Reda.

4              THE COURT:  Okay.  Thank you.

5              (Pause)

6              THE COURT:  And, Mr. Matetsky, is that -- you

7    mentioned that your proposed protective order also has an

8    addendum that follows Judge McMahon's individual practices.  Is

9    that anywhere on -- where is that on the docket?

10             MR. MATETSKY:  We haven't filed it on the docket, but

11   I can hand up a copy.

12             THE COURT:  Okay, sure.

13             MR. MATETSKY:  Judge McMahon's rules said the assigned

14   district judge provides that she's willing to so order

15   protective orders, but she requires there be this language in

16   the last page.  And, in essence, what it says — and I assume

17   your Honor would agree with this — that by so ordering the

18   protective order, the Court is not thereby making an

19   independent determination as to the confidential status of

20   documents it hasn't seen, it's facilitating the discovery

21   process.

22             MR. REDA:  My, I guess, concern, Judge, is that they

23   will stamp everything confidential, and, therefore -- and if we

24   don't agree with it, we're going to keep coming back here.  I

25   have no problem, as I said earlier, not disclosing this to

1    nonparties and to redact personal information, but I'm

2    concerned that they're going to say everything is confidential.

3            THE COURT:  Right.

4            MR. REDA:  It says for attorneys or experts only.

5    Does that mean that the clients can't look at the documents,

6    also?  I was unclear about --

7            THE COURT:  Yes, that's a higher level of

8    confidentiality designation.  Sometimes I get disputes about

9    that, and we can deal with those as they come up.  I will tell

10   you that even when I was in private practice before I took the

11   bench, often the lawyers would stamp everything confidential

12   and then agree to dedesignate if something were to be attached

13   to a motion, because then it ends up on the docket, and it's an

14   attachment or an exhibit, and it is presumptively -- it ought

15   to be dedesignated, okay?

16           So this is what I'm telling you now, is that if

17   something like that issue or that occurrence comes up, I expect

18   you to be able to work together and discuss whether, if it's

19   already been designated confidential, whether it ought to be

20   dedesignated or subject to a limited redaction.  And usually

21   the parties agree on that.

22           I would prefer, as I can tell from Judge McMahon's

23   addendum, that she would also prefer that parties not in the

24   first instance blanket designate everything confidential and

25   then work together to dedesignate things that they want to

MB3KSILC

1    attach to motions or attach as exhibits for some other reason.

2    That said, I have practiced with ESI much more recently, and it

3    is sometimes too burdensome, if you're dealing with a

4    voluminous ESI production, to go document by document and make

5    a confidentiality determination immediately, which is why I

6    don't necessarily agree -- I don't require an addendum like

7    Judge McMahon does, but I do expect the parties, if they intend

8    to file documents that were produced as exhibits to motions or

9    to use them at trial or at hearings, to then take a look at

10   that subset and consider whether those documents should be

11   dedesignated, and if you agree that they should be

12   dedesignated, and they can be attached either with limited

13   redaction of PII, which always should remain redacted, or

14   attached in full, I am fine with that.  And that does not in

15   any way violate the protective order.

16            Does that make sense?

17            MR. REDA:  Yes, Judge.

18            THE COURT:  Okay.

19            Does that alleviate your concerns?

20            MR. REDA:  Yes, Judge, but I just want to be sure this

21   does not preclude, of course, us sharing all the documents with

22   our clients.

23            THE COURT:  Correct, correct.

24            Now, let me talk to you a little bit about the

25   attorneys' eyes only designation.  I'm not sure that it should

1    apply in this case.  It's in my form order in the event the

2    parties need to use it, but I don't think that -- obviously, I

3    haven't seen your documents, but I can't think of a situation

4    right now where that might be necessary.

5         Where I have seen it come up, and where I think it is

6    warranted, for example, are trade secret cases, where the

7    attorneys may need to see certain documents from the other

8    side, but they don't want their clients, obviously, to see that

9    because then they're continuing to disclose -- potentially

10   disclose new trade secrets, right?  And I've also seen it in

11   cases where there might be a law enforcement or public safety

12   issue where you might not want the client to see the document,

13   but it's okay for the lawyer to see them.

14        MR. REDA:  So as long as the clients are still able to

15   because these are the type of documents I would need to go over

16   with the clients.

17        THE COURT:  Of course, of course.

18        And I think that is expected with the proposed

19   protective order.

20        MR. MATETSKY:  Your Honor, if I may, we certainly

21   don't intend to stamp every document in the case confidential,

22   we've already produced many documents that are not designated

23   as confidential, and when we complete our production, we will

24   review the documents.  We're not going to stamp confidential on

25   every page just out of force of habit.  That would be

MB3KSILC

1   unnecessary.

2          I also anticipate we'd be making limited, if any, use

3   of an attorneys' eyes only tier.

4          That being said, we do have concerns about how the

5   plaintiffs might use the documents in this case.  The

6   plaintiffs have issued two press releases about the fact that

7   they're in litigation with Labaton.  We don't think that's

8   necessary.  We certainly are not producing documents to be used

9   for a press campaign.  The plaintiffs have brought three

10  related proceedings in France.  When there were settlement

11  discussions before I was involved, before Mr. Reda was

12  involved, documents were shared with plaintiffs, then counsel,

13  for settlement purposes, those documents made their way into

14  the filings in France, in violation of the Rule 408 privilege

15  that we believe attached to them.

16         We are producing documents for use in this case,

17  particularly the documents we designate as confidential, and

18  we'd like it to be clear — either we can insert it in the

19  protective order, but certainly we're on the record — I'd like

20  it to be very clear that the documents we produce to Mr. Reda's

21  office and designate confidential are being produced for use in

22  this case.  If there's a dispute as to whether a given document

23  should be confidential, we'll certainly discuss it in good

24  faith with Mr. Reda.  If there's an issue as to that he wants

25  to file Bates number 1234 with his next motion and doesn't

MB3KSILC

1    think that he should have to file them under seal, we're

2    certainly open to that discussion with coming to your Honor as

3    the last resort if we're unable to agree to it.  But we need

4    there to be a confidentiality stip, a protective order here,

5    and we need for the plaintiffs to take it seriously and honor

6    it.

7                THE COURT:  Okay.  Mr. Reda?

8                MR. REDA:  Well, there is no indication from me that

9    I'm -- since I've been involved in the case, but that anything

10   that was disclosed prior was subject to any confidentiality

11   agreement.  We've already agreed or said that we would

12   nondisclosure.  I can't control the fact that there are pending

13   criminal charges against this defendant in another country — I

14   have no control over that — but the clients have indicated, and

15   I said in our arguments, that they would not be disclosed in

16   any way.  So, I don't think -- again, I don't like the for the

17   attorneys' eyes only because this is a case that involves a lot

18   of, I think, complex stuff.

19               THE COURT:  I don't think, and the representation I

20   hear from defendants is they don't necessarily anticipate there

21   being attorneys' eyes only designations or that it would be

22   used in a blanket situation.

23               That said, what I'm hearing right now, and I'm getting

24   a little more background, and sometimes this is how it is

25   helpful to have you all here in person, is that there is more

history before, and that predates this lawsuit, that I need to
be aware of.  So thank you for bringing that to my attention.

I heard Mr. Matetsky mention that some of this
happened before Mr. Reda was brought into the case.  So, I
understand this to be -- and based on Mr. Reda's
representations here, that he is going to have to manage his
clients, and we can't do that in the first instance, nor can
the defendants.  If there ends up being some dispute over an
alleged violation of this protective order, which I will enter
unless you have -- Mr. Reda, unless you have specific edits
that you want to make to it, which I will enter then, that is
something to be dealt with down the line, if something happens.
But, in the first instance right now, I'll deal with it, we'll
get the protective order entered, and then we'll hope that
there isn't a violation, and if there is, we'll deal with that
when the time comes.

MR. MATETSKY:  I appreciate that, your Honor.  I agree
with that.  We can upload this protective order in the
stipulated form with Judge McMahon's addendum or not, as you
direct.

I do just need to respond for the record, because
there is a record, to the reference to criminal charges.  I'm
not a French lawyer, but my understanding is that any
individual in France can go to some government office and fill
out a form and thereby initiate a criminal proceeding.  The

MB3KSILC

1    reference to criminal charges should not in any way be

2    understood as meaning that any French government official or

3    prosecutor or judge or anyone other than Mr. Sillam

4    individually and his retained lawyer have asserted that there's

5    been any wrongdoing of any kind.  That's a severely misleading

6    presentation without that background, which has been, as I say,

7    indicated through press releases that although not issued by

8    Mr. Reda's office, had his name on them, and we need to be very

9    clear about that, your Honor.

10              THE COURT:  Okay.

11              MR. REDA:  Just so I'm clear, that's a little

12    disingenuous because --

13              THE COURT:  Okay, stop, stop.  I'm entering the

14    protective order.  If there's problems later on, we'll deal

15    with them when they come, okay?

16              You know what my position is on this.  Mr. Matetsky,

17    thank you for sharing that with me, but I have actually

18    litigated cases and defended cases in France.  So, I understand

19    how it works.

20              MR. MATETSKY:  Okay.  Does he file a protective order

21    this afternoon?

22              THE COURT:  Yes, please.

23              MR. REDA:  I would just ask that the only part that

24    may be deleted is paragraph 4, at least the expert for

25    designation for attorneys or experts only.

MB3KSILC

1          THE COURT:  It just says that the parties need to meet

2     and confer.  You know what, you're going to meet and confer,

3     and you're going to talk to Mr. Matetsky about whether

4     paragraph 4 belongs in the protective order or not.  I will

5     point out again that this is the form protective order -- as

6     represented by Mr. Matetsky, this is the form protective order

7     that is on my website, which means that it has gone through

8     many levels of review.  I will tell you that hundreds of

9     parties have entered that protective order and not had any

10    problem with it.  They've not felt a need to strike out any of

11    the paragraphs.

12         Also, in my individual practices, which you should

13    make yourselves aware of, is the requirement to meet and confer

14    in good faith on all of these issues.  We have spent way too

15    much time on a protective order that is a form that, in the

16    vast majority of cases, gets entered as stipulated.

17         MR. REDA:  Yes, your Honor.

18         THE COURT:  All right.  Next issue, location of

19    plaintiff's depositions.

20         MR. REDA:  Yes, Judge.

21         THE COURT:  Now, Mr. Matetsky, it's your turn to be in

22    the hot seat.  Why do you have to have these depositions

23    conducted in New York?  Why can't you have them conducted

24    virtually or travel to France and do it?

25         MR. MATETSKY:  Well, start with the last point, your

MB3KSILC

1    Honor.  I don't believe it's legally permissible for American

2    lawyers to travel to France and take depositions.  The French

3    government frowns on American --

4                 THE COURT:  I've done it, so it's possible.

5                 MR. REDA:  Okay.  I've been told by French lawyers,

6    it's problematic.

7                 THE COURT:  It may be problematic, but those are

8    problems that you can work through, because I have done it.

9                 MR. MATETSKY:  Is that merely by flying to France and

10   doing it, or is that going through the Hague Convention?

11                THE COURT:  I'm not going to give you legal advice --

12                MR. MATETSKY:  Sure.

13                THE COURT:  -- but it was not as difficult as it might

14   seem.  It was done.  And, again, the Federal Rules of Civil

15   Procedure here say that you should work -- and my individual

16   practices say that if you can stipulate to a process and a

17   location that you can agree is legal and valid and possible,

18   then you should do that.  But I will tell you, I have taken

19   depositions in France.  I had to depose a Swiss citizen.  I did

20   not do that in Switzerland.

21                MR. MATETSKY:  Okay.

22                But let me return to the initial motion.  There is a

23   presumption, which your Honor is familiar with, and we cited a

24   couple of cases in the joint letter, the plaintiffs decided to

25   bring this case in New York.  They could have brought the case

1    in France.  We know they have brought cases in France.  So

2    there's a presumption that plaintiffs should travel to the

3    district.  It is a rebuttable presumption, but it does exist,

4    and that's the starting point.

5              THE COURT:  Okay.  All right.

6              But I also point you to Rule 30(b)(4), which also

7    provides that the parties may stipulate, or the Court may, on

8    motion, order that a deposition be taken by a remote means.

9              MR. MATETSKY:  That is certainly true, depositions

10   have been taken by remote means, and we're all certainly more

11   familiar with the procedure for doing that now than we were a

12   couple of years ago.  But these depositions would be

13   particularly difficult to take by remote means, and we believe

14   that should be a last resort here.  These plaintiffs have

15   indicated they're going to have to testify through an

16   interpreter.

17             THE COURT:  I've done that in Paris with food

18   poisoning.  So what's your next issue?

19             MR. MATETSKY:  If the Court is ordering food

20   poisoning, I'm going to take it.

21             THE COURT:  No, I'm not.

22             MR. MATETSKY:  But we're speaking of the question of

23   live versus remote, and then we can speak to the question --

24             THE COURT:  Right.

25             MR. MATETSKY:  -- of where, if it's live.

MB3KSILC

1          Remote depositions are problematic here.  This is a

2     document-intensive case.  We've all dealt with depositions.  I

3     don't know if your Honor has tried cases virtually, but it's

4     cumbersome in a document-intensive --

5          THE COURT:  I've done a document-heavy video

6     deposition by videoconference about 20 years ago.

7          MR. MATETSKY:  Probably not with a case involving an

8     interpreter, though.  And it's a last resort.  I don't know

9     whether your Honor was taking or defending that deposition --

10         THE COURT:  Look, the reason why I'm talking about my

11    past experience and my experience from 20 years ago is to tell

12    you it can be done.

13         MR. MATETSKY:  It can be done — we're not disputing

14    that.

15         THE COURT:  So here's my ruling:  You're to meet and

16    confer and determine whether you would like to take an

17    in-person deposition, either in Paris or some other location if

18    Paris is not -- your clients are in Paris, Mr. Reda?

19         MR. REDA:  Yes, Judge.

20         THE COURT:  -- in Paris or another location if you

21    want to do it in person — meet and confer — or if you want to

22    take the deposition by remote means.  I expect that you will

23    work together to do this.  I expect that you will work together

24    and find some agreement.  I do not expect there to be a holdup

25    or an absolute refusal to do one or the other.

MB3KSILC

1        MR. MATETSKY:  So your Honor is directing that it is

2    not going to direct they take place in person in New York?

3        THE COURT:  Correct.

4        So, to the extent it's a motion to compel an in-person

5    deposition in New York City of the plaintiffs, I am not going

6    to require that.  That part is denied.

7        You do have to get their depositions.  You can choose

8    whether you want to do it in person and go to Paris or

9    somewhere else if Paris is not feasible for whatever reason, or

10    whether you want to take it by remote means.

11        MR. MATETSKY:  Would the Court direct that the

12    plaintiffs undertake the cost of travel to Paris?  Because the

13    presumption is that the defendants come to New York, and if the

14    Court is giving them an exception to that, which your Honor has

15    discretion to do, we believe it should be at their expense.

16        THE COURT:  Take a look at Rule 30.  It was amended in

17    2020.  I'm not sure if it's going to be amended again as of

18    December 1st of this year, but take a look at Rule 30, see what

19    it says, do a little case law research, and figure it out, work

20    it out amongst yourselves.  My intention right now is not to

21    shift costs.

22        MR. MATETSKY:  I am familiar with that case law.  My

23    understanding is it's discretionary with the Court.  We've

24    heard what your Honor says.

25        THE COURT:  Yes.

MB3KSILC

```
 1              Anything else at this time?

 2              MR. MATETSKY:  Only to ask whether you would want to

 3     set a control date for a follow-up conference?  We could always

 4     cancel it if there's nothing to talk about.

 5              THE COURT:  Actually, why don't you file a joint

 6     letter letting me know what is happening with the deposition

 7     and when it is happening.  I'll give you to November 10th for a

 8     joint status letter to figure out where and how deposition is

 9     happening.

10              MR. REDA:  The deposition will either be remote or in

11     Paris or someplace in France that's agreed upon?

12              THE COURT:  Correct.

13              MR. REDA:  All right.

14              THE COURT:  But I really don't want to hear that it's,

15     for example, someplace in France that's impossible for

16     defendants to get to, after they have said that they elect to

17     do it in person, okay?

18              MR. REDA:  Yes, Judge.

19              THE COURT:  You are to work together to make this as

20     smooth and simple and cost effective a process as it can be.

21              MR. REDA:  Yes, Judge.

22              MR. MATETSKY:  We will meet and confer, we will talk

23     to our client about their preference.

24              If France is difficult, another option I've sometimes

25     seen is it's easier to take depositions in the U.K. than in
```

MB3KSILC

1    France, and we might --

2         THE COURT:  That is exactly where I deposed the Swiss

3    citizen.  So work together.  Certainly, London is much more

4    convenient than having to come to New York, but work together.

5    So the two parts are in person or remote and location.

6         I hope not to hear more disputes.

7         What else is outstanding as far as discovery?  Where

8    are you as far as document discovery?  I guess you haven't

9    really started because we haven't entered the protective order?

10         MR. MATETSKY:  No, respectfully, your Honor, we have

11    started.  Plaintiffs have produced documents.  We're waiting

12    for confirmation that their production is complete, and we

13    served a second request to which the responses were due, I

14    think, yesterday, so I'll ask Mr. Reda later where that stands.

15    But defendants have produced significant documents that were

16    not subject to the confidentiality issue.  And if the Court

17    enters the protective order this week, we'll be in a position

18    to complete our production this month, to be followed by

19    depositions with the discovery cutoff of February 28.

20         THE COURT:  Okay.

21         So, I'll get a joint status letter on November 10th,

22    and I'm also going to direct a joint status letter on

23    December 16th that is generally about the status of discovery.

24         So, the December 16th letter will tell me what you've

25    done to date, what you have coming up, what you have planned.

MB3KSILC

1   If you have disputes that are brewing, maybe a little heads-up

2   about them.  If it makes sense for us to have a short

3   conference so that I can just address the dispute before it

4   becomes a big, big dispute, with a capital D, I'll be happy to

5   do that.

6          Also, in the interim, I'm not inviting this, but I

7   always make it available — look at my individual practices.  If

8   you have a dispute that arises between November 10th and

9   December 16th that you've met and conferred on and that is

10  holding up other things, and you need a quicker answer, take a

11  look at my individual practices, you raise it preferably by

12  jointly status letter.  If you're unable to do that, then raise

13  it in two separate letters, but I prefer a joint letter

14  identifying the dispute, identifying the two positions, and how

15  you haven't been able to work it out, and then I will try to

16  address it as soon as I can, especially if it's holding up

17  other discovery.  All right?

18          MR. REDA:  Yes, Judge.

19          THE COURT:  Anything else at this time?

20          MR. MATETSKY:  Let me just clarify, when we submit the

21  protective order, did you want it with or without Judge

22  McMahon's addendum?

23          THE COURT:  I am fine for you to add Judge McMahon's

24  addendum, maybe to just reference Judge McMahon's individual

25  practices, so it's not confusing that it says the Court so

MB3KSILC

1   ordering --

2           MR. MATETSKY:  We'll clarify that.  I think we've done

3   that, but we'll double-check.

4           THE COURT:  Okay.  All right.

5           Anything else?

6           MR. REDA:  No.  Thank you, Judge.

7           THE COURT:  Thank you, Mr. Reda.

8           MR. REDA:  Thank you.

9           MR. MATETSKY:  Thank you.

10           THE COURT:  Thank you, Mr. Matetsky.

11           We are adjourned.  I request that the parties order a

12   copy of the transcript, share the cost 50/50.

13           Thank you.

14           MR. MATETSKY:  We submit that to the Court?

15           THE COURT:  You don't need to.  Once you order it, it

16   will be on the docket.

17           MR. MATETSKY:  Very good.

18           THE COURT:  Thanks.

19                           *  *  *

20

21

22

23

24

25