```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                               :
                                          Docket #21cv6675
  SILLAM, et al.,                    : 1:21-cv-06675-CM-OTW

                    Plaintiff,       :

    - against -                      :

  LABATON SUCHAROW LLP,              : New York, New York
                                       January 25, 2023
                    Defendant.        :

------------------------------------ :

                       PROCEEDINGS BEFORE
                   THE HONORABLE ONA T. WANG,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          DOUGLAS M. REDA, ESQ.
                         180 Froehlich Farm Boulevard
                         Woodbury, New York 11797

For Defendant:           GANFER SHORE LEEDS & ZAUDERER LLP
                         BY:  MARK ZAUDERER, ESQ.
                              IRA MATETSKY, ESQ.
                         360 Lexington Avenue
                         New York, New York 10017




Transcription Service:   Carole Ludwig, Transcription Services
                         155 East Fourth Street #3C
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording; Transcript
produced by transcription service.
```

## INDEX

## E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

## E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None | | | | |

```
 1                          PROCEEDINGS                      3
 2            HONORABLE ONA T. WANG (THE COURT):  -- under
 3   the Federal Rules and the Hague Convention would
 4   apply.  What does that actually mean and what does
 5   that prevent or preclude your clients from doing that
 6   matters so much here.
 7            MR. MARK ZAUDERER: Sure, and thank you for the
 8   opportunity, I'm going to address that specifically --
 9            THE COURT:  Yes, and you don't have to stand. I
10   know for some lawyers you can't help it, it's like a
11   reflex, but if you're more comfortable sitting down and
12   speaking into the microphone that's fine, too.
13            MR. ZAUDERER:  Thank you, and if you'll allow me
14   a few minutes I'll do that directly as well, so, and then
15   I'm going to tell you some things that I think are quite
16   shocking that I've learned.
17            So in terms of the practicalities, one of the
18   suggestions has been made, well, why just, what's the
19   problem, take a remote deposition from here, it's under
20   the Hague Convention.  Well if a deposition and, by the
21   way, let me say at the outset, Your Honor, I'm not going
22   to argue the law, this is a discretionary matter, we
23   are entirely in agreement with that although we've
24   noted that the default is you've got a plaintiff who
25   brought a suit here and we've suggested to you there
```

```
 1                          PROCEEDINGS                    4
 2  has to be good reason so that the shoe is on the other
 3  foot, so here's addressing that.
 4          If we take a deposition here during business
 5  hours it's six hours later in France.
 6          THE COURT:  Yep, no, that's not even where I
 7  was going.
 8          MR. ZAUDERER:  Go ahead.
 9          THE COURT:  I was going first, first, look,
10  we've talked about the different possibilities, right,
11  I can appreciate in this case that there could be
12  reasons why you might not want to do a remote
13  deposition and why there are challenges, among them
14  the time difference. So I wanted to talk first about
15  -- well I want to just say first that I'm dismayed
16  that we're still arguing about this, but I wanted to
17  talk first about why you cannot do an in person
18  deposition in France because, that's assuming, right,
19  if we're talking about a deposition in person in
20  France that's assuming that plaintiffs have made a
21  case why there is good cause to, to have the
22  depositions proceed in France.
23          MR. ZAUDERER:  Okay.
24          THE COURT:  I'm not necessarily ruling that
25  plaintiffs have made that showing because one of the
```

```
 1                          PROCEEDINGS                    5

 2   other alternatives I am still considering is, is

 3   whether they should be compelled to come to New York

 4   or whether there ought to be a remote deposition with

 5   them sitting in France to address their concerns.

 6   However, the reason why I'm exploring an in person

 7   deposition in France in the first instance is because

 8   they've been done before, they were done before the

 9   pandemic --

10           MR. ZAUDERER:  We know that.

11           THE COURT:  They've been done, right?  If it

12   takes, it takes the issue of plaintiff's inability or

13   unwillingness to travel off the table, right, it takes

14   that factor away. It also takes away your concerns

15   about the time difference, about the possibility that

16   there's other people in the room or other influences

17   or, you know, and, look, I'm old school because I have

18   done remote and video depositions well before the

19   pandemic --

20           MR. ZAUDERER:  Judge, may I?

21           THE COURT:  (continuing) -- but as the party,

22   as a lawyer taking a deposition --

23           MR. ZAUDERER:  Judge --

24           THE COURT:  I completely understand why, why

25   an in person deposition and particularly in this case
```

```
 1                        PROCEEDINGS                6
 2    might be preferable. I'm not yet ruling on either of
 3    those, I just want to explore --
 4           MR. ZAUDERER:  I understand.
 5           THE COURT:  (continuing) -- the various
 6    options here.
 7           MR. ZAUDERER:  It does not take away the
 8    problem, and please indulge me and let me explain it,
 9    there are some unusual situations here which I have to
10    have the opportunity to make you aware of, okay?
11           THE COURT:  Okay.
12           MR. ZAUDERER:  So in this, let's say we were
13    taking it, now we're going to have a brouhaha at the
14    outset, okay, and I'm going to tell you why, and there
15    is going to be an examiner there who is not familiar
16    with things here and we're in a time difference. And I
17    don't know what Your Honor's practice is --
18           THE COURT:  Wait, are you still talking about
19    a remote deposition?
20           MR. ZAUDERER:  No, in person in France.
21           THE COURT:  Okay.
22           MR. ZAUDERER:  First of all, I'm going to have
23    to go over there, consider the expense, right, I've
24    got to bring this gentleman with me here with the
25    documents, I have to have French counsel, I have to
```

 1

 2    hire the videographers over there, the stenographers

 3    over there, the translators over there, it's

 4    expensive. And we can't just show up, there's only an

 5    overnight going to Paris, that's the only way to get

 6    there, you can't get there at ten in the morning and

 7    then do a deposition. So you're there at least a day

 8    and a half in advance, then you've got to take another

 9    day wasted, another day, another day.

10         But let me get to the heart of this, which I

11    will, okay? I went over the incognito last week to

12    attend a French proceeding. This is what's going on

13    and is highly relevant, Your Honor.  This gentleman

14    has brought three criminal proceedings in France. In

15    France you can do it two ways, you can either go to

16    the prosecutor as you would here and ask them to

17    investigate -- please.

18         THE COURT:  When you gentleman, which

19    gentleman?

20         MR. ZAUDERER:  Plaintiff.

21         THE COURT:  Which one?

22         MR. ZAUDERER:  Sillam.  Sillam, Mr. Sillam,

23    okay, he's gone and twice he was turned down by the

24    prosecutors there.   And then he brought a third

25    proceeding which you can do in France, anybody can

PROCEEDINGS                              8

 1

 2   prosecute a criminal case, and I went there and I sat

 3   there incognito and I saw such allegations that were

 4   being considered such as a settlement, a civil

 5   settlement that Sillam had made here in a prior

 6   proceeding with the defendants was a crime, okay, absurd,

 7   absurd contentions.  And I found out from, because Labaton

 8   was being investigated at the behest of Mr. Sillam, the

 9   French police revealed to us that this is a gentleman who

10   has been serially investigated for multiple serious crimes,

11   that is Mr. Sillam.

12          THE COURT:  When you say this is a gentleman --

13          MR. ZAUDERER:  Sillam, Mr. Sillam.

14          THE COURT:  Okay.

15          MR. ZAUDERER:  Okay, plaintiff Sillam.  According

16   to the police, and I have the translation, and this is going

17   to be relevant to the deposition because I'm going to be

18   asking him about all this and we're going to have a brouhaha

19   and somebody sitting in Europe who is overseeing this

20   deposition isn't going to have the slightest idea what the

21   Rules of Evidence are in a proceeding in the Southern

22   District of New York or how prior criminal --

23          THE COURT:  How much do the rules -- oh, okay, so

24   you're talking about Rules of Evidence for criminal

25   proceedings in New York?

 1

 2          MR. ZAUDERER:  No, the civil, we're in a civil

 3  case here --

 4          THE COURT:  Why do the Rules of Evidence matter in

 5  a deposition?

 6          MR. ZAUDERER:  Because I'm going to use it at

 7  trial in the Southern District. This deposition will be used

 8  in the Southern District, that's why, Your Honor.

 9          THE COURT:  Right --

10          MR. ZAUDERER:  Okay.

11          THE COURT:  So why, so, okay, this gets back

12  to the question I asked at the beginning then, why can

13  you not get questions and answers under oath that you

14  could use in a civil proceeding --

15          MR. ZAUDERER:  Right, I'm going to answer your

16  question, Your Honor, what if the lawyer says I direct

17  the witness not to answer, it's improper, criminal,

18  whatever, and now we have somebody, a supervisor who

19  is not going to know what to do, who knows what that

20  person will do. It's now, we're there and it's ten

21  o'clock in the morning, this is going to start up, and

22  now it's four o'clock in the morning here. I don't

23  know what Your Honor's practices are, I'm certainly

24  not going to call chambers at 4 a.m. and, if not,

25  we're going to be stuck over there until we get a

1                          PROCEEDINGS                    10

2   ruling, that's what is going to happen.

3          THE COURT:  Or you could bring it to the Part

4   1 judge and take your chances there.

5          MR. ZAUDERER:  At 4 a.m., how do I do that?

6          THE COURT:  Yes, you know what, what happens

7   when there's -- what happens when there's fights?

8   You're a very experienced litigator, Mr. Zauderer.

9          MR. ZAUDERER:  Yes.

10          THE COURT:  What happens when there are fights

11   in another time zone and there are deposition issue,

12   what do you do?  I've always told people when I was a

13   practitioner, I tell people now, you make your record

14   and you move on.  I want to get more granular, okay --

15          MR. ZAUDERER:  I'm getting there.

16          THE COURT:  This hypothetical, yes, it could

17   happen, but what are the bases where, one, a lawyer

18   can direct a witness not to answer?  Are they

19   different in the United States versus France?  Can they

20   be asserted differently, what does that mean, or does that

21   just stage the question to an issue of sanctions, an issue

22   to compel at additional deposition?  You may have to show

23   that, you know, you weren't able to get what you were able

24   to get and maybe there will be costs assessed. But those

25   are all issues that may come up but they may not come up,

1
2   but the parties are very much aware that the Federal Civil
3   Discovery Rules allow apportionment of costs,
4   apportionment and potentially sanctions if the parties
5   don't work together in good faith to complete --
6           MR. ZAUDERER:  May I respond?
7           THE COURT:  Yes.
8           MR. ZAUDERER:  Thank you.  May I respond to
9   that, thank you.  My response, Your Honor, is we can
10  avoid all that if we're here.  If we're here in the
11  Southern District in Manhattan during normal business
12  hours and if there has to be delay, you know, we just
13  go home.  Mr. Sillam has taken, one person has come
14  here and taken an airplane and stayed in a nice hotel.
15  And it will either get resolved that day or another
16  day, we don't have to deal with do we hang around in
17  France, do we come back, do we go over again and spend
18  money and time over there.  There's just simply in my
19  view, respectfully, no reason for that.  You avoid all
20  these problems. I cannot understand, Your Honor, why
21  one should even question the preference of a
22  deposition being taken in France rather than here
23  where the --
24          THE COURT:  Mr. Zauderer, I'm going to cut you
25  off right now.

```
 1                          PROCEEDINGS                    12

 2            MR. ZAUDERER:  Sure.

 3            THE COURT:  I told you at the outset why.

 4            MR. ZAUDERER:  Right.

 5            THE COURT:  You acknowledge that this is a

 6   discretionary determination.

 7            MR. ZAUDERER:  I do.  I do.

 8            THE COURT:  Right?  I will tell you that when

 9   I was a practitioner I conducted multiday depositions

10   in Paris of French nationals.  We were able to work it

11   out, and I'm trying to understand why you're not able

12   to work it out, okay. I get that you would prefer, and

13   it would be cheaper for you to have the deposition in

14   New York.  I have not ruled out that that is what I

15   may order ultimately, but I want to explore why we are

16   fighting so hard on this and --

17            MR. ZAUDERER:  Okay.

18            THE COURT:  Because you are saying it's not

19   possible.  And what I'm hearing here is it would be

20   expensive, it would be inconvenient and, you know

21   what, I'm going to tell you that it would be extremely

22   inconvenient given what I'm hearing from what

23   plaintiffs are saying about having to come to New

24   York, that they don't have passports, do you really

25   want to be pushing out the deadlines waiting for them
```

PROCEEDINGS                          13

```
 1  to get their passports if, indeed, they are ordered to
 2  appear in New York for a deposition?  Do you want to
 3  have those fights?  I'm trying to understand which is
 4  going to be the most cost effective just in speedy
 5  resolution.
 6          MR. ZAUDERER:  Okay.  May I, excuse my
 7  enthusiasm, Your Honor, there's another reason, okay.
 8  This plaintiff has felt free to bring criminal
 9  proceedings --
10          THE COURT:  Okay.
11          MR. ZAUDERER:  Okay, that's my concern.  And I,
12  as I say, I went there incognito in court --
13          THE COURT:  Okay, let me, can we table that
14  again?
15          MR. ZAUDERER:  Sure.
16          THE COURT:  What I saw in multiple filings was
17  we can't do a deposition under the Federal Rules, the
18  Hague Convention would apply.  Why, you can do this
19  under a commissioner, you can agree to certain rules
20  of the deposition, I still am not hearing specifically
21  why taking a deposition of a French national in France
22  under the Hague Convention is so impossible, okay?  I
23  will set aside, let's just put the blocking statute
24  issue on hold, I have questions about that as well
```


```
 1                          PROCEEDINGS                    14
 2  because that also came up in my past experience and
 3  somehow we were able to work it out, okay, but let me
 4  hear about the whole, the Federal Rules versus Hague
 5  Convention and why it's not possible?
 6          MR. ZAUDERER:  I do not say it is not
 7  possible, I do not make that contention.
 8          THE COURT:  Okay.
 9          MR. ZAUDERER:  I want to be clear and forgive
10  me if I didn't make that clear. I am not arguing it's
11  not possible.  What I am saying, if I can talk about
12  the blocking statute, is this plaintiff over whom
13  counsel here have no control has filed a criminal
14  proceeding, he has been charged criminally, himself,
15  multiple times, including possession of a firearm,
16  fraud, I have the record here of six, five or six
17  instances where he's been investigated and charged by
18  the police.  He, there is nothing that would restrain
19  him after I take a deposition in France from filing a
20  criminal proceeding claiming whatever he wants to, as
21  he's done with Labaton, and responsible lawyers there.
22  He's filed a criminal proceeding over there and he'll
23  do it with me. And you and I may say well that's
24  frivolous, but I have to defend it. I have to hire
25  French lawyers. He can bring a criminal proceeding and
```

 1

 2    there is a record here, that's my concern. I'm not

 3    arguing that we couldn't do a deposition with all the

 4    costs and all that, if I haven't been clear, I

 5    apologize.

 6            THE COURT:  Okay, how does the -- so the

 7    concern as you're articulating it now --

 8            MR. ZAUDERER:  Yes.

 9            THE COURT:  Is if you were to go to Paris to

10    take the deposition you don't have any assurances that

11    you're not going to be subjected to a frivolous, some

12    sort of proceeding in France on the basis of what you

13    are, the fact of taking the deposition.

14            MR. ZAUDERER:  Yes, Your Honor.

15            THE COURT:  I see Mr. Reda shaking his head,

16    talk to me about this.  And, you know, I have to tell

17    you, this is something that is unique to this case

18    that does concern me and it's sort of outside of the

19    law, okay, this really does, this is one of the

20    practical concerns that I'm hearing. So go ahead, Mr.

21    Reda.

22            MR. REDA:  Well, Judge, I would just I guess

23    start by saying that I came here thinking this was

24    really their motion to reargue or renew, yet there's

25    no new facts, they certainly couldn't argue and did

PROCEEDINGS                                16

1

2  not argue that the Court misapplied the law, the law

3  is crystal clear in this area, there is really no gray

4  area, and they haven't done anything but put forth the

5  same old arguments except now they now want to say,

6  almost like defame my client with all these

7  allegations that they didn't bring up in their papers,

8  I don't know what they're talking about, but my

9  clients have, and we stated it in our papers that they

10 are willing to sign affidavits stating that they will

11 not do anything in regards to these lawyers pertaining

12 to the depositions that occur in France.

13        And they can draft the affidavits however they

14 want to proceed with this, but our clients, and the

15 reason we're here, given, you know, have offered to

16 the Court that they are medically unable to travel.

17 The man has not traveled since 2018 to the United

18 States, that's five years, and his doctor has said that at

19 this point he shouldn't be traveling because of his health

20 issues. The same with the other plaintiff.  And we have

21 said if the Court wants these documents or wants these

22 doctors' notes we'd be more than happy to supply them.

23        And understand, again, now he's saying he was in

24 France incognito.  When he came to the Court and asked for

25 an adjournment of the last conference, he didn't say he

1
2    was going to Court incognito, he said that he had a case

3    involving the exact same parties in France.  And that was

4    months in advance, I mean this court date was months in

5    advance, they could have, if they had done anything in

6    this case since August or even the latest in November when

7    you ruled that they couldn't, they hadn't come here, they

8    had to do it in France or remotely -- or remotely in your

9    original order you, this motion here is a motion to

10   reargue your original decision which stated that the

11   deposition should either be in France or remotely as our

12   clients are in France.  They are now trying to get you to

13   change your mind but they haven't given you any new

14   information, either law or facts, that would warrant you

15   changing your original order.

16           And what I find more, I guess troublesome, is

17   that since, we've been doing this since August, they've

18   made no attempt to go through the Hague convention. I mean

19   not at all, and yet in their papers they argue it's going

20   to take too long.  Well, you know what, it wouldn't have

21   taken too long if they did it when they were supposed to.

22   In fact, if they had done it in a timely fashion when he

23   was in France, we could have done the depositions then, we

24   all could have gone there.  He was there, clients were

25   there, could have done it then, but he didn't.

```
  1                          PROCEEDINGS                  18

  2              And the law is very clear, in fact, our Courts,

  3   the Federal Courts have ruled that the deposition on

  4   notice in exact facts like this case, which is people that

  5   voluntarily want to be deposed, there's no national French

  6   interest, there's no interest by the French government in

  7   this case, all of the things the Third Circuit Court of

  8   appeals has talked about in why the Hague convention is

  9   just one method and maybe not the best method. Only they,

 10   Congress had indicated that you should use the Hague if

 11   the party doesn't want to be deposed, he has to be forced

 12   to be deposed, you'll have to go through the Hague. Our

 13   clients have voluntarily said they want to be deposed in

 14   France, they've said they'll sign affidavits saying that

 15   they won't pursue any action and this, we could have been

 16   done with this already. He was in France, we could have

 17   gone to France, I just don't understand that they keep

 18   doing the same thing yet they've done nothing to move this

 19   forward as far as the Hague convention is concerned, not

 20   that they need to, because depositions on notice would be

 21   the preferred way to go.

 22              And this whole thing about when we get there,

 23   when we're there on notice, the Federal Rules of Civil

 24   Procedure apply.  We don't need a French lawyer there to

 25   interpret the Federal Rules, we all know the Federal
```

1

2  Rules, that's what's going to apply to these witnesses.

3  And as the Court pointed out, if our clients somehow take

4  advantage of this and don't answer questions, there are

5  sanctions that the Court can impose, like dismissing their

6  complaint because the Federal Rules allow for that.  so

7  I don't think we have to worry about what the French

8  law says, what French lawyers are going to say,

9  because there will really be no reason for French

10 lawyers to be there. We're conducting a deposition in

11 France or remotely based on the Federal Rules of Civil

12 Procedure as they apply to this case.

13         MR. ZAUDERER:  May I -- oh, sorry, may I

14 reply, Your Honor?

15         MR. REDA:  And  I also just wanted out to the

16 Court --

17         THE COURT:  I just want to let Mr. Reda

18 finish.

19         MR. REDA:  (continuing) -- that not only was

20 this motion improper but they violated all the Court

21 rules, 6.3 says you're not allowed to attach

22 affidavits to their papers. So instead, what, they

23 call them declarations, I mean is that a way that you

24 get around it?  And, again, no new evidence, no new

25 facts, just the same old argument that, well, they

PROCEEDINGS                    20

should be here because they sued here. But I think
we've established reasonable cause to understand why
they can't come here now, it's a medical issue.

And what's more I think interesting is that
they've already told us that one of their witnesses,
one of their lawyers, has medical issues and they want
us depose him virtually, which we said we would do. So
it's all right for their witness to be deposed
virtually, but our witnesses have to be in person in
New York. It just boggles my mind that we're still
arguing something and yet they've done nothing at all
to move this forward. We could have been done with
this already and we haven't even started.

MR. ZAUDERER:  May I reply?

THE COURT:  Sure.

MR. ZAUDERER:  Thank you.  Look, first of all,
we have supplied an affidavit from French counsel on
the issue of the undertaking not to bring a criminal
proceeding that's been proffered here. And the
affidavit states as a matter of French law that it's
irrelevant, it's ineffective, you cannot promise with
legal effect not to bring a criminal action based on
something in the future. I mean that's been
uncontroverted here, that's number one.

The second, I would like to just briefly --

THE COURT:  Well what about, what about the teeth that we have here with sanctions, apportionment --

MR. ZAUDERER:  You know, you can bring all the sanctions you wish here, one can, that's not going to stop me having to respond to a criminal proceeding in France, okay, by Mr. Sillam.  It just won't.

THE COURT:  Unless, unless, for example, the party were directed to pay costs for having to defend the proceeding, right?

MR. ZAUDERER:  This is a person who's been investigated for criminal behavior six times and he's in France. He is not, and even if this case is dismissed here he is not going to forego bringing a criminal charge against me for anything he can superficially argue, okay, that's what I face as counsel and going over there. I don't want to be exposed to that.

THE COURT:  Yet you have representations from an officer of the court here that he's not going to let his client do that.

MR. ZAUDERER:  He can't control his client. Why, I'm not going to assume that.  He would come

```
 1                          PROCEEDINGS                22
 2   here, say, look, I told him he can't do it, I'll make
 3   a representation, what's it worth?
 4          THE COURT:  Really? So your suggestion is that
 5   as an officer of the court Mr. Reda would not be able
 6   to control his client, but he apparently doesn't know
 7   that so he's willing to put his own integrity and
 8   reputation out there and potentially face sanctions if
 9   it comes, if it turns out that that's not, that's not
10   appropriate, that's not possible?
11          MR. ZAUDERER:  I can't speak for him under
12   what circumstances he would make that representation,
13   whether he will or he won't, but either way it does
14   not protect us from Mr. Sillam, okay?  He may in good
15   faith speak to his client and say I won't bring it and
16   then he makes that representation and Mr. Sillam does
17   it, what's that worth?  He said, Judge, I made that in
18   good faith, he probably would, I don't doubt it, that
19   has no meaning or effect.
20          I'd like to also address the procedural issue
21   if it's of any concern or consequence. I just want to
22   remind the Court that the original determination of
23   the place of deposition was not on a formal noticed
24   motion that was briefed, it was an oral discussion at
25   an conference following a joint submission concerning
```

1

2   the positions.

3          THE COURT:  And the text of my order, so I

4   don't want to -- I, there is enough going on in this

5   case and the related issues, and the disputes between

6   your clients that aren't even before this Court for me

7   to get bogged down in parsing out procedure and what I

8   meant in my prior order, but my prior order directed

9   you all to meet and confer. I do not get the sense

10  that there's been a whole lot of meeting and

11  conferring going on here.

12         MR. ZAUDERER:  We did confer, my colleagues

13  continually confer, I think that's accurate.

14         ATTORNEY:  Yes, we met and conferred

15  extensively, unfortunately we just can't agree.

16         MR. ZAUDERER:  Yeah, this is sometimes where

17  people have to agree to disagree, we're all aware of

18  the obligation and the utility of conferring, and

19  we've done that, but sometimes people agree to

20  disagree and their clients are in sharp contrast with

21  each other.

22         MR. REDA:  If I may, Judge?

23         THE COURT:  Go ahead.

24         MR. REDA:  I'd also, again, these, this

25  declaration from a French lawyer, improper, shouldn't

1

2  have been even allowed to be submitted on the docket

3  --

4          THE COURT:  Okay, go ahead, move onto the next

5  issue.

6          MR. REDA:  But in all of this extraneous stuff

7  about my clients, I mean that they never brought up to

8  the Court before, now all of a sudden he's got all

9  these things, he's this horrible person, he's going to

10 have them arrested, I mean I don't know what to say to

11 it because I don't know if any of that is true. All I

12 know is that he was there in France I guess last week,

13 he didn't get arrested, he came back, so I guess there

14 wasn't any problem there.  I don't know. It's just

15 nothing has changed other than the fact that my

16 clients are still ill, still can't travel under

17 doctors' orders and, as I said, we can do this and

18 fashion it in a way, I don't know why we can't do it

19 remotely.  Then they don't have to worry about being

20 arrested and all that stuff that they're making up.

21 You know, nothing's happened, I don't know what to

22 tell them about my client has assured me that they

23 would sign affidavits. One of the clients is a lawyer

24 in France, he would be -- everyone is willing to sign

25 whatever they need, they feel to be protected, but if

PROCEEDINGS                          25

they're so afraid of going to France, not that it

stopped them from going last week, perhaps maybe we

should do it remotely which could be easily done. It's

not like we're asking them just because we don't want

to come, you know, they don't want to come, there are

valid medical reasons that preclude them from

traveling at this time.

          THE COURT:  Okay --

          MR. ZAUDERER:  May I address -- sorry.

          THE COURT:  No.  Mr. Reda, sometimes if it

looks like you're winning an argument, you don't need

to keep talking.

          MR. REDA:  Yes, Judge.

          THE COURT:  All right, one thing, I want to

move forward on this, all right?  You, Mr. Reda, you

represented that there are medical, real, valid

medical issues that preclude your clients from

traveling for a deposition. You've represented that

you can provide a doctor's note but you have not yet.

          MR. REDA:  Only because the, in our papers,

even in our first submissions we asked the Court if

they wanted them we would --

          THE COURT:  Right, I know.

          MR. REDA:  And since you didn't ask for them,

1

2  we didn't give them to you.  But we can give them to

3  you at any time, Judge.

4        THE COURT:  More, more concerning to me is,

5  and also, since we're on the record I don't want to

6  get into the details of your client's medical

7  conditions or anything, but I wanted to know if those

8  medical issues and those reasons have been fully

9  disclosed to defense counsel while you've been talking

10  about whether or not the, you know, this is a good

11  enough reason, in other words.

12        MR. REDA:  Yes, Judge, we've supplied them

13  with that documentation, we just didn't supply it to

14  the Court because the Court didn't day they wanted it.

15        THE COURT:  Okay, I see defense counsel wants

16  to confer, so why don't you talk among yourselves for

17  a moment.

18        MR. ZAUDERER:  Thank you.

19        THE COURT:  Okay.

20            (PAUSE IN PROCEEDING)

21        MR. ZAUDERER:  Your Honor, there were two

22  plaintiffs, as you know. With respect to the second

23  plaintiff, Mr. Saulnier, we've been given no proffer

24  of any medical issue or any medical condition,

25  whatsoever. We've been given his driver's license

```
 1
 2    which shows his age which I believe was 79, mere age
 3    without more is not probative at all of inability to
 4    travel. With respect to Mr. Sillam, we've been given
 5    an unsworn doctor's note from early September from a
 6    general practitioner, very vague, conclusory, unsworn
 7    post litigation. We've been telling the plaintiffs for
 8    six months that this, we believe this is conclusory
 9    and inadequate under this Court's case law and they've
10    given us nothing further.
11            MR. REDA:  All I can say, Judge, is they have
12    never asked for any further documentation, we gave
13    them the doctor's note in French and then we had it
14    translated for them so that it would be in English
15    also. And as they're aware, he's got serious medical
16    issues, heart conditions, the doctor precludes him
17    from traveling. They keep bringing up that he traveled
18    in 2018, well that was five years ago, things change.
19            MR. ZAUDERER:  If --
20            THE COURT:  Okay, Mr. Reda, is it, is it your
21    position for both plaintiffs that there are medical
22    reasons, that there are medical reasons that they
23    should not be traveling?
24            MR. REDA:  Yes.
25            THE COURT:  Okay.  I am -- all right, but it
```

PROCEEDINGS                    28

1
2  sounds like there's a dispute as to whether the
3  proffers that have been provided are sufficient, okay.
4  All right, who wanted to speak next, Mr. Zauderer, go
5  ahead.
6          MR. ZAUDERER:  Yeah, just on one issue, kind
7  of the flourish was, the statement was made I went to
8  France, nothing happened, I didn't get arrested.
9  That's not what happens.  Mr. Sillam here --
10         THE COURT:  I don't care.  I don't care,
11 that's not relevant here, okay?
12         MR. ZAUDERER:  All right.
13         THE COURT:  What I've heard articulated, a
14 concern that there will be criminal proceedings --
15         MR. ZAUDERER:  Correct.
16         THE COURT:  Unfairly brought that will cause
17 problems --
18         MR. ZAUDERER:  Correct, Your Honor.
19         THE COURT:  Significant problems, right --
20         MR. ZAUDERER:  Yes, he just has to file them,
21 that's all he has to do.
22         THE COURT:  Okay, let's, let's explore that
23 issue a little bit. I'm hearing from Mr. Reda that Mr.
24 Reda, as an officer of the court represent that he
25 will not, this his clients will not, will do no such

1

2  thing, okay.  What I'm hearing now is quite

3  speculative and I'm a little bit concerned at the tone

4  and the tenor of this argument, but what you're

5  saying, Mr. Zauderer is, also as an officer of the

6  court, Mr. Reda doesn't have control of his clients,

7  his clients are crazy and they're going to sue me

8  anyway.

9          MR. ZAUDERER:  I think it's, I can't know

10 that. I can't know that.

11         THE COURT:  Okay --

12         MR. ZAUDERER:  Of course it's speculative.

13         THE COURT:  But explain to me --

14         MR. ZAUDERER:  Yes.

15         THE COURT:  Explain to me why the Court does

16 not have the ability, this Court, why I --

17         MR. ZAUDERER:  Yes.

18         THE COURT:  And the District Judge on this

19 case, do not have the ability to fashion a proper

20 remedy or recourse if, in fact, it turns out that

21 these clients have done something that Mr. Reda

22 advised them not to do and which they, themselves,

23 have represented and promised not to do?

24         MR. ZAUDERER:  Because in the real world, Your

25 Honor, I don't believe Mr. Sillam will care. I have

1
2   his criminal history, why would he care?  The worst
3   that's going to happen is the Court would impose some
4   fine, perhaps dismiss his case, he's not here, he's
5   not American, he's in France, he can still file a
6   criminal proceeding over there, he can do anything he
7   wants.
8          So the answer, Your Honor, respectfully, is
9   the very important tools that this Court has would not
10  be effective if what I say is true and I think there
11  is a record here to suggest this is a real
12  possibility.
13         THE COURT:  Not that I'm suggesting this, that
14  anybody consider this, but you did not mention, for
15  example, contempt sanctions?
16         MR. ZAUDERER:  Again, I don't think, first of
17  all, I don't know whether we'd get that, but assuming
18  we were afforded that relief, what does it matter to
19  Mr. Sillam?  He's French, he has no concern. He's
20  brought this case here to take a shot at it and he
21  keeps bringing criminal cases in France, and he keeps
22  being investigated, and if we can get, we've been told
23  this by the police there because Labaton was the
24  subject of his investigation so they released to us
25  his criminal history which is substantial.

1

2          THE COURT:  All right, you are not going to

3    mention Mr. Sillam's criminal history anymore, okay,

4    it's irrelevant at this point.

5          MR. ZAUDERER:  Okay.

6          THE COURT:  All right, talk to me about, is

7    there any other reason why you cannot conduct an in

8    person deposition in France? I've heard the, you know,

9    I'm going to be subject to potential criminal charges,

10   not because of the state of the law or because of the,

11   because of the French blocking statute or anything

12   like that but specifically because of these

13   plaintiffs.  The argument is also made that these

14   plaintiffs' lawyers' representations are not

15   sufficient, that the plaintiffs, themselves, that the

16   representations by the plaintiffs, themselves, are not

17   sufficient.  So that's one reason, right?  And I guess

18   the other -- is that the primary reason, what are the

19   other reasons why you cannot do a deposition in

20   France?

21          MR. ZAUDERER:  There is no reason other than

22   that that I cannot do it. I'm not saying it can't be

23   done and if I have made, I don't think I've argued

24   that, I'm not, Your Honor.  I'm saying there are many

25   practical problems which I've discussed, I know Your

1

2   Honor is fully aware of them because sometimes in the

3   real world, you know, the theoretical remedies for

4   things are really not practical and that's what I've

5   suggested. I won't repeat myself, I'll refer you to

6   what I've already argued, all about the time

7   differences, the practical problems with a busy Court,

8   can't be expected to address every problem right away

9   and even if it were 3,500 miles away in a different

10  time zone and perhaps having to stay there, it's

11  expensive, in my view there are, respectfully, no

12  justification.

13          And one other point, I think the only final

14  point, it's probably buried in our papers so it's not

15  new, is I would ask the Court to take into

16  consideration when you weigh all these factors, much

17  of our experience and perhaps Your Honor's experience

18  in practice, is with nonparty witnesses. And a lot of

19  the case law comes from that.  And while it is not

20  determinative, we're talking about a party. Usually we

21  take nonparty witnesses in Europe, we have cases here,

22  the witnesses are all over, I've done a lot of this

23  over the years, I've really never seen a position

24  where, what's Mr. Sillam going to not come to trial

25  because he's too ill, he's going to rely on my

1

2  deposition of him?  I mean the reality, I mean that's

3  something to consider. I don't know the answer to

4  that. He claims he's too sick but he's bringing the

5  case here and three criminal cases in France and he's

6  going to come say I don't have to come trial and just

7  wait for that and maybe he can extract a settlement,

8  this is not going to happen. So that's my other point,

9  Your Honor.

10            MR. REDA:  If I may respond, Judge?

11            THE COURT:  Go ahead.

12            MR. REDA:  Well first of all, the sanction of

13  you actually dismissing his case so outweighs any

14  allegation they might bring a criminal, a baseless

15  charge against this lawyer, I mean the plaintiffs have

16  spent so much money in legal fees and such to

17  prosecute this case, they think that it's worth a lot

18  of money, to think that they would intentionally,

19  knowing that the case could be dismissed and they

20  could be sanctioned by this Court even further because

21  they somehow have some vendetta against a lawyer

22  they've never met is so speculative and kind of silly.

23  Because I mean they want the case here, they want to

24  have the case adjudicated, they wouldn't do anything

25  so blatant that would cause this Court to dismiss

PROCEEDINGS                          34

1

2  their case as a sanction for violating an affidavit

3  they are willing to sign fashioned by either the Court

4  or by defense counsel that shows that they're not

5  going to do that. I mean and it keeps talking about

6  this, you know, if this wasn't in Court, you know,

7  this would be a defamation lawsuit, I mean every, I

8  mean you would think this man is a child molesting

9  murderer the way they keep talking about him, we

10 talked to the police about him, all this stuff.

11 There's no proof of it, there's nothing they gave to

12 the Court, nothing they gave to us, it's just kind of

13 trying impugning him by a broad stroke that he's not a

14 nice guy, yet the subject matter of this lawsuit is

15 that their clients defrauded them, lied and

16 misrepresented to them facts which is why we're to

17 begin with.

18         So if anyone has a history of

19 misrepresentation, of lying --

20         MR. ZAUDERER:  Oh --

21         MR. REDA:  (continuing) -- of doing the wrong

22 thing, it's not my clients, it's their clients.

23         MR. ZAUDERER:  That's out of order.

24         THE COURT:  Oh, my goodness, you're both out

25 of order.  All right --

```
 1                        PROCEEDINGS                    35

 2             MR. ZAUDERER:  Respectfully, Judge, I,

 3   apologies, I don't think I've said, made any argument

 4   that's out of order, I apologize if I have.

 5             THE COURT:  You have continually referred to

 6   the plaintiffs in this case in pejorative terms,

 7   suggested that they won't listen to their lawyers,

 8   suggested that they are willing to bring baseless and

 9   frivolous lawsuits --

10             MR. ZAUDERER:  Correct, I do, Your Honor.

11             THE COURT:  And continued to push that point

12   even after I have told you not to keep doing it.

13             MR. ZAUDERER:  Apologize if I've done that --

14             THE COURT:  I have listened and I have heard

15   your concern.  I agree that given some of the history

16   in this case, that it is not, that there is some there

17   there, that there is a non-zero possibility that this

18   might happen, but I have also listened carefully to

19   what Mr. Reda, who is also an officer of this court

20   and who represents these individuals, that they have

21   tendered or proffered affidavits or other assurances

22   that they will not do such a thing, and that I think

23   should reduce the possibility, even if it doesn't

24   reduce it to zero it reduces it to a number that is,

25   that may be acceptable considering the other recourse
```

that you may have. Which admittedly would happen after

a bad event or a bad incident, but sometimes that's

what -- sometimes that's all we've got, right, that is

inherent in the definition of the word remedy, all

right.  And we also have not yet covered whether a

remote deposition might alleviate that issue and bring

that possibility down to zero.

So let's talk about a remote or video

deposition.

MR. ZAUDERER:  Sure.

THE COURT:  I have heard already why there are

reasons that it would be impracticable, why it would a

hassle, why it would not be preferred. I share those

reasons, okay, I understand that, I want to hear if

there's anything else with regard to a remote or video

deposition that makes it not preferred, or less

preferred, or not possible.

MR. ZAUDERER:  Sure, I hope this is

responsive. The only other point other than the things

that you've alluded to in the practicalities is the

point we've made in the papers that under the law as

we've put it out for Your Honor, whatever concerns

there are under the blocking statute exist whether the

deposition is in person or by, or is remote, that's

1

2  our view that we've advanced to you and substantiated.

3         THE COURT:  But I thought I heard Mr. Reda say

4  that the blocking statute really concerns national,

5  issues of national economic interest and normally do

6  not apply or would not be implicated if there were a

7  witness who was appearing voluntarily and under

8  agreement and for a private personal lawsuit.

9         MR. ZAUDERER:  So, Your Honor, if I may ask

10  Mr. Matetsky to address it who can do so more

11  knowledgeably than I.  Go ahead.

12         MR. MATETSKY:  Very briefly, Your Honor, and

13  we've given you some case law on this. There are many

14  countries which although they are parties to the Hague

15  convention, take the position if you've got a

16  consensual deposition you're free to take it in our

17  territory, we don't express a national interest, we

18  don't -- we don't care.

19         THE COURT:  And France is not one of them?

20         MR. MATETSKY:  France is not one of those

21  countries.  France, and we've given you the law on

22  this and we've given you, Mr. Tetley's declaration

23  takes the position that even if it's fully consensual,

24  if the deposition of a French national is taking place

25  on French territory, whether in person or remotely,

1
2   you have to jump through the Hague convention hoops.
3           THE COURT:  Okay, why not jump through the
4   Hague Convention hoops?
5           MR. MATETSKY:  Because there's no assurance --
6   there are two ways that people can address that.  One
7   is frankly to say even though we're supposed to go
8   through the Hague Convention we're just not going to
9   do it, everyone will turn a blind eye and we just
10  won't care.
11          THE COURT:  Okay.
12          MR. MATETSKY:  That might be tenable in
13  another case, given what we've heard earlier about
14  these particular plaintiffs we wouldn't feel
15  comfortable about that.
16          THE COURT:  I'm not, I'm not even putting that
17  on the table.
18          MR. MATETSKY:  Okay, the other --
19          THE COURT:  So what's the not turning a blind
20  eye?
21          MR. MATETSKY:  If we don't turn a blind eye
22  then we have to go through the Hague Convention as
23  pointed and as we've discussed, there is significant
24  potential delay there.  There are two possible
25  alternatives, let's suppose, I gather Your Honor is

1
2  familiar with the procedure, we go through the
3  Commissioner.  In many cases there is a, there is a
4  deposition that takes place that runs smoothly but
5  that is not guaranteed to happen. We don't know who
6  the Commissioner is going to be, what the Commissioner
7  is going to do, what attitude the Commissioner is
8  going to take, how the Commissioner might react to the
9  different scenarios that might come up, there is no
10 assurance of a complete and full examination. And
11 given that as Mr. Zauderer pointed out we're not
12 talking about some peripheral nonparty, we're talking
13 about the plaintiffs in the action, there should be a
14 full, free, unfettered deposition under the American
15 rules is our submission.
16         THE COURT:  So the problem here is there will
17 be delay, if you go through the Hague you have delay
18 and you have problems with a Commissioner, anything
19 else?
20         MR. MATETSKY:  And that there is no assurance
21 that we'll have the full and free deposition that we'd
22 be able to have in New York.
23         THE COURT:  You know what, there is no
24 assurance that anybody gets to have, that any
25 deposition will proceed fully, freely and fairly no

1

2  matter where it's taken, no matter who's taking it,

3  okay, and there are remedies after the fact.

4        I want to go back to -- I want to go back to

5  your point about the Commissioner, Mr. Matetsky.  So

6  you're suggesting that you would have no ability to

7  find or designate your own commissioner? I thought

8  that under the Hague there could be a judge or some

9  judicial officer or you could find your own

10 commissioner?

11       MR. MATETSKY:  We could ask for that. We could

12 ask for that and Your Honor could ask for that, but

13 there is no guarantee that it would be granted.

14       THE COURT:  There are no guarantees in life,

15 Mr. Matetsky.  All right, Mr. Reda, do you have

16 something to say about this issue?

17       MR. REDA:  Yeah, first of all, this issue has

18 been, was addressed really almost word for word by the

19 Federal District Court in Pennsylvania in which they

20 said --

21       THE COURT:  Yes, which you cited in your, I'm

22 trying to look at, trying to find where it is in your

23 brief.

24       MR. REDA:  Yeah, page 4, Judge.

25       THE COURT:  Okay, this is the asbestos case?

1

2          MR. REDA:  Yes, product liability litigation

3   in the Eastern District of Pennsylvania --

4          THE COURT:  Yep.

5          MR. REDA:  Where the Court ruled all that "the

6   voluntary deposition of a plaintiff in this case poses

7   no threat to France's sovereignty or to France's

8   interest in its own legal procedures, the deposition

9   will not compel anyone's testimony, will burden or

10  inconvenience France or its Courts or citizens."

11  That's what we have here.  And there is nothing to

12  indicate that we can't do this remotely. I mean could

13  it be, I'm not saying that it wouldn't be less

14  convenient, yes, it would be a little harder, but it's

15  not like it's asking you because, you know, they just

16  don't want to come. I think that there are valid

17  medical reasons for that, that's why we've been having

18  this conversation. If I had come here and said to the

19  Court, well, they just, you know, they just don't want

20  to come, well, too bad, they have to come.  But that's

21  not what we have here, they don't have to go through

22  the Hague convention, in fact, our Federal Courts have

23  ruled consistently, not only the Second Circuit but

24  the Third Circuit, the Supreme Court, that the

25  preferred way of doing depositions is through notice

1

2  and that you'd only go to the Hague Convention if you

3  think there's going to be a real problem with a

4  witness who is not voluntarily willing to be deposed.

5  That's not the case here.

6         So while they could have gone through the

7  Hague Convention, there was no need for them to do

8  that because our witnesses are voluntarily, and it's

9  not even they're nonparty witnesses, they are, they

10  are parties that have a great interest, you know, in

11  this proceeding, therefore, they have to be careful

12  about what they do that's going to affect the Court's,

13  you know, granting sanctions if they don't do -- if

14  they do something improper. This, the notice

15  requirement is really the way they should have gone

16  here, but if they wanted to go Hague they should have

17  done that, you know, months ago. I don't think there's

18  anything that makes it so insurmountable that we can't

19  do this deposition remotely, especially considering

20  that even before we got to this point they had already

21  stated they were videotaping the deposition. So I mean

22  I think they're protected many different ways to make

23  sure that this goes as smoothly as any deposition can

24  go.

25         THE COURT:  All right, any response to that,

 1
 2  defense counsel?

 3          MR. ZAUDERER:  Give us a moment, Your Honor.

 4          THE COURT:  Okay, thanks.

 5              (PAUSE IN PROCEEDING)

 6          MR. ZAUDERER:  Your Honor, the case that Mr.

 7  Reda cites, I believe, is a case in which the Court

 8  said, you know what, everybody's in agreement, just

 9  let's ignore the Hague Convention and just go take the

10  deposition and hope the French authorities don't find

11  out about it don't care. I believe that's the

12  alternative, the one alternative that your

13  specifically indicated a month ago --

14          THE COURT:  So then go to the Hague

15  Convention.  If you don't want to do it that way then

16  go through the Hague Convention, right, what's the

17  problem with that?

18          MR. ZAUDERER:  Well I think we've indicated

19  what our concerns are about --

20          THE COURT:  You might not get the commissioner

21  that you want?  Why, you know what, there are plenty

22  of lawyers resident in France who are also barred in

23  this court, perhaps one of them might be an

24  appropriate commissioner for your deposition, if you

25  elect to conduct it by remote means, or I guess if you

1

2  were to be there in person, I guess.

3          MR. ZAUDERER:  Judge, respectfully, I've made

4  my arguments to you.

5          THE COURT:  All right, I guess I'm just trying

6  to understand what the, that, I'm trying to understand

7  that, and I would like you to correct me if I'm wrong

8  here, but the issues, the video or remote deposition

9  would resolve completely the concerns, Mr. Zauderer,

10 that you would have with potential frivolous criminal

11 prosecutions.

12         MR. ZAUDERER:  No --

13         THE COURT:  No.

14         MR. ZAUDERER:  It would not, Your Honor. No,

15 if my theory is correct and I've explained why, the

16 same concern whether you do something remotely or in

17 person in France.

18         MR. MATETSKY:  France, and we've given Your

19 Honor a declaration and authority on this, France

20 takes the position that if the witness is sitting in

21 France it's a French deposition to which the French

22 procedural requirements apply regardless of where the

23 questioner is sitting.

24         MR. ZAUDERER:  And I think you asked a

25 practical question and I'm trying to answer you as

1

2  well, Your Honor, I think you asked about what

3  problems would that, and maybe we've covered this, I

4  apologize in advance if I have, but not only is it

5  expensive and difficult, but with the time difference,

6  I checked with French counsel, I have to have a

7  reporter, I have to have a videographer, I have to

8  have a translator. We're talking about 11:00 at night,

9  you can't easily get people to do that in France at

10 night, it just doesn't work that way in that system. I

11 can't just say, oh, call somebody, just get a

12 reporter, oh, what time do we start, what time do we

13 go to, well we go to 11:00 at night. It doesn't,

14 that's a practical problem, I hope that's responsive.

15          THE COURT:  Oh, I see, that would be a

16 practical problem.

17          MR. ZAUDERER:  Yes.

18          THE COURT:  That perhaps could be alleviated

19 if the deposition were taken during business hours in

20 France.

21          MR. ZAUDERER:  Yes, and I have to do it at 4

22 a.m.

23          THE COURT:  With me taking no position whether

24 counsel is in New York or Paris, right?

25          MR. ZAUDERER:  Right, I mean I'd have to get

1
2   to the office at 2 a.m. after a full day, prepare, and
3   take a seven or eight hour deposition. You know, I'm
4   as old as the, one of these defendants here, my birthday
5   is tomorrow.

6           THE COURT:  Happy early birthday.

7           MR. ZAUDERER:  Thank you.  One of the
8   plaintiffs, I should say.

9           THE COURT:  Okay, just a minute.  So, Mr.
10  Reda, you've tendered or you proffered some a sworn
11  affidavit or undertaking that your clients would not
12  pursue?

13          MR. REDA:  Yeah, we put in our papers that
14  they would sign whatever affidavits that the, we told
15  them this, that they feel comfortable to protect them
16  that he would not be bringing, neither of them would
17  be bringing any criminal proceedings or any
18  proceedings, whatsoever, in France, in regards to the
19  deposition.  They could even have sanctions built into
20  the affidavit if they violate that, I just don't, I
21  think the chances of it happening are so slim because
22  the ultimate sanction here would be you dismiss their
23  case and I think that --

24          THE COURT:  There could be more than that.

25          MR. REDA:  Yes, exactly, and that, in and of

1

2  itself, would be enough to make sure that they never

3  do that because, you know, they put a lot of time,

4  energy and money into this case and, therefore, to

5  have some lawyer that they don't know somehow

6  frivolously arrested and risk the case being dismissed

7  and then being financially sanctioned, I think is

8  farfetched and the chances of that are slim to none.

9         THE COURT:  Okay, any other -- all right.

10        MR. ZAUDERER:  I think I've, I don't want to

11 repeat myself but I think I've made the point in

12 conclusion that I don't believe that the plaintiff,

13 based on the record which I've asserted I think

14 fairly, is trustworthy and will not be deterred in

15 France by anything that's done here.  But I've made

16 that point, Your Honor, and I'd just repeat it.

17        THE COURT:  And you've made it again.

18        MR. ZAUDERER:  Thank you.

19        THE COURT:  And you need not make it further.

20        MR. ZAUDERER:  I'm sorry?

21        THE COURT:  And you need not make it again.

22        MR. ZAUDERER:  Very well, I'm guided by what

23 you say.

24        THE COURT:  All right, although everything

25 that I had issued in this case concerning the

1
2  plaintiffs' depositions were -- concerning the
3  plaintiffs' depositions was aimed to get the parties
4  and their counsel to find a mutually acceptable path
5  forward for depositions, I am concerned that counsel
6  in this case are unable to reach agreement on much of
7  anything.  So as to Mr. Saulnier, if there are medical
8  reasons why, to be proffered as to why Mr. Saulnier
9  should not or cannot attend a deposition in New York
10 in person I direct you to provide them to counsel no
11 later than February 3rd.  They are not to be filed on
12 the docket, they are not to be sent to chambers.
13         All right, and I expect that the lawyers
14 should meet and confer on a process and attempt one
15 last time to agree on a deposition process and
16 location for Mr. Saulnier after that has been, that
17 medical proffer has been provided.
18         MR. REDA:  Yes, Your Honor.
19         THE COURT:  Okay.  As to Mr. Sillam, I
20 regretfully feel that we would not even resolve the
21 first issue of the, whether what Mr. Sillam has
22 already proffered constitutes good cause without
23 further evidentiary hearings and further discovery. I
24 do not think that is practical, or helpful or an
25 efficient way to resolve the issue of Mr. Sillam's

1

2  deposition.

3          Accordingly, my ruling with regard to Mr.

4  Sillam's deposition is that defendants may elect

5  whether to conduct a deposition of Mr. Sillam remotely

6  or in person with Mr. Sillam in France.  That is

7  defendants' election. The parties are to work together

8  in good faith to agree to the particulars and

9  logistics of the deposition, including but not limited

10 to providing affidavits or other statements or

11 agreements from Mr. Sillam to address the concerns

12 raised by defense counsel about frivolous proceedings

13 brought in France, or potential frivolous proceedings

14 brought in France.  The Court takes no position on

15 whether defendants should proceed under the Hague

16 convention. That is at their election, I'm not going to rule

17 one way or the other.

18          I am going to caution counsel because you're the

19 ones that are here, that I expect you to behave and conduct

20 yourselves in the deposition and insure that your clients

21 also, to the extent that they're present, conduct themselves

22 appropriately. If there are motions to compel or motions to

23 continue the deposition or motions for sanction that arise

24 out of the deposition, they will be briefed, they will

25 include the full transcript as well as the video which can

```
 1                          PROCEEDINGS                    50
 2  be filed provisionally under seal, and if I need to decide a
 3  motion I will apportion costs under 37(a)(5). I'm telling
 4  you right now, all right, I will make this a loser pays
 5  situation if there are further motions concerning Mr.
 6  Sillam's deposition. I take to heart, I am concerned by the,
 7  by what you have told me, Mr. Zauderer, about what Mr.
 8  Sillam has done in the past about criminal proceedings, I am
 9  listening to that, okay.  Maybe I'm like Charlie Brown with
10  a football, but I have faith and hope that Mr. Reda and the
11  representations that he's made and the work that he has done
12  with his client will make that a nonissue, all right?  If it
13  becomes an issue, I do want to hear about it, okay?
14          All right, the other thing that I wanted to
15  raise, I know that that was the only issue that you
16  all had raised, but we have been getting snail mail
17  from a lawyer in France concerning subpoenas served by
18  plaintiffs on Degroof Petercam Wealth Management, does
19  anybody have, can anybody tell me what these letters
20  are about?  And I, we did have them put on the docket
21  and if you don't have copies my deputy can hand you
22  clean copies of what we received?
23          MR. ZAUDERER:  I had seen something that was
24  filed on the docket just about twenty minutes before
25  Court so I obviously haven't had attention, a chance
```

PROCEEDINGS                    51

to explore it thoroughly.  But from our point of view,

these are, the plaintiffs gave us notice weeks ago

that they were planning to serve a bunch of document

subpoenas on financial institutions in France that

allegedly once had a relationship with Labaton.  This

wasn't done under any valid procedure I'm aware of,

you can't just show up in France and start serving

American depositions so it's not surprising that some

of the nonparties have problems with that.  I don't

know that those nonparties are actually before this

Court, but from our point of view that's what this is.

        These are not documents that the, that the

plaintiffs actually need.  Labaton has produced all of

its records relating to any income that it received

from these institutions during the relevant time

period, but plaintiffs, these are plaintiffs'

subpoenas so that's all I have to say.

        THE COURT:  Okay, are these, are these

subpoenas seeking documents or documents and

depositions?

        MR. REDA:  Just documents, Judge, and they,

and I told the lawyer, he said that they weren't going

to provide documents for a couple of reasons, but one

was that they don't have any, second of all, it's not

1
2  the right entity, and we said fine, end of discussion,
3  you don't have the documents, don't, you know, we're
4  not doing anything further.  And for some reason, I
5  think this is the second time he's filed the same
6  letter to the Court explaining why he's not providing
7  documents that we're not, no longer asking him to
8  provide because he says he doesn't have them. And that
9  it's not the right entity and we should subpoena an
10 entity in the United States, not in France, fine.  We
11 accepted his representations and I thought the matter was
12 completed because we're not doing anything further.
13         We did it properly through the way you're
14 supposed to serve subpoenas in France but he said that
15 they're not, you know, they're not complying and we
16 said fine, so don't comply. I don't know why he, that
17 wasn't good enough for the lawyer that he felt that he
18 had to let the Court know that he wasn't going to
19 comply, but I think now it's just a nonissue because
20 we're not going any further with it, as I told the
21 lawyer.
22         THE COURT:  All right, I'm going to direct
23 that you file a joint status letter by February 17th.
24 The status letter will, will describe the status of
25 plaintiffs' depositions. In other words, you're going

PROCEEDINGS                                    53

1
2    to tell me what you decided to do with regard to Mr.

3    Sillam's deposition and also let me know if there are

4    any disputes coming up with Mr. Saulnier's deposition,

5    or if you're able to schedule it. I will give you a

6    little heads up, obviously not binding, it's not a

7    ruling, but if, if there is a dispute on Mr.

8    Saulnier's deposition, we're going to go through the

9    same discussion and the same articulation. So you can

10   save your clients a lot of expense by cutting to the

11   chase and exploring whether an in person deposition in

12   France, a remote deposition with the witness in France

13   or a deposition in New York, which of these is

14   possible or amenable. But I would hope not to have to

15   see this as a full blown motion again. If it is I'll

16   address it but I will address it with 37(a)(5), Rule

17   37(a)(5) in the back of my head.

18        And then the other item to be discussed

19   specifically in the joint status letter is whether,

20   whether there is a dispute about these third party

21   subpoenas, okay, or whether it's no longer an issue.

22   And then, of course, whether there are any new

23   disputes and if there is anything else that the Court

24   needs to address, all right?

25        So anything else that anybody needs to raise

1

2   at this time, Mr. Reda?

3           MR. REDA:  Not raise, is it possible to, I now

4   you said 2/3 for the medicals, is it possible to get a

5   couple of more days to get those only because he's in

6   France, I've got to, you know, make sure that, and

7   then once we get them I've got to have them translated

8   into English because no one here is going to be able

9   to read them in French and the doctor isn't going to

10  read them in French, but we'll have them translated

11  into English as we did with Mr. Sillam's medical.

12          THE COURT:  All right, February 10th.

13          MR. REDA:  Thank you, Judge.

14          MR. ZAUDERER:  Nothing -- I'm sorry, nothing

15  on our side.

16          THE COURT:  Okay. All right, thank you very

17  much. I had another question, I see a gentleman

18  sitting in the back, is he one of your lawyers?

19          MR. ZAUDERER:  He's with Labaton, in-house

20  counsel.

21          THE COURT:  Oh, okay. All right, what's your

22  name?

23          MR. MICHAEL KENT:  Michael Kent, Your Honor.

24          THE COURT:  Okay.  You're welcome to sit at

25  counsel table, even if you're, you know, not speaking

1   or anything like that as the client. I have plenty of

2   cases where the clients, you know, if they choose to

3   attend a conference are welcome to come and sit at

4   counsel table.

5        MR. KENT: Thank you, Your Honor.

6        THE COURT: Okay? All right, thank you. All

7   right, so medical proffer for Mr. Saulnier, February

8   10th, joint status letter by February 17th to talk

9   about plaintiffs' depositions, whether any issue

10  remains with the third party subpoenas and also any

11  other disputes on the horizon.

12       All right, is there anything we need to do

13  about the discovery end date or is that still far

14  enough out that we can leave it?

15       MR. ZAUDERER: May I have a moment?

16       MR. REDA: I think, Judge, the only

17  outstanding discovery is the depositions. The

18  depositions. I believe all paper discovery has been

19  completed is my understanding.

20       THE COURT: Okay, what's the discovery end

21  date?

22       MR. REDA: Right now it's February 28th for

23  fact witnesses?

24       MR. ZAUDERER: Yeah, we're going to need an

1

2  extension if we go through these hoops.

3          THE COURT:  Yes, so why don't you in the

4  February 17th letter also propose a new discovery end

5  date.

6          MR. ZAUDERER:  Thank you, we will.

7          MR. REDA:  Yes, Judge.

8          THE COURT:  All right, the last thing is I'm

9  going to request the parties order a copy of the

10 transcript, share the cost 50/50.

11         MR. ZAUDERER:  Sure.

12         THE COURT:  All right, thank you very much, we

13 are adjourned.

14             (Whereupon the matter is adjourned.)

15

16

17

18

19

20

21

22

23

24

25

57

C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Sillam, et al. versus Labaton Sucharow LLP, Docket #21cv6675, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature    _____

           Carole Ludwig

Date: February 1, 2023