N8FzzSILc-dh

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   GERARD SILLAM,

4              Plaintiff,

5         v.                          21 Civ. 6675 (CM)(OTW)

6   LABATON SUCHAROW LLP, et al.,
                                      Conference
7
               Defendants.
8
    ------------------------------x
9                                     New York, N.Y.
                                      August 15, 2023
10                                    11:00 a.m.

11  Before:

12                    HON. ONA T. WANG,

13                                    Magistrate Judge

14                    APPEARANCES

15  DOUGLAS M. REDA, ESQ.
        Attorney for Plaintiff
16
    FLEMMING ZULACK WILLIAMSON ZAUDERER, LLP
17      Attorneys for Defendant Labaton Sucharow
    BY:  MARK C. ZAUDERER
18       IRA MATETSKY

19  Also Present:   James Christie, General Counsel, Labaton
    Sucharow LLP
20

21

22

23

24

25
```

N8FzzSILc-dh

```
 1            (Case called; appearances noted)

 2            THE COURT:  As you can see, I'm not sure, since the

 3   last time you were here, whether the tables have been moved

 4   back to their pre-COVID setup.  In any event, some of the

 5   better things that have stayed since COVID is, I'm not going to

 6   require you to stand up to address the Court.  You may stay

 7   seated and speak into the microphone.  You're also free to use

 8   the podium, if that makes you more comfortable.  I'm very

 9   relaxed about where you address the Court.

10            However, I'm not relaxed about this hearing, because I

11   am extremely concerned that there have been one or more

12   violations of the promises contained in Mr. Sillam's

13   declaration, so the hearing today is to address that in the

14   first instance, and then see where we go from here.

15            I have reviewed the parties' submissions.  Let's take

16   the easiest thing first, which is the ECF 112, which is

17   defendant's filings on plaintiff's interrogatory responses.  I

18   hear what you're saying.  I'm treating it as a motion to compel

19   again, responses to the interrogatories.  And that is likely to

20   be denied because we are at the close of discovery, and while

21   Mr. Sillam may reserve and plaintiff may reserve all the rights

22   that they want, discovery is likely to be closed, and it is

23   most likely closed as to supplemental interrogatory responses

24   at this time.

25            If it's not stated in the depositions, if something
```

N8FzzSILc-dh

1    were to plop out with a fact finder later, that might be up to

2    the fact finder whether they would even allow it at this late

3    date.  But I would suggest that some of the briefing that led

4    up to this hearing as well as, perhaps, the transcript here,

5    and if there is any follow-up with this show cause hearing,

6    that all of that may be informative as to whether the fact

7    finder might be willing to allow additional testimony or

8    evidence concerning the basis of the claims.

9            But the way I read that letter -- and I don't have the

10   ECF number in front of me, but the way that I read that letter

11   from plaintiff's counsel was to represent that, only the filing

12   of the proofs of claim now serve as a basis for damages.

13           If that later is attempted to be expanded, I expect

14   that counsel knows exactly what they would need to do to let

15   the fact finder know their position on that.  But I'm not

16   inclined to extend discovery to get more wishy-washy answers.

17   I don't think that you're likely to get clearer answers at this

18   point in time.

19           We are here because I am concerned about the

20   allegations that Mr. Sillam, one of the plaintiffs in this

21   action, filed or instituted a new criminal proceeding in

22   France, notwithstanding earlier declarations that were

23   presented to the Court and to defendants in order to enable

24   their depositions to proceed with the plaintiff's sitting in

25   France.

SOUTHERN DISTRICT REPORTERS, P.C.

1              And I know that Mr. Zauderer warned me that the

2    promises might not be worth anything, but I decided to let the

3    plaintiffs show that they were capable of advancing this case

4    in a manner that comported with the rules that we set here, in

5    a manner that comported with the promises that they made in

6    order to avoid a ruling that they had to be deposed in the

7    United States.

8              Let's start at the beginning.

9              Mr. Sillam is claiming that the new criminal

10   proceeding -- let's call it that, or the March criminal

11   proceeding -- was instituted because defendants and defense

12   counsel had somehow obtained minutes that related to a prior

13   criminal proceeding.

14             Is that how I understand it?

15             MR. REDA:  Prior criminal proceedings, Judge, yes.

16   Under French law, it's my understanding that it's questionable

17   whether they could have received all the documents that they

18   did, but the French law seems to indicate that the minutes are

19   not to be had by other attorneys, and even if they had them,

20   they are not allowed to be published in any other proceedings.

21             Mr. Sillam contends, through his French attorney, that

22   they disseminated these minutes in a French proceeding and also

23   in our proceeding when they attached them to their third set of

24   interrogatories, which, I'm told, was in violation of French

25   law.

N8FzzSILc-dh

1          THE COURT:  They were attached to document requests;

2     right?

3          MR. REDA:  Yes.

4          THE COURT:  That's what was attached to your file.

5          Was there a protective order entered in this case

6     governing the document production and exchange?

7          MR. REDA:  Yes, Judge.

8          And we have everything that they've marked as

9     confidential has never been disclosed to anyone but the

10    clients.  That was documents they received, I suggest,

11    illegally or against French criminal law and disseminated them

12    against French criminal law.

13         THE COURT:  How were they disseminated?  Under a

14    protective order in connection with a federal criminal

15    proceeding that your client instituted and in connection with a

16    document request that was never published until you attached

17    them to your filing without a sealing request.  How did

18    defendants publish those minutes?

19         MR. REDA:  According to French law, my understanding

20    -- and I understand that I'm not a French lawyer -- that using

21    the minutes in any way in any other proceeding, other than the

22    one that they were originally in, is a violation of French

23    secrecy laws, notwithstanding that it might not be a violation

24    of a protective order here.  It might not be a violation of

25    federal law.

1          But they used those minutes in a civil proceeding in

2     France and also in the proceeding here.  I'm told that's a

3     violation of French secrecy laws, and it had nothing to do with

4     the deposition.

5          This proceeding --

6          THE COURT:  Okay, stop.  We're going to take this at

7     my pace and in my order.

8          MR. REDA:  Yes, Judge.

9          THE COURT:  I understand what you've put in your

10    papers.  I've read them.  I don't want to go over that.

11         I have specific questions that are detailed, that are

12    factual, that relate to the law, and I'm asking the questions

13    here.  Right now, this is a show cause hearing, and right now,

14    I'm trying to get to the bottom of what exactly is alleged to

15    be criminal.

16         I'm trying to narrow that down, and then I'm going to

17    try to figure out whether that is still a violation of the

18    promises contained in the declaration, and then the next thing

19    I'm going to do is, I'm going to figure out:  If there was a

20    violation or a breach of the promises contained in the

21    declaration, who breached and who enabled the breach, and who

22    allowed the breaches to happen and that may be the French and

23    U.S. counsel referred to in the declarations as well.  Because

24    I'm sure that Mr. Sillam didn't do this on his own, or if he

25    did, and he didn't tell his counsel, then he's got a bigger

N8FzzSILc-dh

1    problem there.  All right?  All right.

2              So, as it relates to this case here, the source of the

3    criminal action is that they were attached to document

4    requests.

5              Is that right?

6              MR. REDA:  To here and also in France.

7              THE COURT:  I don't care.

8              MR. REDA:  Yes, Judge, here.

9              THE COURT:  What's going on here?

10             MR. REDA:  Yes, Judge.

11             THE COURT:  So they were attached to document requests

12   that were propounded to Mr. Sillam.

13             MR. REDA:  Correct.

14             THE COURT:  Is there any other source of alleged

15   criminal liability?

16             MR. REDA:  I'm sorry, Judge.  I didn't hear that.

17             THE COURT:  That relates to this case.

18             MR. REDA:  No, Judge.

19             It's just the publishing here and attaching them to

20   the document requests.

21             THE COURT:  You keep using the word publishing.  How

22   were they published in this case?

23             MR. REDA:  That they were sent to us.

24             THE COURT:  How is that publication?

25             MR. REDA:  They were not supposed to be used in any

SOUTHERN DISTRICT REPORTERS, P.C.

1   form.  My understanding of the French law is, they're not

2   supposed to be used in any way, in any proceeding.  Whether

3   it's by discovery, whether it's published to a court, the law

4   is that they're not supposed to use it in any way.

5          THE COURT:  Is that like a "We Don't Talk About

6   Bruno," so you can't even talk about it, ever?

7          MR. REDA:  Yes, in this -- In the minutes that they

8   use that they weren't even supposed to have access to, they're

9   not supposed to use them in anything but the original

10  proceeding.  Any use in any way in any other proceeding -- I am

11  informed -- is a violation of French criminal law, regardless

12  of where it occurs, whether it's here or in France.

13         And that's what, I think, the French lawyer who filed

14  it, Sophie, stated in her affidavit, that where and how it

15  happens, that it happened at all is the violation is my

16  understanding, Judge.

17         THE COURT:  So it is like a "We Don't Talk About

18  Bruno."  Once it happens, you can never talk about it, ever.

19  Like, Mr. Sillam could never talk about it either.

20         Is that what you're saying?

21         MR. REDA:  No one -- I don't know if he can't talk

22  about it, because it's his record, but no one else can talk

23  about it in any other proceeding but the one where they got the

24  records for, which they did use them for.

25         THE COURT:  So no one can even ask questions about any

1    of his prior criminal history in France ever, anywhere, even in

2    a case here where that might be used, let's say, at a trial to

3    challenge his credibility.

4              MR. REDA:  No, not at all, Judge.  I'm not saying

5    that.  They, of course, can ask any questions they want about

6    his criminal record.  They just can't use those records in

7    order to ask the questions.  They can't use those records.

8              THE COURT:  Hypothetically speaking, if defendants had

9    made those same document requests but had not attached the

10   minutes, there would be no criminal liability?

11             MR. REDA:  Well, there would still be in France,

12   because --

13             THE COURT:  No, no.

14             MR. REDA:  There would be no criminal liability here

15   if they didn't attach them.  If they just asked questions and

16   didn't give the basis for their questions, yes.  But they

17   didn't do that.  They attached all this stuff to try to make

18   him look bad in order to then ask questions.

19             They could have asked the questions.  They just didn't

20   have to attach the documents that they allegedly have been

21   precluded, under French law, from using.

22             THE COURT:  How do you not also violate French

23   criminal law by actually filing them on the docket?  Now they

24   are published.

25             Isn't the step that you took to publish them on the

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

N8FzzSILc-dh

1    docket even worse?

2         MR. REDA:  I thought, Judge, that the Court needed to

3    be aware of what happened, since it was already published in

4    France and had been used here.

5         I could be, Judge.  But we had his permission to let

6    the Court know what they had done, so, I believe, maybe that

7    makes a difference.

8         THE COURT:  So if Mr. Sillam gives permission, implied

9    or explicit, then there's no criminal liability.

10        MR. REDA:  I don't know, Judge, for the French law.  I

11   know that they didn't ask for his permission to use them, so I

12   don't know.

13        THE COURT:  But that wasn't my question.

14        MR. REDA:  Yes, Judge.  I realize that.

15        THE COURT:  That wasn't my question.

16        MR. REDA:  No, it wasn't.

17        THE COURT:  So what was my question?

18        MR. REDA:  I believe that it's a violation of French

19   law, regardless of the consent.  But I'll be honest with you,

20   Judge, I'm not 100 percent sure on that, because I don't

21   practice French law, and so I don't know.

22        THE COURT:  Well, given that you allowed and counseled

23   your client to make certain promises, wasn't it incumbent on

24   you to have a better understanding of the French law?

25        MR. REDA:  Yes, Judge, but I just want the record to

N8FzzSILc-dh

1    be clear.  I don't believe that what he did violated your

2    order.

3               THE COURT:  I know.  I am trying to get to that,

4    because I need to make that assessment, and I am also concerned

5    that Mr. Sillam did not act alone.  I am also concerned that he

6    could have gotten counsel from -- I'm questioning, also, the

7    counsel he got from his French and U.S. lawyers, both before

8    and after he signed the declaration.  Those are all things that

9    I am considering right now.

10              Going back to my question, why is it that your filing

11   on the docket without even any request to file under seal with

12   Mr. Sillam's permission -- so that's not a violation of French

13   law then -- and if it's not a violation of French law, why is

14   it not a violation of French law?

15              MR. REDA:  I believe that the law is meant to protect

16   him so that if he doesn't -- If he waives the protection, then

17   it shouldn't be violation of law.  It's a violation of law

18   because it's meant to protect his criminal record and the

19   minutes from his criminal proceedings, so I believe that he

20   could waive that, but no one else can.

21              THE COURT:  How are the promises in his declaration

22   not some form of limited waiver of his rights?

23              MR. REDA:  I agree with you that they are a limited

24   waiver, but what my position is, Judge --

25              THE COURT:  You're saying he didn't waive this.

N8FzzSILc-dh

1          MR. REDA:  No.  Because this is something -- The

2    waiver that we did was to protect the defendants.  My

3    recollection is, when we did this --

4          THE COURT:  It was to protect the defendants from

5    getting sued in France again, and this is what happened.

6          MR. REDA:  For the depositions.

7          THE COURT:  And in this action.

8          MR. REDA:  Except I don't believe that the declaration

9    was meant to protect them from filing, from violating French

10   law just because he said he wouldn't have them arrested for

11   violating French law for the depositions.  I don't believe that

12   it was a carte blanche -- that they could do whatever they want

13   under French law because they did the depositions in France.

14          He could have filed --

15          THE COURT:  There's a concern here, because I was also

16   led to believe that this was a way to get the depositions done

17   without having to force the issues of making your clients come

18   to the United States to be deposed.

19          So in addition to this concern about whether the

20   promises contained in the declaration were breached, in

21   addition to that, I am extremely concerned, also, about a fraud

22   upon the tribunal.

23          Do you understand what is at stake here?

24          MR. REDA:  Yes, Judge.

25          Okay.  So again, your understanding of the declaration

SOUTHERN DISTRICT REPORTERS, P.C.

N8FzzSILc-dh

1    was, essentially, to allow some form of deposition and that

2    defendants could then, perhaps, ask some questions that might

3    nominally have led to criminal liability but wouldn't because

4    of the promises contained in the declaration.

5         MR. REDA:  No, not at all, Judge.  I'm saying that the

6    declarations were made so that -- if I remember correctly, we

7    had discussed doing this through the Hague Convention or doing

8    it just by the federal rules, and you had said that we could do

9    it either way.

10        In order to do it without the Hague Convention, we

11   signed the declaration saying that it might be a violation of

12   French law to do these depositions without the Hague

13   Convention, so just in case it is, our clients will say that

14   they will not do anything in regards to the depositions being

15   done in France if it's a violation of French law.

16        As it turned out -- and it took months, and it delayed

17   the case -- they decided to go through the Hague Convention

18   anyways, so the declarations didn't really matter because they

19   only would have mattered if we didn't use the Hague Convention.

20   They used the Hague Convention, so the declarations were

21   unnecessary, because they were only really necessary pursuant

22   to the civil rules.

23        THE COURT:  The declarations were necessary to help me

24   rule that your clients could stay in France to be deposed.  I

25   was not going to get involved in how those depositions were to

N8FzzSILc-dh

1    proceed.  And wisely, I think, defendants and defense counsel

2    stayed in the U.S. to conduct those depositions.

3          But let's roll it back a little bit.  I am trying to

4    understand the source of the criminal liability, and you're

5    telling me that the source of the criminal liability was

6    defendant's attaching these criminal minutes to a document

7    request that they served in January of 2023.

8          Is that right?

9          MR. REDA:  Yes, Judge.  It's one of the grounds, yes.

10         THE COURT:  That's the ground that matters to me here

11   in this case, because the closest connection to "in this

12   action," that was language that was in the deposition.  That's

13   what I'm going to focus on right now.

14         MR. REDA:  Yes, Judge.

15         THE COURT:  Your attaching the document request with

16   the minutes in a filing in response to this order to show cause

17   without a sealing motion or any other protections does not lead

18   to criminal liability, because Mr. Sillam gave his permission

19   and, in essence, it is up to Mr. Sillam -- the "victim," if you

20   want to call it -- to decide whether to institute a criminal

21   proceeding or not.

22         MR. REDA:  It's his right to protect, so therefore, he

23   has the right to determine whether or not he can waive a right.

24   A client can always waive a right to a protection they have.

25   He thought it was in his best interest for you to know what

N8FzzSILc-dh

1    they had actually sent to him and also the court in France,

2    that you would know exactly what we were dealing with.

3            THE COURT:  If he was so concerned about that criminal

4    right, that right and that protection, why did he file the

5    complaint in March -- and it doesn't come to light until his

6    deposition when he's asked a question -- if he and his counsel

7    had the document requests as of January 2023?  That's what I'm

8    trying to understand.

9            MR. REDA:  I don't believe that the defendants first

10   found out about the criminal charges in France until his

11   deposition.  I think they were aware of them before then,

12   because they were filed in March.  I don't know how either

13   their French counsel or they were not aware of it.

14           THE COURT:  No, you're not answering my question.

15           MR. REDA:  I'm sorry.

16           THE COURT:  Why did I not hear about this until now or

17   until recently after the depositions?  If Mr. Sillam was so

18   concerned about protecting his rights under French law, why are

19   you not calling defense counsel upon receipt of the document

20   request and saying:  Hey, wait a second.  This violates French

21   law.  I just wanted to let you know and give you a chance to

22   withdraw the document requests.  I've done my research here.

23   The cases would suggest that you can't use these in these

24   document requests.  I'm going to give you one free buy.

25   Withdraw your document request.  Make your request another way.

N8FzzSILc-dh

1          Or, why was this not raised in your responses and

2     objections?  Why was this not a subject of a meet and confer,

3     or was it?

4          MR. REDA:  It was not, Judge.

5          And I have to say that I was not aware that he had

6     filed that criminal complaint until it was brought to my

7     attention by the defense.  We were not informed by the client

8     that he had done that.  I apologize, but I was not aware.

9          If he had asked me, I would have advised him to do

10    nothing.  But I was not given that advice, and it also had to

11    do with a matter that I don't represent him on, which is a

12    matter --

13          THE COURT:  Stop.

14          Had he asked your advice, you would have said:  Maybe

15    you shouldn't do this.

16          MR. REDA:  Correct.

17          THE COURT:  Okay.

18          Which paragraph of the declaration is it?  Oh yes, is

19    it paragraph seven?  I am submitting this declaration freely

20    and voluntarily after having had a full opportunity to consult

21    with my attorneys in both New York and France.  I understand

22    the terms of this declaration which my attorneys translated

23    into French for my review before I signed it.

24          Are you the attorneys in New York who are referenced

25    in that paragraph?

N8FzzSILc-dh

1          MR. REDA:  Yes, Judge.  We counseled him on this, in

2    regards to signing the declaration.

3          THE COURT:  And he signed the declaration in February

4    of 2023, which was after you got the document request with the

5    minutes; right?

6          MR. REDA:  Right, but at the time that we got the

7    document requests for the minutes, I have to say that I was

8    unaware that that was a violation of French law.

9          THE COURT:  He apparently chose not to tell you or not

10   to ask you.

11         MR. REDA:  He never told us that it was a violation of

12   French law.  I didn't know he filed that, and as I said

13   earlier, I would have counseled him not to file it, but I'm not

14   so sure that the filing of it is actually a violation of this

15   order.

16         But I would have erred on the side of caution and told

17   him not to do it, but I still don't think that it's a violation

18   of this order, because the order really was supposed to protect

19   something from going awry in the deposition, and nothing went

20   awry in the deposition, and this was filed months before the

21   deposition.

22         THE COURT:  I'm still not understanding how the timing

23   of this in any way exonerates anybody in this situation.

24         But, maybe I'll let defense counsel talk to me a

25   little bit about what we do now, now that we have this mess.

N8FzzSILc-dh

1          MR. MATETSKY:  Good morning, your Honor.  Ira Matetsky

2    for the defendants.

3          As we indicated in our filing that we made -- I

4    believe it was on Sunday evening -- there are a variety of

5    options available to the Court if your Honor were to find that

6    there's been a violation of the promises made in the

7    declaration and both the letter and the spirit of the Court's

8    rulings that led to the filing of the declaration.

9          Certainly, there should be a finding on the record

10   that there was such a violation by Mr. Sillam.  Second, it

11   would be the possibility of an imposition of costs.  I think

12   your Honor has said -- I'm not certainly going to speak for the

13   Court, but -- your Honor has indicated that had counsel

14   indicated that Mr. Sillam and Mr. Saulnier were not willing to

15   sign these declarations, or had they refused to sign the

16   declarations at the outcome of the proceeding, the outcome of

17   the issue of where the plaintiffs would be deposed would be

18   very different, that there's at least a possibility that the

19   plaintiffs would have been required to come to New York for

20   their depositions.

21         We, the defendants, incurred a substantial amount of

22   incremental cost for going through the Hague Convention, which

23   your Honor had indicated was the appropriate way to proceed in

24   deposition in France: costs for commissioner, costs for French

25   lawyers and many other costs to quantify.  Those were, in

N8FzzSILc-dh

1    effect, the consequence of the false declaration that was made,

2    and we believe an imposition of those costs would be an

3    appropriate remedy.  The Court also has the option of imposing

4    a monetary sanction payable directly to the Court in the nature

5    of a fine or a penalty.

6            Finally, as we represent in our letter to the Court --

7    and I'm not going to get into the question of whether this

8    would be an order by your Honor or would be a recommendation of

9    the district judge, but -- this does rise to the level where

10   dismissal of the action should at least be seriously

11   entertained and would be appropriate.

12           These are plaintiffs that will do anything.  Their

13   word is worth nothing.  They have broken the letter and the

14   spirit of their commitment to the Court.  They have broken

15   their representations to us.

16           I, sitting here today and my partner Mr. Zauderer and

17   our law firm and five lawyers in France and three lawyers from

18   Labaton, one of whom retired four years ago and was dismissed

19   from the case last year -- I have no idea why he's named -- all

20   of these people are now defendants in a criminal matter in

21   France.  They are theoretically subject to whatever might

22   happen in France.

23           Why?  Again --

24           THE COURT:  Is this a situation where, because there

25   has been a new criminal proceeding instituted, that these

N8FzzSILc-dh

1    individuals also can't go to France?

2            MR. MATETSKY:  I'm not going to pretend to be a French

3    lawyer.  I don't know that there's a restriction on my going to

4    France.  I'm certainly not going to go there without checking,

5    but as a matter of principle, this is the most routine thing

6    that happens in a case.  Information is shared with us, and

7    without getting into the details of what words were spoken

8    between myself and our office and the lawyers in France who

9    represent the defendants, they gave us this document.

10           I think your Honor can reasonably understand that if

11    we had been told:  You're not allowed to use this document;

12    this is a confidential document, we would not have used it.

13           THE COURT:  Like if you were not allowed to use it

14    even with a protective order in place, you would not have used

15    it.

16           MR. MATETSKY:  We would not have used it.  We would

17    not have touched it.  They wouldn't have given it to us.  Our

18    understanding was that it was permissible because --

19           THE COURT:  Sorry, who gave that to you again?

20           MR. MATETSKY:  We received it via the lawyers for the

21    defendants in France.  It was given to them in the context of

22    the prior criminal proceeding in France, the prior criminal

23    proceeding in France that led to a police investigation in

24    which -- the system in France is that the officials assemble

25    all the information, and part of the information is the

1    investigation history of the parties.

2              This was given to us and we were going to inquire.  We

3    weren't going to jump to the conclusion as to what Mr. Sillam

4    might or might not have done in connection with these incidents

5    that appeared in the report.  We were going to ask him about

6    it, and we did the most routine thing that happens in a case;

7    we sent a document request.

8              We did not file it on the docket.  Civil Rule 5 says

9    that discovery materials are not filed on the docket.  The only

10   person who saw it was Mr. Reda and his assistant in his office,

11   and, presumably, he sent it to his clients.  Those are the only

12   people who saw this document as a result of our serving the

13   document request.  Your Honor didn't see it.  Judge McMahon

14   didn't see it.  The general public didn't see it.  We didn't do

15   what the plaintiffs like to do and put out a press release

16   about it.

17             We said:  Give us any documents that are relevant to

18   these investigations so that we could see whether there's a

19   possibility that any of them led to a criminal conviction that

20   would be admissible under evidence Rule 609.

21             THE COURT:  I think Mr. Zauderer is trying to get your

22   attention so why don't you take a moment.

23             MR. MATETSKY:  And we were told by our French

24   correspondent counsel that we could use this.  And again, we

25   used it in the most circumspect manner possible.

N8FzzSILc-dh

1          The next thing that happened is, we received -- after

2     some time, it wasn't on time -- we received responses to the

3     document questions and the responses did not say, you have

4     committed a crime.

5          They said, we object to your requests because they're

6     irrelevant.  And we said, well, we don't agree with that.  Did

7     we run to the judge with that?  No.  We'll follow up at the

8     deposition.

9          At the deposition, I asked Mr. Sillam a bunch of

10    questions.  I said, we're going to go through a list of

11    instances in which we understand you were investigated.  He

12    responded.  And this is several weeks after he's, unbeknownst

13    to us, filed a criminal proceeding.  He said, I will be happy

14    to answer your questions, and we went through each one of the

15    incidents.  That was at the first deposition.

16         We come back a week later.  He claimed he couldn't go

17    on.  He went back the following week and I'm asking him about

18    the criminal proceedings.  Tell us about the first criminal

19    proceeding filed in France which was rejected by the

20    prosecutor.  Tell us about the second criminal proceeding that

21    you filed in France which you took to a trial through a direct

22    summons and were sanctioned $150,000 euros for bringing a case

23    in bad faith.

24         And then, did you bring any other cases?  He said,

25    yes, I filed a third case; this was news to us.  It was news to

N8FzzSILc-dh

1     my client.  I gather it was news to Mr. Reda.

2              Well, tell us about this third case. I filed it

3     earlier this year.  Well, whom did you file it against?

4     Listing a bunch of defendants, including my firm.

5              Based on use of the document in federal court, in

6     questioning -- by then, for sure -- I understood that the only

7     place we questioned Mr. Sillam was his deposition the previous

8     week.  I understood it to be a reference to the deposition.

9              Now we were told it's not -- We had not seen the

10    criminal complaint.  My client had not seen a criminal

11    complaint.  They refused to provide us with a copy of the

12    criminal complaint.  So we served an interrogatory saying, tell

13    us some more information about this.  They refused to answer

14    that interrogatory.  That led to our letter to your Honor,

15    which was about the interrogatories, but also, bringing this

16    matter to the Court's attention.

17             And that's the chronology from our point of view.

18             THE COURT:  What's the status of that third criminal

19    action now?

20             MR. MATETSKY:  You're asking me, or Mr. Reda?

21             THE COURT:  Mr. Reda.  It's his client, and he filed

22    it.

23             MR. REDA:  I believe it's still pending in France,

24    Judge.  And as of now, because all of France seems to close

25    down in the month of August, I don't think anything's happened.

N8FzzSILc-dh

1              MR. MATETSKY:  To the best of my knowledge, we have

2      not heard from the prosecutors.  It's sitting at somebody's

3      desk.

4              THE COURT:  All right.  How do you want to proceed?

5      I'm asking the defendants.

6              MR. MATETSKY:  We ask that the Court make a

7      recommendation that this case be dismissed as a sanction for

8      the violation of the order.  In addition or in the alternative,

9      we ask for an award of costs and/or a monetary sanction payable

10     to the Court.

11             This will not be, as I indicated, the first time that

12     these plaintiffs -- Mr. Sillam in particular, but both

13     plaintiffs -- have been found to have abused the judicial

14     process.  The prior criminal proceeding was brought not as a

15     mere complaint to the prosecutor, but was filed as sort of a

16     hybrid action.

17             It went to a public trial.  There was a full day of

18     testimony, after which -- and we've given this to your Honor as

19     Exhibits A in French and B in English to our submission -- a

20     finding that Mr. Sillam did not even have any standing for this

21     matter; that Saulnier, technically, had standing, but had not

22     proven that any criminal offense had occurred.  This was a

23     relatively routine civil matter that was being handled in the

24     the United States.

25             The Court said that filing a criminal proceeding, it's

N8FzzSILc-dh

1    a very serious matter that needs to be done in good faith based

2    on proportionality and based upon good faith belief that

3    criminal conduct had occurred.

4            There was no basis for this here.  And that court,

5    which normally assesses costs in the range of a few hundred or

6    a couple of thousand euros, found that there was an abuse of

7    the process of the court and awarded costs and sanctions

8    exceeding $150,000, which, needless to say, have not been paid.

9            The idea that a substantial sanction is in order for

10   abusing the judicial process is not something, unfortunately,

11   that is foreign to these plaintiffs.

12           THE COURT:  What you're saying is that a French court

13   had previously found that the institution of criminal

14   proceedings against some set or subset of these defendants was

15   an abuse of process and instituted sanctions.

16           Does that have any -- I don't know if the word

17   conclusive is too strong a word to use, but -- what notice

18   should the Court take in connection with what was done before

19   in its assessment of whether this new filing from March,

20   standing alone, potentially could be abuse of process again,

21   but also whether and how that might be a breach of the promises

22   contained in Mr. Sillam's declaration?

23           MR. MATETSKY:  In fairness, I don't think I can claim

24   that that prior criminal proceeding was a violation of this

25   order, because it was dated back in 2020.

N8FzzSILc-dh

1          THE COURT:  Right, but I'm saying that the finding

2     that even that prior one was an abuse of process, does that

3     have any estoppel effect on what Mr. Sillam or his counsel

4     should have known, could have known, should have done,

5     shouldn't have done?

6          How much should I consider that in my determination,

7     whether the March criminal filing in France violates the

8     declaration, and if it did violate the promises in the

9     declaration, does it relate to an appropriate sanction for the

10    newest violation?

11         MR. MATETSKY:  I would say that the answer to that is,

12    yes, your Honor.  These are recidivists.  These are repeat

13    offenders.  Mr. Sillam, in particular, has a propensity which

14    goes back to 2009 when he filed a criminal proceeding against

15    Labaton.  He filed a criminal proceeding against Labaton in

16    2015.  At the drop of a hat, when everybody else would bring a

17    civil proceeding or write a letter, Mr. Sillam goes running for

18    a prosecutor.

19         That's why -- And we recognize that, when we worked to

20    prepare this declaration, that Mr. Sillam would sign.  We

21    understood that Mr. Sillam looks for any excuse to go running

22    to the French prosecutors or to file some form of criminal

23    proceeding, whether there's any culpable basis for it or not.

24         He did it to Labaton in 2009.  He did it to Labaton in

25    2015.  He did it three times to Labaton in this matter, prior

N8FzzSILc-dh

1      to this.  He did it to Labaton's previous outside counsel.

2              When we spoke in this courtroom back in January and

3      said we don't think these representations are going to be good

4      enough, we were concerned that we were going to see another

5      incident of the same.  So the fact that not just we, as

6      interested parties or counsel for interested parties, but three

7      judges of a fairly senior French criminal tribunal -- who were

8      called away from their real criminal docket to deal with what

9      should have been a garden-variety civil case in the United

10     States in which Mr. Sillam should not even be a plaintiff, they

11     held -- yes, of course, we would submit that this is relevant,

12     especially since we wanted to reinforce to Mr. Sillam that this

13     was to be broadly understood and this was to be taken

14     seriously.

15             We wrote it in paragraph 6 of the declaration that Mr.

16     Sillam and Mr. Saulnier signed.  They understood that the

17     sanctions for violation of these promises, not to bring any

18     lawsuit, any legal proceeding -- including a criminal

19     proceeding in France relating directly or indirectly to the

20     action -- could include sanctions up to and including

21     dismissal.

22             We put that in there for a reason.  He signed it.  He

23     agreed to it.  He should be bound by it, especially given the

24     extensive prior pattern of abuse.

25             THE COURT:  Mr. Zauderer.

N8FzzSILc-dh

1          MR. ZAUDERER:  I don't want to duplicate.  I would

2     just like to add, your Honor, because this has been on my mind.

3          I've been practicing for over 50 years in this

4     jurisdiction.  I'm a member of this court.  I'm known to this

5     court.  I can't emphasize disturbing it is to find a litigant

6     in a civil case here -- which is about a claim to a share of

7     fees in certain actions -- has resulted in multiple criminal

8     actions, including one against me, which has all kinds of

9     implications for lawyers practicing in the United States

10    involving insurance companies that get implicated and all kinds

11    of reporting.

12         It's outrageous, your Honor, that this has been

13    allowed to happen, and I very much appreciate the Court's

14    attention and consideration of the seriousness of what has

15    occurred here.  Thank you.

16         THE COURT:  Thanks.

17         I mean, I will add to that that I started this

18    proceeding.  My order to show cause also indicated this, that

19    one of my big concerns here was that this was proffered as a

20    way to resolve the motion practice about having Mr. Sillam and

21    Mr. Saulnier appear for depositions in the United States and

22    that I was led -- and perhaps misled -- to think that we would

23    get to a close of discovery in a more civil and efficient and

24    expedient way than we are, sitting here now.

25         MR. REDA:  May I respond at all, Judge?

N8FzzSILc-dh

1          THE COURT:  Yes.  Go ahead.

2          MR. REDA:  I just want to say, first of all, the first

3    criminal proceeding, Judge, is on appeal.  It's been stayed and

4    there'll be a full-blown new trial in that matter, so it's not

5    over.

6          But more importantly, Judge, I think -- and, as well,

7    I said that I might have counseled my client differently -- I

8    still take the position that this is not a violation of the

9    declaration, because even if those depositions had occured in

10   New York and they had done the same conduct with these minutes,

11   the same criminal law would have been violated in France.  It

12   didn't matter where the depositions occurred; it was what they

13   did which was illegal on its face.

14         THE COURT:  Right.  But the decision about where the

15   depositions occurred.  I mean, the declarations were essential

16   to my allowing them to stay in France.

17         MR. REDA:  Yes.

18         THE COURT:  And that is something that I decided,

19   based on representations that were made to me in court.

20         MR. REDA:  Yes.

21         THE COURT:  That's number one.

22         Number two, regardless of where the depositions

23   occurred -- so I'm following up on what you're just saying

24   now -- I still don't understand how Mr. Sillam, with or without

25   his counsel, did not violate the promise contained in paragraph

N8FzzSILc-dh

1   4 of his declaration, which I will read and you can tell me how

2   it is not violative of the plain language of this paragraph.

3           "I will not file or pursue any type of legal

4   proceeding in France, including but not limited to any type of

5   criminal proceeding or criminal complaint against defendants,

6   defendants' counsel, or any persons affiliated with them

7   relating directly or indirectly to the conduct of the

8   deposition or this action."

9           And it's the last three words of that sentence that

10  have me sitting here right now going:  How, if Mr. Sillam is

11  claiming that the use of the criminal minutes in document

12  requests served in January -- before this declaration was

13  signed and in a private communication to the person who is

14  arguably the "victim" of the new crime -- how does that not

15  relate directly to this action?

16          MR. REDA:  I just say this Judge, I do not believe

17  that the declaration can be used as a sword by the defendants

18  to break French law and then say, well, we can't be prosecuted

19  for breaking French law.

20          THE COURT:  But they're saying they didn't break

21  French law, so maybe I need to have a hearing on whether that

22  actually broke French law.  And all I'm hearing from you is,

23  you're an American lawyer, and you think it did.  And I'm

24  hearing from defense counsel that they consulted with French

25  counsel and confirmed that it did not.

N8FzzSILc-dh

1        So do you want me to make a decision on that, a

2   finding on that on the record right now, or do you want, maybe,

3   to have some better briefing on that, although I'm not sure

4   that will help you.

5        MR. REDA:  I will just say that as part of our papers,

6   we submitted an affidavit from the French law stating that it

7   is a violation of French law under oath.

8        THE COURT:  Maybe I need to have that person testify.

9   Where is that?  Is that one of the attachments?

10       110-6?

11       MR. REDA:  It is from Sophie Larroque, the attorney.

12       THE COURT:  ECF 110-6; right?

13       MR. REDA:  Yes, Judge.  I believe so.

14       THE COURT:  That's the English translation.

15       MR. REDA:  It was in French and English, Judge.

16       THE COURT:  "Because the police report translated into

17   English by GANFER SHORE will be published on PACER and will be

18   accessible to the public."  That did not happen until you filed

19   the ECF 110.

20       MR. REDA:  Yes, but it was published in France.

21       THE COURT:  But this statement -- Remember, I am

22   concerned with how this relates to this action.  There is a

23   nexus here.

24       MR. REDA:  Yes, Judge.

25       THE COURT:  Mr. Sillam, whether he had actual notice,

N8FzzSILc-dh

 1    he certainly had constructive notice that those minutes had

 2    been sent to his counselor in connection with this action.

 3              And again, he is the plaintiff in this action, and the

 4    use of those minutes in those document requests, apparently,

 5    only gives rise to criminal consequences as they relate to this

 6    case, because there was some thought that the minutes or the

 7    police report would be published on PACER and accessible to the

 8    public, which did not happen until August 11, 2023.

 9              MR. REDA:  They were published though, in January of

10    2023 in France.

11              MR. MATETSKY:  Certainly not by us.

12              MR. REDA:  By the French lawyers that gave the

13    documents to Labaton.

14              THE COURT:  So then --

15              MR. REDA:  Mr. Zauderer was at that trial.

16              THE COURT:  As Mr. Matetsky just said, why does that

17    give rise to criminal liability for the defendants and

18    defendants' counsel in the U.S.?

19              MR. REDA:  Because the French law --

20              THE COURT:  U.S. counsel.

21              MR. REDA:  I'm sorry.  What, Judge?

22              THE COURT:  U.S. counsel.  How is that not a violation

23    of paragraph 4?

24              MR. REDA:  Because I don't believe paragraph 4

25    insulates parties from independent criminal action.  If what

N8FzzSILc-dh

1    they did was illegal in France, I don't know if they get

2    protection, because our client wasn't supposed to do anything

3    about it.

4            THE COURT:  Because he made certain promises after the

5    time that those document requests were actually served.

6            MR. REDA:  Yes, but I don't think --

7            THE COURT:  He made those promises.

8            MR. REDA:  Right.

9            THE COURT:  And from what I heard from you today, you

10   had his permission.  He gave permission to publish them in ECF

11   110.  Why doesn't that action take care of the matter?

12           Why doesn't that action take care of the criminal

13   complaint as it relates to these individuals who are before me

14   in Court on this case?

15           MR. REDA:  Because they also were responsible for

16   disseminating these same documents in France, and Zauderer was

17   there at the criminal trial with these documents, so it was

18   published in France.

19           THE COURT:  I don't even want to get into this,

20   because this is -- The breach of the promise in the declaration

21   was about relating to this action, and Mr. Reda has made it

22   fairly clear today and in his earlier filings that it arises

23   from the attachment of these minutes to the document requests.

24           To some extent, I don't really care what happens to

25   France, but I do care about promises and representations that

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

N8FzzSILc-dh

1   were made to me and made to defense counsel in this case, in

2   the context of this case, and in federal court in the Southern

3   District of New York.  That is what I'm focusing on.

4           MR. REDA:  I understand that, Judge, and I don't

5   believe that Mr. Sillam thought he was violating your order

6   because he interpreted it incorrectly that --

7           THE COURT:  Perhaps we need to have him here under

8   oath, then.  Is that what you propose?  Maybe we should have a

9   full-on evidentiary hearing with Mr. Sillam under oath.

10          MR. REDA:  As you brought up earlier, nothing has

11  changed as far as his medical condition, which was the real

12  reason for this.  That has not changed.

13          THE COURT:  But I was almost at the point of having

14  him come because of his medical condition anyway.  And I will

15  also point out that at the time, we were at a different point

16  with the pandemic, which we are not now.

17          MR. REDA:  Yes, Judge.

18          THE COURT:  So if Mr. Sillam's intent is really at

19  issue, the only way to really get at it, and the only way for

20  me to really assess this would be to have him at an evidentiary

21  hearing, or do you propose other ways to address this problem

22  we now have?

23          MR. REDA:  Well, you could have him appear virtually

24  before the Court.

25          THE COURT:  Nope.

N8FzzSILc-dh

```
1            MR. REDA:  Or we could further brief this issue.  I

2       would contact the French lawyer to get a better handle.

3            THE COURT:  Better handle?

4            If there is further briefing on French law, there will

5       be somebody who will actually be briefing the issue.  And you

6       know what?  The defendants, for what it's worth, will also be

7       briefing the issue.

8            MR. REDA:  Yes, Judge, I realize that.

9            MR. ZAUDERER:  Your Honor, if I might just set the

10      record straight on something.  A statement was just made by

11      Mr. Reda.

12           THE COURT:  I saw you shaking your head.  Yes, go

13      ahead.

14           MR. ZAUDERER:  That I disseminated something in

15      France, absolutely untrue.  I sat in the audience in the

16      proceeding.  I didn't participate and do anything.  And that

17      statement that Mr. Reda just made, I have to say, is

18      outrageous.  He has no basis to say that.

19           THE COURT:  Well, that brings me to the other part of

20      this hearing, which was to ask defendants what rules of

21      professional conduct or ethical canons are also implicated,

22      given the timing of these actions?

23           MR. ZAUDERER:  That's an issue we'd like an

24      opportunity to consider.

25           I am on the grievance committee in New York.  I don't
```

N8FzzSILc-dh

1    want to speak for the committee or appear to be doing that, so

2    I'd like to reflect on that, if I may.

3                    THE COURT:  Okay.

4                    Anything else anyone needs to address at this time?

5                    MR. REDA:  Just that --

6                    MR. ZAUDERER:  No, your Honor.

7                    MR. REDA:  I was unaware that this happened until it

8    was brought to my attention.  It certainly was not my intention

9    to do so.

10                   THE COURT:  My concern, though, is, once this was put

11   in issue and it was put in issue with the declaration, where

12   Mr. Sillam said that he had consulted with his lawyers, he had

13   an opportunity to consult with his lawyers up until this point

14   of signing the declaration -- signed it, apparently, with, most

15   likely, the encouragement so that his case could proceed --

16   that maybe it's on him for not keeping you in the loop.

17                   But we've had at least some hints and some suggestion

18   that -- and certainly in the prior document requests that

19   attached them -- I'm surprised that in formulating responses to

20   the requests and, particularly, in preparing for the deposition

21   and, potentially, before instituting a new criminal complaint

22   -- that there would not have been some counsel sought or given

23   on whether or how the declarations that, by then, had been

24   signed.

25                   MR. REDA:  I'll just state that I prepped him for the

1    depositions in April.  I wasn't aware that this -- I didn't

2    find out that this was filed until the defense found out when

3    it was mentioned at his deposition.

4            THE COURT:  Okay.  So here's what I'd like to do.

5            I'd like to set a very short briefing schedule on the

6    issue of whether attaching criminal minutes from France in a

7    document request that is not public and in a case where the

8    documents and the requests have been marked confidential -- so

9    they're not published or public anywhere yet, as it relates to

10   this case, and that they were sent to the "victim" -- whether

11   that constitutes or gives rise to criminal liability in France.

12   That's question number one.

13           Does the use of the documents in the document requests

14   give rise to criminal liability in France?  Even if they do --

15   and I'm not convinced that they do in the way that they were

16   used, but I'm going to give you another chance to try to show

17   me that they do -- but even if they do, do these following

18   facts have any bearing on whether Mr. Sillam breached the

19   promise, violated the promise contained in paragraph 4 of his

20   declarations?

21           The responses were silent.  The responses to the

22   document request were silent about whether there was a crime

23   committed.  There was, apparently, no meet and confer process

24   among counsel about whether we might want to withdraw these

25   because they might give rise to criminal liability or anything.

N8FzzSILc-dh

1    In other words, there's no notice before that.

2              For the later publication on the docket with Mr.

3    Sillam's permission, did the evidence he used, together or

4    separately, constitute a waiver of his right to complain, in

5    any event?

6              It seems to me that at a minimum, the fact that Mr.

7    Sillam was silent, whether he told his U.S. counsel or sought

8    U.S. counsel about this, that he seems to be using the French

9    criminal law as both a sword and a shield, and I am concerned

10   about that.

11             A separate but related issue is whether any of these

12   other actions or inaction, including giving his own counsel the

13   right to publish on the docket without sealing the very same

14   documents he's complaining that defendants and defense counsel

15   used in a document request, does that essentially lead to some

16   sort of a waiver of his right to complain, in any event, about

17   the use of the documents in the document request?

18             I also want to know the status of this criminal case.

19   I want to know about the status of the prior criminal case that

20   resulted in the $150,000-euro sanction.  I want to know about

21   the factual and legal findings in that case, and I also want to

22   know whether any of those factual findings inform on what we

23   should do in this case.

24             And I don't want defense counsel jump to the

25   conclusion:  Aha, he was previously found to have commited

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300

N8FzzSILc-dh

1    abuse of process in France.  Therefore, dismiss the case.  I

2    don't want to get there in just one jump.

3            What it might do is shed some light on Mr. Sillam's

4    intent in the early part of 2023, such that there would be no

5    need, for example, to have a separate hearing on what Mr.

6    Sillam believed or didn't believe and for me to assess his

7    credibility.  And I'm telling you right now that if it came to

8    that, and I needed to assess his credibility, he would be doing

9    it here in person.

10            The last issue is whether there's any ethical rules or

11   rules of professional responsibility that are also implicated,

12   given Mr. Sillam's reliance and representation that he

13   consulted with his lawyers.

14            Anything else I need to address at this time?

15            MR. ZAUDERER:  No, your Honor.  Not on our behalf.

16            MR. REDA:  No, your Honor.

17            THE COURT:  My preliminary finding, now, is that there

18   was a violation, but I'm giving you a chance to brief --

19   particularly, the French law -- to show me that there wasn't.

20   I'm giving another chance, but my preliminary finding is that

21   there was and to take this very seriously.

22            How much time would you need to brief this?  And

23   plaintiff's side gets to brief it first.  Defendant's side will

24   then have a response.

25            How much time do you need, Mr. Reda?

N8FzzSILc-dh

1          MR. REDA:  I'm on trial next week.

2          Could I get three weeks, Judge?

3          THE COURT:  If you get three weeks from Friday, you'll

4     get to September 8.

5          MR. REDA:  Yes, Judge.

6          THE COURT:  I assume you have junior lawyers who work

7     with you.  I don't want to ruin their Labor Day Weekend.

8          Friday, September 8.  Is that enough time?

9          How much time would you need to respond?

10         MR. MATETSKY:  My initial instinct is also to say

11    three weeks.  I'm mindful that this is activity is also going

12    to be going on in parallel with putting the pretrial order and

13    the summary judgment motion together for Judge McMahon.

14         THE COURT:  What's her date for the summary judgement?

15         MR. MATETSKY:  September 29.

16         MR. ZAUDERER:  We also have to consult French counsel

17    and get opinions from them, so maybe it could take four weeks,

18    depending.

19         THE COURT:  Okay.  And has she referred this for

20    general pretrial?

21         MR. MATETSKY:  Yes.  Her rules indicate the referrals

22    are just for discovery, but I did look up the actual form of

23    reference.  It is for general pretrial.

24         THE COURT:  Okay.

25         MR. MATETSKY:  The only exception is, she does have

N8FzzSILc-dh

1    something in her case management order that, unfortunately,

2    indicates that only she can change dates.

3         THE COURT:  Yes.

4         How about this.  Let's put the response on for

5    September 29, and then I will leave it up to you to ask Judge

6    McMahon for an extension of the motion for summary judgment

7    briefing, if you think that would be appropriate.

8         If you do, I would strongly suggest that you get a

9    copy of the transcript as soon as possible.  Include the copy

10   of the transcript with your request, and make the request as

11   soon as possible as well.

12        MR. ZAUDERER:  Would it be appropriate, your Honor, to

13   say that you would recommend that, or do you want us not to do

14   that?

15        MR. REDA:  I'm considering a much stronger

16   recommendation than that, and that would also be on the

17   transcript.  Okay?

18        September 29 would be your opposition to plaintiff's

19   supplemental briefing, I'll call it.

20        Anything else we need to do at this time?

21        MR. ZAUDERER:  Not on our behalf, your Honor.

22        MR. REDA:  No, your Honor.

23        THE COURT:  Mr. Matetsky, please enter notice of

24   appearance.

25        MR. MATETSKY:  Your Honor, I've been receiving these,

N8FzzSILc-dh

1    and we will take care of that.

2             THE COURT:  No.  You need to enter one that's separate

3    from receiving the ECF.

4             MR. MATETSKY:  We will take care of that today.

5             THE COURT:  Okay.  Thank you.  All right.

6             Please order a copy of the transcript.  Share the cost

7    50/50, and I'll look forward to reading your submissions.

8             Thank you.

9             MR. REDA:  Thank you, your Honor.

10            MR. MATETSKY:  Thank you, your Honor.

11            (Adjourned)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.

(212) 805-0300