# EXHIBIT C

```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                         Docket #21cv6675
  SILLAM, et al.,                   : 1:21-cv-06675-CM-OTW

                    Plaintiff,      :

   - against -                      :

  LABATON SUCHAROW LLP,             : New York, New York
                                      January 25, 2023
                    Defendant.      :

------------------------------------ :


                     PROCEEDINGS BEFORE
                 THE HONORABLE ONA T. WANG,
               UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:          DOUGLAS M. REDA, ESQ.
                         180 Froehlich Farm Boulevard
                         Woodbury, New York 11797


For Defendant:           GANFER SHORE LEEDS & ZAUDERER LLP
                         BY:  MARK ZAUDERER, ESQ.
                               IRA MATETSKY, ESQ.
                         360 Lexington Avenue
                         New York, New York 10017




Transcription Service:   Carole Ludwig, *Transcription Services*
                         155 East Fourth Street #3C
                         New York, New York 10009
                         Phone:  (212) 420-0771
                         Email:  Transcription420@aol.com


Proceedings recorded by electronic sound recording; Transcript
produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1                        PROCEEDINGS                         3
 2           HONORABLE ONA T. WANG (THE COURT):  -- under
 3    the Federal Rules and the Hague Convention would
 4    apply.  What does that actually mean and what does
 5    that prevent or preclude your clients from doing that
 6    matters so much here.
 7           MR. MARK ZAUDERER: Sure, and thank you for the
 8    opportunity, I'm going to address that specifically --
 9           THE COURT:  Yes, and you don't have to stand. I
10    know for some lawyers you can't help it, it's like a
11    reflex, but if you're more comfortable sitting down and
12    speaking into the microphone that's fine, too.
13           MR. ZAUDERER:  Thank you, and if you'll allow me
14    a few minutes I'll do that directly as well, so, and then
15    I'm going to tell you some things that I think are quite
16    shocking that I've learned.
17              So in terms of the practicalities, one of the
18    suggestions has been made, well, why just, what's the
19    problem, take a remote deposition from here, it's under
20    the Hague Convention.  Well if a deposition and, by the
21    way, let me say at the outset, Your Honor, I'm not going
22    to argue the law, this is a discretionary matter, we
23    are entirely in agreement with that although we've
24    noted that the default is you've got a plaintiff who
25    brought a suit here and we've suggested to you there
```

has to be good reason so that the shoe is on the other

foot, so here's addressing that.

        If we take a deposition here during business

hours it's six hours later in France.

        THE COURT:  Yep, no, that's not even where I

was going.

        MR. ZAUDERER:  Go ahead.

        THE COURT:  I was going first, first, look,

we've talked about the different possibilities, right,

I can appreciate in this case that there could be

reasons why you might not want to do a remote

deposition and why there are challenges, among them

the time difference. So I wanted to talk first about

-- well I want to just say first that I'm dismayed

that we're still arguing about this, but I wanted to

talk first about why you cannot do an in person

deposition in France because, that's assuming, right,

if we're talking about a deposition in person in

France that's assuming that plaintiffs have made a

case why there is good cause to, to have the

depositions proceed in France.

        MR. ZAUDERER:  Okay.

        THE COURT:  I'm not necessarily ruling that

plaintiffs have made that showing because one of the

1

2   other alternatives I am still considering is, is

3   whether they should be compelled to come to New York

4   or whether there ought to be a remote deposition with

5   them sitting in France to address their concerns.

6   However, the reason why I'm exploring an in person

7   deposition in France in the first instance is because

8   they've been done before, they were done before the

9   pandemic --

10          MR. ZAUDERER:  We know that.

11          THE COURT:  They've been done, right?  If it

12  takes, it takes the issue of plaintiff's inability or

13  unwillingness to travel off the table, right, it takes

14  that factor away. It also takes away your concerns

15  about the time difference, about the possibility that

16  there's other people in the room or other influences

17  or, you know, and, look, I'm old school because I have

18  done remote and video depositions well before the

19  pandemic --

20          MR. ZAUDERER:  Judge, may I?

21          THE COURT:  (continuing) -- but as the party,

22  as a lawyer taking a deposition --

23          MR. ZAUDERER:  Judge --

24          THE COURT:  I completely understand why, why

25  an in person deposition and particularly in this case

1

2  might be preferable. I'm not yet ruling on either of

3  those, I just want to explore --

4          MR. ZAUDERER:  I understand.

5          THE COURT:  (continuing) -- the various

6  options here.

7          MR. ZAUDERER:  It does not take away the

8  problem, and please indulge me and let me explain it,

9  there are some unusual situations here which I have to

10  have the opportunity to make you aware of, okay?

11         THE COURT:  Okay.

12         MR. ZAUDERER:  So in this, let's say we were

13  taking it, now we're going to have a brouhaha at the

14  outset, okay, and I'm going to tell you why, and there

15  is going to be an examiner there who is not familiar

16  with things here and we're in a time difference. And I

17  don't know what Your Honor's practice is --

18         THE COURT:  Wait, are you still talking about

19  a remote deposition?

20         MR. ZAUDERER:  No, in person in France.

21         THE COURT:  Okay.

22         MR. ZAUDERER:  First of all, I'm going to have

23  to go over there, consider the expense, right, I've

24  got to bring this gentleman with me here with the

25  documents, I have to have French counsel, I have to

1

2  hire the videographers over there, the stenographers

3  over there, the translators over there, it's

4  expensive. And we can't just show up, there's only an

5  overnight going to Paris, that's the only way to get

6  there, you can't get there at ten in the morning and

7  then do a deposition. So you're there at least a day

8  and a half in advance, then you've got to take another

9  day wasted, another day, another day.

10        But let me get to the heart of this, which I

11 will, okay? I went over the incognito last week to

12 attend a French proceeding. This is what's going on

13 and is highly relevant, Your Honor.  This gentleman

14 has brought three criminal proceedings in France. In

15 France you can do it two ways, you can either go to

16 the prosecutor as you would here and ask them to

17 investigate -- please.

18        THE COURT:  When you gentleman, which

19 gentleman?

20        MR. ZAUDERER:  Plaintiff.

21        THE COURT:  Which one?

22        MR. ZAUDERER:  Sillam.  Sillam, Mr. Sillam,

23 okay, he's gone and twice he was turned down by the

24 prosecutors there.   And then he brought a third

25 proceeding which you can do in France, anybody can

 1
 2    prosecute a criminal case, and I went there and I sat
 3    there incognito and I saw such allegations that were
 4    being considered such as a settlement, a civil
 5    settlement that Sillam had made here in a prior
 6    proceeding with the defendants was a crime, okay, absurd,
 7    absurd contentions.  And I found out from, because Labaton
 8    was being investigated at the behest of Mr. Sillam, the
 9    French police revealed to us that this is a gentleman who
10    has been serially investigated for multiple serious crimes,
11    that is Mr. Sillam.
12            THE COURT:  When you say this is a gentleman --
13            MR. ZAUDERER:  Sillam, Mr. Sillam.
14            THE COURT:  Okay.
15            MR. ZAUDERER:  Okay, plaintiff Sillam.  According
16    to the police, and I have the translation, and this is going
17    to be relevant to the deposition because I'm going to be
18    asking him about all this and we're going to have a brouhaha
19    and somebody sitting in Europe who is overseeing this
20    deposition isn't going to have the slightest idea what the
21    Rules of Evidence are in a proceeding in the Southern
22    District of New York or how prior criminal --
23            THE COURT:  How much do the rules -- oh, okay, so
24    you're talking about Rules of Evidence for criminal
25    proceedings in New York?

1

2       MR. ZAUDERER:  No, the civil, we're in a civil

3  case here --

4       THE COURT:  Why do the Rules of Evidence matter in

5  a deposition?

6       MR. ZAUDERER:  Because I'm going to use it at

7  trial in the Southern District. This deposition will be used

8  in the Southern District, that's why, Your Honor.

9       THE COURT:  Right --

10      MR. ZAUDERER:  Okay.

11      THE COURT:  So why, so, okay, this gets back

12 to the question I asked at the beginning then, why can

13 you not get questions and answers under oath that you

14 could use in a civil proceeding --

15      MR. ZAUDERER:  Right, I'm going to answer your

16 question, Your Honor, what if the lawyer says I direct

17 the witness not to answer, it's improper, criminal,

18 whatever, and now we have somebody, a supervisor who

19 is not going to know what to do, who knows what that

20 person will do. It's now, we're there and it's ten

21 o'clock in the morning, this is going to start up, and

22 now it's four o'clock in the morning here. I don't

23 know what Your Honor's practices are, I'm certainly

24 not going to call chambers at 4 a.m. and, if not,

25 we're going to be stuck over there until we get a

ruling, that's what is going to happen.

       THE COURT:  Or you could bring it to the Part

1 judge and take your chances there.

       MR. ZAUDERER:  At 4 a.m., how do I do that?

       THE COURT:  Yes, you know what, what happens

when there's -- what happens when there's fights?

You're a very experienced litigator, Mr. Zauderer.

       MR. ZAUDERER:  Yes.

       THE COURT:  What happens when there are fights

in another time zone and there are deposition issue,

what do you do?  I've always told people when I was a

practitioner, I tell people now, you make your record

and you move on.  I want to get more granular, okay --

       MR. ZAUDERER:  I'm getting there.

       THE COURT:  This hypothetical, yes, it could

happen, but what are the bases where, one, a lawyer

can direct a witness not to answer?  Are they

different in the United States versus France?  Can they

be asserted differently, what does that mean, or does that

just stage the question to an issue of sanctions, an issue

to compel at additional deposition?  You may have to show

that, you know, you weren't able to get what you were able

to get and maybe there will be costs assessed. But those

are all issues that may come up but they may not come up,

1

2    but the parties are very much aware that the Federal Civil

3    Discovery Rules allow apportionment of costs,

4    apportionment and potentially sanctions if the parties

5    don't work together in good faith to complete --

6              MR. ZAUDERER:  May I respond?

7              THE COURT:  Yes.

8              MR. ZAUDERER:  Thank you.  May I respond to

9    that, thank you.  My response, Your Honor, is we can

10   avoid all that if we're here. If we're here in the

11   Southern District in Manhattan during normal business

12   hours and if there has to be delay, you know, we just

13   go home. Mr. Sillam has taken, one person has come

14   here and taken an airplane and stayed in a nice hotel.

15   And it will either get resolved that day or another

16   day, we don't have to deal with do we hang around in

17   France, do we come back, do we go over again and spend

18   money and time over there.  There's just simply in my

19   view, respectfully, no reason for that.  You avoid all

20   these problems. I cannot understand, Your Honor, why

21   one should even question the preference of a

22   deposition being taken in France rather than here

23   where the --

24             THE COURT:  Mr. Zauderer, I'm going to cut you

25   off right now.

1

2          MR. ZAUDERER:  Sure.

3          THE COURT:  I told you at the outset why.

4          MR. ZAUDERER:  Right.

5          THE COURT:  You acknowledge that this is a

6   discretionary determination.

7          MR. ZAUDERER:  I do.  I do.

8          THE COURT:  Right?  I will tell you that when

9   I was a practitioner I conducted multiday depositions

10  in Paris of French nationals.  We were able to work it

11  out, and I'm trying to understand why you're not able

12  to work it out, okay. I get that you would prefer, and

13  it would be cheaper for you to have the deposition in

14  New York.  I have not ruled out that that is what I

15  may order ultimately, but I want to explore why we are

16  fighting so hard on this and --

17         MR. ZAUDERER:  Okay.

18         THE COURT:  Because you are saying it's not

19  possible.  And what I'm hearing here is it would be

20  expensive, it would be inconvenient and, you know

21  what, I'm going to tell you that it would be extremely

22  inconvenient given what I'm hearing from what

23  plaintiffs are saying about having to come to New

24  York, that they don't have passports, do you really

25  want to be pushing out the deadlines waiting for them

1

2   to get their passports if, indeed, they are ordered to

3   appear in New York for a deposition?  Do you want to

4   have those fights?  I'm trying to understand which is

5   going to be the most cost effective just in speedy

6   resolution.

7        MR. ZAUDERER:  Okay.  May I, excuse my

8   enthusiasm, Your Honor, there's another reason, okay.

9   This plaintiff has felt free to bring criminal

10  proceedings --

11       THE COURT:  Okay.

12       MR. ZAUDERER:  Okay, that's my concern.  And I,

13  as I say, I went there incognito in court --

14       THE COURT:  Okay, let me, can we table that

15  again?

16       MR. ZAUDERER:  Sure.

17       THE COURT:  What I saw in multiple filings was

18  we can't do a deposition under the Federal Rules, the

19  Hague Convention would apply.  Why, you can do this

20  under a commissioner, you can agree to certain rules

21  of the deposition, I still am not hearing specifically

22  why taking a deposition of a French national in France

23  under the Hague Convention is so impossible, okay?  I

24  will set aside, let's just put the blocking statute

25  issue on hold, I have questions about that as well

1

2   because that also came up in my past experience and

3   somehow we were able to work it out, okay, but let me

4   hear about the whole, the Federal Rules versus Hague

5   Convention and why it's not possible?

6           MR. ZAUDERER:  I do not say it is not

7   possible, I do not make that contention.

8           THE COURT:  Okay.

9           MR. ZAUDERER:  I want to be clear and forgive

10  me if I didn't make that clear. I am not arguing it's

11  not possible.  What I am saying, if I can talk about

12  the blocking statute, is this plaintiff over whom

13  counsel here have no control has filed a criminal

14  proceeding, he has been charged criminally, himself,

15  multiple times, including possession of a firearm,

16  fraud, I have the record here of six, five or six

17  instances where he's been investigated and charged by

18  the police.  He, there is nothing that would restrain

19  him after I take a deposition in France from filing a

20  criminal proceeding claiming whatever he wants to, as

21  he's done with Labaton, and responsible lawyers there.

22  He's filed a criminal proceeding over there and he'll

23  do it with me. And you and I may say well that's

24  frivolous, but I have to defend it. I have to hire

25  French lawyers. He can bring a criminal proceeding and

1

2  there is a record here, that's my concern. I'm not

3  arguing that we couldn't do a deposition with all the

4  costs and all that, if I haven't been clear, I

5  apologize.

6          THE COURT:  Okay, how does the -- so the

7  concern as you're articulating it now --

8          MR. ZAUDERER:  Yes.

9          THE COURT:  Is if you were to go to Paris to

10  take the deposition you don't have any assurances that

11  you're not going to be subjected to a frivolous, some

12  sort of proceeding in France on the basis of what you

13  are, the fact of taking the deposition.

14          MR. ZAUDERER:  Yes, Your Honor.

15          THE COURT:  I see Mr. Reda shaking his head,

16  talk to me about this.  And, you know, I have to tell

17  you, this is something that is unique to this case

18  that does concern me and it's sort of outside of the

19  law, okay, this really does, this is one of the

20  practical concerns that I'm hearing. So go ahead, Mr.

21  Reda.

22          MR. REDA:  Well, Judge, I would just I guess

23  start by saying that I came here thinking this was

24  really their motion to reargue or renew, yet there's

25  no new facts, they certainly couldn't argue and did

1
2  not argue that the Court misapplied the law, the law
3  is crystal clear in this area, there is really no gray
4  area, and they haven't done anything but put forth the
5  same old arguments except now they now want to say,
6  almost like defame my client with all these
7  allegations that they didn't bring up in their papers,
8  I don't know what they're talking about, but my
9  clients have, and we stated it in our papers that they
10 are willing to sign affidavits stating that they will
11 not do anything in regards to these lawyers pertaining
12 to the depositions that occur in France.

13          And they can draft the affidavits however they
14 want to proceed with this, but our clients, and the
15 reason we're here, given, you know, have offered to
16 the Court that they are medically unable to travel.
17 The man has not traveled since 2018 to the United
18 States, that's five years, and his doctor has said that at
19 this point he shouldn't be traveling because of his health
20 issues. The same with the other plaintiff.  And we have
21 said if the Court wants these documents or wants these
22 doctors' notes we'd be more than happy to supply them.

23          And understand, again, now he's saying he was in
24 France incognito.  When he came to the Court and asked for
25 an adjournment of the last conference, he didn't say he

1

2  was going to Court incognito, he said that he had a case

3  involving the exact same parties in France.  And that was

4  months in advance, I mean this court date was months in

5  advance, they could have, if they had done anything in

6  this case since August or even the latest in November when

7  you ruled that they couldn't, they hadn't come here, they

8  had to do it in France or remotely -- or remotely in your

9  original order you, this motion here is a motion to

10 reargue your original decision which stated that the

11 deposition should either be in France or remotely as our

12 clients are in France.  They are now trying to get you to

13 change your mind but they haven't given you any new

14 information, either law or facts, that would warrant you

15 changing your original order.

16        And what I find more, I guess troublesome, is

17 that since, we've been doing this since August, they've

18 made no attempt to go through the Hague convention. I mean

19 not at all, and yet in their papers they argue it's going

20 to take too long.  Well, you know what, it wouldn't have

21 taken too long if they did it when they were supposed to.

22 In fact, if they had done it in a timely fashion when he

23 was in France, we could have done the depositions then, we

24 all could have gone there.  He was there, clients were

25 there, could have done it then, but he didn't.

2            And the law is very clear, in fact, our Courts,

3    the Federal Courts have ruled that the deposition on

4    notice in exact facts like this case, which is people that

5    voluntarily want to be deposed, there's no national French

6    interest, there's no interest by the French government in

7    this case, all of the things the Third Circuit Court of

8    appeals has talked about in why the Hague convention is

9    just one method and maybe not the best method. Only they,

10   Congress had indicated that you should use the Hague if

11   the party doesn't want to be deposed, he has to be forced

12   to be deposed, you'll have to go through the Hague. Our

13   clients have voluntarily said they want to be deposed in

14   France, they've said they'll sign affidavits saying that

15   they won't pursue any action and this, we could have been

16   done with this already. He was in France, we could have

17   gone to France, I just don't understand that they keep

18   doing the same thing yet they've done nothing to move this

19   forward as far as the Hague convention is concerned, not

20   that they need to, because depositions on notice would be

21   the preferred way to go.

22            And this whole thing about when we get there,

23   when we're there on notice, the Federal Rules of Civil

24   Procedure apply.  We don't need a French lawyer there to

25   interpret the Federal Rules, we all know the Federal

Rules, that's what's going to apply to these witnesses.

And as the Court pointed out, if our clients somehow take

advantage of this and don't answer questions, there are

sanctions that the Court can impose, like dismissing their

complaint because the Federal Rules allow for that.  so

I don't think we have to worry about what the French

law says, what French lawyers are going to say,

because there will really be no reason for French

lawyers to be there. We're conducting a deposition in

France or remotely based on the Federal Rules of Civil

Procedure as they apply to this case.

     MR. ZAUDERER:  May I -- oh, sorry, may I

reply, Your Honor?

     MR. REDA:  And  I also just wanted out to the

Court --

     THE COURT:  I just want to let Mr. Reda

finish.

     MR. REDA:  (continuing) -- that not only was

this motion improper but they violated all the Court

rules, 6.3 says you're not allowed to attach

affidavits to their papers. So instead, what, they

call them declarations, I mean is that a way that you

get around it?  And, again, no new evidence, no new

facts, just the same old argument that, well, they

1

2  should be here because they sued here. But I think

3  we've established reasonable cause to understand why

4  they can't come here now, it's a medical issue.

5           And what's more I think interesting is that

6  they've already told us that one of their witnesses,

7  one of their lawyers, has medical issues and they want

8  us depose him virtually, which we said we would do. So

9  it's all right for their witness to be deposed

10 virtually, but our witnesses have to be in person in

11 New York. It just boggles my mind that we're still

12 arguing something and yet they've done nothing at all

13 to move this forward. We could have been done with

14 this already and we haven't even started.

15          MR. ZAUDERER:  May I reply?

16          THE COURT:  Sure.

17          MR. ZAUDERER:  Thank you.  Look, first of all,

18 we have supplied an affidavit from French counsel on

19 the issue of the undertaking not to bring a criminal

20 proceeding that's been proffered here. And the

21 affidavit states as a matter of French law that it's

22 irrelevant, it's ineffective, you cannot promise with

23 legal effect not to bring a criminal action based on

24 something in the future. I mean that's been

25 uncontroverted here, that's number one.

1

2        The second, I would like to just briefly --

3        THE COURT:  Well what about, what about the

4   teeth that we have here with sanctions, apportionment

5   --

6        MR. ZAUDERER:  You know, you can bring all the

7   sanctions you wish here, one can, that's not going to

8   stop me having to respond to a criminal proceeding in

9   France, okay, by Mr. Sillam.  It just won't.

10        THE COURT:  Unless, unless, for example, the

11   party were directed to pay costs for having to defend

12   the proceeding, right?

13        MR. ZAUDERER:  This is a person who's been

14   investigated for criminal behavior six times and he's

15   in France. He is not, and even if this case is

16   dismissed here he is not going to forego bringing a

17   criminal charge against me for anything he can

18   superficially argue, okay, that's what I face as

19   counsel and going over there. I don't want to be

20   exposed to that.

21        THE COURT:  Yet you have representations from

22   an officer of the court here that he's not going to

23   let his client do that.

24        MR. ZAUDERER:  He can't control his client.

25   Why, I'm not going to assume that.  He would come

here, say, look, I told him he can't do it, I'll make

a representation, what's it worth?

THE COURT:  Really? So your suggestion is that

as an officer of the court Mr. Reda would not be able

to control his client, but he apparently doesn't know

that so he's willing to put his own integrity and

reputation out there and potentially face sanctions if

it comes, if it turns out that that's not, that's not

appropriate, that's not possible?

MR. ZAUDERER:  I can't speak for him under

what circumstances he would make that representation,

whether he will or he won't, but either way it does

not protect us from Mr. Sillam, okay?  He may in good

faith speak to his client and say I won't bring it and

then he makes that representation and Mr. Sillam does

it, what's that worth?  He said, Judge, I made that in

good faith, he probably would, I don't doubt it, that

has no meaning or effect.

I'd like to also address the procedural issue

if it's of any concern or consequence. I just want to

remind the Court that the original determination of

the place of deposition was not on a formal noticed

motion that was briefed, it was an oral discussion at

an conference following a joint submission concerning

1

2   the positions.

3           THE COURT:  And the text of my order, so I

4   don't want to -- I, there is enough going on in this

5   case and the related issues, and the disputes between

6   your clients that aren't even before this Court for me

7   to get bogged down in parsing out procedure and what I

8   meant in my prior order, but my prior order directed

9   you all to meet and confer. I do not get the sense

10  that there's been a whole lot of meeting and

11  conferring going on here.

12          MR. ZAUDERER:  We did confer, my colleagues

13  continually confer, I think that's accurate.

14          ATTORNEY:  Yes, we met and conferred

15  extensively, unfortunately we just can't agree.

16          MR. ZAUDERER:  Yeah, this is sometimes where

17  people have to agree to disagree, we're all aware of

18  the obligation and the utility of conferring, and

19  we've done that, but sometimes people agree to

20  disagree and their clients are in sharp contrast with

21  each other.

22          MR. REDA:  If I may, Judge?

23          THE COURT:  Go ahead.

24          MR. REDA:  I'd also, again, these, this

25  declaration from a French lawyer, improper, shouldn't

 1

 2  have been even allowed to be submitted on the docket

 3  --

 4          THE COURT:  Okay, go ahead, move onto the next

 5  issue.

 6          MR. REDA:  But in all of this extraneous stuff

 7  about my clients, I mean that they never brought up to

 8  the Court before, now all of a sudden he's got all

 9  these things, he's this horrible person, he's going to

10  have them arrested, I mean I don't know what to say to

11  it because I don't know if any of that is true. All I

12  know is that he was there in France I guess last week,

13  he didn't get arrested, he came back, so I guess there

14  wasn't any problem there.  I don't know. It's just

15  nothing has changed other than the fact that my

16  clients are still ill, still can't travel under

17  doctors' orders and, as I said, we can do this and

18  fashion it in a way, I don't know why we can't do it

19  remotely.  Then they don't have to worry about being

20  arrested and all that stuff that they're making up.

21  You know, nothing's happened, I don't know what to

22  tell them about my client has assured me that they

23  would sign affidavits. One of the clients is a lawyer

24  in France, he would be -- everyone is willing to sign

25  whatever they need, they feel to be protected, but if

they're so afraid of going to France, not that it

stopped them from going last week, perhaps maybe we

should do it remotely which could be easily done. It's

not like we're asking them just because we don't want

to come, you know, they don't want to come, there are

valid medical reasons that preclude them from

traveling at this time.

          THE COURT:  Okay --

          MR. ZAUDERER:  May I address -- sorry.

          THE COURT:  No.  Mr. Reda, sometimes if it

looks like you're winning an argument, you don't need

to keep talking.

          MR. REDA:  Yes, Judge.

          THE COURT:  All right, one thing, I want to

move forward on this, all right?  You, Mr. Reda, you

represented that there are medical, real, valid

medical issues that preclude your clients from

traveling for a deposition. You've represented that

you can provide a doctor's note but you have not yet.

          MR. REDA:  Only because the, in our papers,

even in our first submissions we asked the Court if

they wanted them we would --

          THE COURT:  Right, I know.

          MR. REDA:  And since you didn't ask for them,

1

2   we didn't give them to you.  But we can give them to

3   you at any time, Judge.

4        THE COURT:  More, more concerning to me is,

5   and also, since we're on the record I don't want to

6   get into the details of your client's medical

7   conditions or anything, but I wanted to know if those

8   medical issues and those reasons have been fully

9   disclosed to defense counsel while you've been talking

10  about whether or not the, you know, this is a good

11  enough reason, in other words.

12       MR. REDA:  Yes, Judge, we've supplied them

13  with that documentation, we just didn't supply it to

14  the Court because the Court didn't day they wanted it.

15       THE COURT:  Okay, I see defense counsel wants

16  to confer, so why don't you talk among yourselves for

17  a moment.

18       MR. ZAUDERER:  Thank you.

19       THE COURT:  Okay.

20            (PAUSE IN PROCEEDING)

21       MR. ZAUDERER:  Your Honor, there were two

22  plaintiffs, as you know. With respect to the second

23  plaintiff, Mr. Saulnier, we've been given no proffer

24  of any medical issue or any medical condition,

25  whatsoever. We've been given his driver's license

which shows his age which I believe was 79, mere age

without more is not probative at all of inability to

travel. With respect to Mr. Sillam, we've been given

an unsworn doctor's note from early September from a

general practitioner, very vague, conclusory, unsworn

post litigation. We've been telling the plaintiffs for

six months that this, we believe this is conclusory

and inadequate under this Court's case law and they've

given us nothing further.

        MR. REDA:  All I can say, Judge, is they have

never asked for any further documentation, we gave

them the doctor's note in French and then we had it

translated for them so that it would be in English

also. And as they're aware, he's got serious medical

issues, heart conditions, the doctor precludes him

from traveling. They keep bringing up that he traveled

in 2018, well that was five years ago, things change.

        MR. ZAUDERER:  If --

        THE COURT:  Okay, Mr. Reda, is it, is it your

position for both plaintiffs that there are medical

reasons, that there are medical reasons that they

should not be traveling?

        MR. REDA:  Yes.

        THE COURT:  Okay.  I am -- all right, but it

1

2  sounds like there's a dispute as to whether the

3  proffers that have been provided are sufficient, okay.

4  All right, who wanted to speak next, Mr. Zauderer, go

5  ahead.

6         MR. ZAUDERER:  Yeah, just on one issue, kind

7  of the flourish was, the statement was made I went to

8  France, nothing happened, I didn't get arrested.

9  That's not what happens.  Mr. Sillam here --

10         THE COURT:  I don't care.  I don't care,

11  that's not relevant here, okay?

12         MR. ZAUDERER:  All right.

13         THE COURT:  What I've heard articulated, a

14  concern that there will be criminal proceedings --

15         MR. ZAUDERER:  Correct.

16         THE COURT:  Unfairly brought that will cause

17  problems --

18         MR. ZAUDERER:  Correct, Your Honor.

19         THE COURT:  Significant problems, right --

20         MR. ZAUDERER:  Yes, he just has to file them,

21  that's all he has to do.

22         THE COURT:  Okay, let's, let's explore that

23  issue a little bit. I'm hearing from Mr. Reda that Mr.

24  Reda, as an officer of the court represent that he

25  will not, this his clients will not, will do no such

1

2   thing, okay.  What I'm hearing now is quite

3   speculative and I'm a little bit concerned at the tone

4   and the tenor of this argument, but what you're

5   saying, Mr. Zauderer is, also as an officer of the

6   court, Mr. Reda doesn't have control of his clients,

7   his clients are crazy and they're going to sue me

8   anyway.

9           MR. ZAUDERER:  I think it's, I can't know

10  that. I can't know that.

11          THE COURT:  Okay --

12          MR. ZAUDERER:  Of course it's speculative.

13          THE COURT:  But explain to me --

14          MR. ZAUDERER:  Yes.

15          THE COURT:  Explain to me why the Court does

16  not have the ability, this Court, why I --

17          MR. ZAUDERER:  Yes.

18          THE COURT:  And the District Judge on this

19  case, do not have the ability to fashion a proper

20  remedy or recourse if, in fact, it turns out that

21  these clients have done something that Mr. Reda

22  advised them not to do and which they, themselves,

23  have represented and promised not to do?

24          MR. ZAUDERER:  Because in the real world, Your

25  Honor, I don't believe Mr. Sillam will care. I have

his criminal history, why would he care?  The worst

that's going to happen is the Court would impose some

fine, perhaps dismiss his case, he's not here, he's

not American, he's in France, he can still file a

criminal proceeding over there, he can do anything he

wants.

        So the answer, Your Honor, respectfully, is

the very important tools that this Court has would not

be effective if what I say is true and I think there

is a record here to suggest this is a real

possibility.

        THE COURT:  Not that I'm suggesting this, that

anybody consider this, but you did not mention, for

example, contempt sanctions?

        MR. ZAUDERER:  Again, I don't think, first of

all, I don't know whether we'd get that, but assuming

we were afforded that relief, what does it matter to

Mr. Sillam?  He's French, he has no concern. He's

brought this case here to take a shot at it and he

keeps bringing criminal cases in France, and he keeps

being investigated, and if we can get, we've been told

this by the police there because Labaton was the

subject of his investigation so they released to us

his criminal history which is substantial.

1
2          THE COURT:  All right, you are not going to

3    mention Mr. Sillam's criminal history anymore, okay,

4    it's irrelevant at this point.

5          MR. ZAUDERER:  Okay.

6          THE COURT:  All right, talk to me about, is

7    there any other reason why you cannot conduct an in

8    person deposition in France? I've heard the, you know,

9    I'm going to be subject to potential criminal charges,

10   not because of the state of the law or because of the,

11   because of the French blocking statute or anything

12   like that but specifically because of these

13   plaintiffs.  The argument is also made that these

14   plaintiffs' lawyers' representations are not

15   sufficient, that the plaintiffs, themselves, that the

16   representations by the plaintiffs, themselves, are not

17   sufficient.  So that's one reason, right?  And I guess

18   the other -- is that the primary reason, what are the

19   other reasons why you cannot do a deposition in

20   France?

21          MR. ZAUDERER:  There is no reason other than

22   that that I cannot do it. I'm not saying it can't be

23   done and if I have made, I don't think I've argued

24   that, I'm not, Your Honor.  I'm saying there are many

25   practical problems which I've discussed, I know Your

1 | Honor is fully aware of them because sometimes in the

2 | real world, you know, the theoretical remedies for

3 | things are really not practical and that's what I've

4 | suggested. I won't repeat myself, I'll refer you to

5 | what I've already argued, all about the time

6 | differences, the practical problems with a busy Court,

7 | can't be expected to address every problem right away

8 | and even if it were 3,500 miles away in a different

9 | time zone and perhaps having to stay there, it's

10 | expensive, in my view there are, respectfully, no

11 | justification.

12 |         And one other point, I think the only final

13 | point, it's probably buried in our papers so it's not

14 | new, is I would ask the Court to take into

15 | consideration when you weigh all these factors, much

16 | of our experience and perhaps Your Honor's experience

17 | in practice, is with nonparty witnesses. And a lot of

18 | the case law comes from that.  And while it is not

19 | determinative, we're talking about a party. Usually we

20 | take nonparty witnesses in Europe, we have cases here,

21 | the witnesses are all over, I've done a lot of this

22 | over the years, I've really never seen a position

23 | where, what's Mr. Sillam going to not come to trial

24 | because he's too ill, he's going to rely on my

1

2  deposition of him?  I mean the reality, I mean that's

3  something to consider. I don't know the answer to

4  that. He claims he's too sick but he's bringing the

5  case here and three criminal cases in France and he's

6  going to come say I don't have to come trial and just

7  wait for that and maybe he can extract a settlement,

8  this is not going to happen. So that's my other point,

9  Your Honor.

10          MR. REDA:  If I may respond, Judge?

11          THE COURT:  Go ahead.

12          MR. REDA:  Well first of all, the sanction of

13 you actually dismissing his case so outweighs any

14 allegation they might bring a criminal, a baseless

15 charge against this lawyer, I mean the plaintiffs have

16 spent so much money in legal fees and such to

17 prosecute this case, they think that it's worth a lot

18 of money, to think that they would intentionally,

19 knowing that the case could be dismissed and they

20 could be sanctioned by this Court even further because

21 they somehow have some vendetta against a lawyer

22 they've never met is so speculative and kind of silly.

23 Because I mean they want the case here, they want to

24 have the case adjudicated, they wouldn't do anything

25 so blatant that would cause this Court to dismiss

1

2     their case as a sanction for violating an affidavit

3     they are willing to sign fashioned by either the Court

4     or by defense counsel that shows that they're not

5     going to do that. I mean and it keeps talking about

6     this, you know, if this wasn't in Court, you know,

7     this would be a defamation lawsuit, I mean every, I

8     mean you would think this man is a child molesting

9     murderer the way they keep talking about him, we

10    talked to the police about him, all this stuff.

11    There's no proof of it, there's nothing they gave to

12    the Court, nothing they gave to us, it's just kind of

13    trying impugning him by a broad stroke that he's not a

14    nice guy, yet the subject matter of this lawsuit is

15    that their clients defrauded them, lied and

16    misrepresented to them facts which is why we're to

17    begin with.

18              So if anyone has a history of

19    misrepresentation, of lying --

20              MR. ZAUDERER:  Oh --

21              MR. REDA:  (continuing) -- of doing the wrong

22    thing, it's not my clients, it's their clients.

23              MR. ZAUDERER:  That's out of order.

24              THE COURT:  Oh, my goodness, you're both out

25    of order.  All right --

1

2     MR. ZAUDERER:  Respectfully, Judge, I,

3 apologies, I don't think I've said, made any argument

4 that's out of order, I apologize if I have.

5     THE COURT:  You have continually referred to

6 the plaintiffs in this case in pejorative terms,

7 suggested that they won't listen to their lawyers,

8 suggested that they are willing to bring baseless and

9 frivolous lawsuits --

10     MR. ZAUDERER:  Correct, I do, Your Honor.

11     THE COURT:  And continued to push that point

12 even after I have told you not to keep doing it.

13     MR. ZAUDERER:  Apologize if I've done that --

14     THE COURT:  I have listened and I have heard

15 your concern.  I agree that given some of the history

16 in this case, that it is not, that there is some there

17 there, that there is a non-zero possibility that this

18 might happen, but I have also listened carefully to

19 what Mr. Reda, who is also an officer of this court

20 and who represents these individuals, that they have

21 tendered or proffered affidavits or other assurances

22 that they will not do such a thing, and that I think

23 should reduce the possibility, even if it doesn't

24 reduce it to zero it reduces it to a number that is,

25 that may be acceptable considering the other recourse

that you may have. Which admittedly would happen after
a bad event or a bad incident, but sometimes that's
what -- sometimes that's all we've got, right, that is
inherent in the definition of the word remedy, all
right.  And we also have not yet covered whether a
remote deposition might alleviate that issue and bring
that possibility down to zero.

So let's talk about a remote or video
deposition.

MR. ZAUDERER:  Sure.

THE COURT:  I have heard already why there are
reasons that it would be impracticable, why it would a
hassle, why it would not be preferred. I share those
reasons, okay, I understand that, I want to hear if
there's anything else with regard to a remote or video
deposition that makes it not preferred, or less
preferred, or not possible.

MR. ZAUDERER:  Sure, I hope this is
responsive. The only other point other than the things
that you've alluded to in the practicalities is the
point we've made in the papers that under the law as
we've put it out for Your Honor, whatever concerns
there are under the blocking statute exist whether the
deposition is in person or by, or is remote, that's

1

2   our view that we've advanced to you and substantiated.

3          THE COURT:  But I thought I heard Mr. Reda say

4   that the blocking statute really concerns national,

5   issues of national economic interest and normally do

6   not apply or would not be implicated if there were a

7   witness who was appearing voluntarily and under

8   agreement and for a private personal lawsuit.

9          MR. ZAUDERER:  So, Your Honor, if I may ask

10  Mr. Matetsky to address it who can do so more

11  knowledgeably than I.  Go ahead.

12         MR. MATETSKY:  Very briefly, Your Honor, and

13  we've given you some case law on this. There are many

14  countries which although they are parties to the Hague

15  convention, take the position if you've got a

16  consensual deposition you're free to take it in our

17  territory, we don't express a national interest, we

18  don't -- we don't care.

19         THE COURT:  And France is not one of them?

20         MR. MATETSKY:  France is not one of those

21  countries.  France, and we've given you the law on

22  this and we've given you, Mr. Tetley's declaration

23  takes the position that even if it's fully consensual,

24  if the deposition of a French national is taking place

25  on French territory, whether in person or remotely,

1  you have to jump through the Hague convention hoops.

2          THE COURT:  Okay, why not jump through the

3  Hague Convention hoops?

4          MR. MATETSKY:  Because there's no assurance --

5  there are two ways that people can address that.  One

6  is frankly to say even though we're supposed to go

7  through the Hague Convention we're just not going to

8  do it, everyone will turn a blind eye and we just

9  won't care.

10         THE COURT:  Okay.

11         MR. MATETSKY:  That might be tenable in

12 another case, given what we've heard earlier about

13 these particular plaintiffs we wouldn't feel

14 comfortable about that.

15         THE COURT:  I'm not, I'm not even putting that

16 on the table.

17         MR. MATETSKY:  Okay, the other --

18         THE COURT:  So what's the not turning a blind

19 eye?

20         MR. MATETSKY:  If we don't turn a blind eye

21 then we have to go through the Hague Convention as

22 pointed and as we've discussed, there is significant

23 potential delay there.  There are two possible

24 alternatives, let's suppose, I gather Your Honor is

```
 1                          PROCEEDINGS                        39

 2   familiar with the procedure, we go through the

 3   Commissioner.  In many cases there is a, there is a

 4   deposition that takes place that runs smoothly but

 5   that is not guaranteed to happen. We don't know who

 6   the Commissioner is going to be, what the Commissioner

 7   is going to do, what attitude the Commissioner is

 8   going to take, how the Commissioner might react to the

 9   different scenarios that might come up, there is no

10   assurance of a complete and full examination. And

11   given that as Mr. Zauderer pointed out we're not

12   talking about some peripheral nonparty, we're talking

13   about the plaintiffs in the action, there should be a

14   full, free, unfettered deposition under the American

15   rules is our submission.

16            THE COURT:  So the problem here is there will

17   be delay, if you go through the Hague you have delay

18   and you have problems with a Commissioner, anything

19   else?

20            MR. MATETSKY:  And that there is no assurance

21   that we'll have the full and free deposition that we'd

22   be able to have in New York.

23            THE COURT:  You know what, there is no

24   assurance that anybody gets to have, that any

25   deposition will proceed fully, freely and fairly no
```

1

2   matter where it's taken, no matter who's taking it,

3   okay, and there are remedies after the fact.

4           I want to go back to -- I want to go back to

5   your point about the Commissioner, Mr. Matetsky.  So

6   you're suggesting that you would have no ability to

7   find or designate your own commissioner? I thought

8   that under the Hague there could be a judge or some

9   judicial officer or you could find your own

10  commissioner?

11          MR. MATETSKY:  We could ask for that. We could

12  ask for that and Your Honor could ask for that, but

13  there is no guarantee that it would be granted.

14          THE COURT:  There are no guarantees in life,

15  Mr. Matetsky.  All right, Mr. Reda, do you have

16  something to say about this issue?

17          MR. REDA:  Yeah, first of all, this issue has

18  been, was addressed really almost word for word by the

19  Federal District Court in Pennsylvania in which they

20  said --

21          THE COURT:  Yes, which you cited in your, I'm

22  trying to look at, trying to find where it is in your

23  brief.

24          MR. REDA:  Yeah, page 4, Judge.

25          THE COURT:  Okay, this is the asbestos case?

1

2          MR. REDA:  Yes, product liability litigation

3    in the Eastern District of Pennsylvania --

4          THE COURT:  Yep.

5          MR. REDA:  Where the Court ruled all that "the

6    voluntary deposition of a plaintiff in this case poses

7    no threat to France's sovereignty or to France's

8    interest in its own legal procedures, the deposition

9    will not compel anyone's testimony, will burden or

10   inconvenience France or its Courts or citizens."

11   That's what we have here.  And there is nothing to

12   indicate that we can't do this remotely. I mean could

13   it be, I'm not saying that it wouldn't be less

14   convenient, yes, it would be a little harder, but it's

15   not like it's asking you because, you know, they just

16   don't want to come. I think that there are valid

17   medical reasons for that, that's why we've been having

18   this conversation. If I had come here and said to the

19   Court, well, they just, you know, they just don't want

20   to come, well, too bad, they have to come.  But that's

21   not what we have here, they don't have to go through

22   the Hague convention, in fact, our Federal Courts have

23   ruled consistently, not only the Second Circuit but

24   the Third Circuit, the Supreme Court, that the

25   preferred way of doing depositions is through notice

1
2    and that you'd only go to the Hague Convention if you
3    think there's going to be a real problem with a
4    witness who is not voluntarily willing to be deposed.
5    That's not the case here.
6              So while they could have gone through the
7    Hague Convention, there was no need for them to do
8    that because our witnesses are voluntarily, and it's
9    not even they're nonparty witnesses, they are, they
10   are parties that have a great interest, you know, in
11   this proceeding, therefore, they have to be careful
12   about what they do that's going to affect the Court's,
13   you know, granting sanctions if they don't do -- if
14   they do something improper. This, the notice
15   requirement is really the way they should have gone
16   here, but if they wanted to go Hague they should have
17   done that, you know, months ago. I don't think there's
18   anything that makes it so insurmountable that we can't
19   do this deposition remotely, especially considering
20   that even before we got to this point they had already
21   stated they were videotaping the deposition. So I mean
22   I think they're protected many different ways to make
23   sure that this goes as smoothly as any deposition can
24   go.
25              THE COURT:  All right, any response to that,

1

2  defense counsel?

3          MR. ZAUDERER:  Give us a moment, Your Honor.

4          THE COURT:  Okay, thanks.

5              (PAUSE IN PROCEEDING)

6          MR. ZAUDERER:  Your Honor, the case that Mr.

7  Reda cites, I believe, is a case in which the Court

8  said, you know what, everybody's in agreement, just

9  let's ignore the Hague Convention and just go take the

10 deposition and hope the French authorities don't find

11 out about it don't care. I believe that's the

12 alternative, the one alternative that your

13 specifically indicated a month ago --

14         THE COURT:  So then go to the Hague

15 Convention.  If you don't want to do it that way then

16 go through the Hague Convention, right, what's the

17 problem with that?

18         MR. ZAUDERER:  Well I think we've indicated

19 what our concerns are about --

20         THE COURT:  You might not get the commissioner

21 that you want?  Why, you know what, there are plenty

22 of lawyers resident in France who are also barred in

23 this court, perhaps one of them might be an

24 appropriate commissioner for your deposition, if you

25 elect to conduct it by remote means, or I guess if you

1   were to be there in person, I guess.

2          MR. ZAUDERER:  Judge, respectfully, I've made

3   my arguments to you.

4          THE COURT:  All right, I guess I'm just trying

5   to understand what the, that, I'm trying to understand

6   that, and I would like you to correct me if I'm wrong

7   here, but the issues, the video or remote deposition

8   would resolve completely the concerns, Mr. Zauderer,

9   that you would have with potential frivolous criminal

10  prosecutions.

11          MR. ZAUDERER:  No --

12          THE COURT:  No.

13          MR. ZAUDERER:  It would not, Your Honor. No,

14  if my theory is correct and I've explained why, the

15  same concern whether you do something remotely or in

16  person in France.

17          MR. MATETSKY:  France, and we've given Your

18  Honor a declaration and authority on this, France

19  takes the position that if the witness is sitting in

20  France it's a French deposition to which the French

21  procedural requirements apply regardless of where the

22  questioner is sitting.

23          MR. ZAUDERER:  And I think you asked a

24  practical question and I'm trying to answer you as

1        PROCEEDINGS                    45

2    well, Your Honor, I think you asked about what

3    problems would that, and maybe we've covered this, I

4    apologize in advance if I have, but not only is it

5    expensive and difficult, but with the time difference,

6    I checked with French counsel, I have to have a

7    reporter, I have to have a videographer, I have to

8    have a translator. We're talking about 11:00 at night,

9    you can't easily get people to do that in France at

10   night, it just doesn't work that way in that system. I

11   can't just say, oh, call somebody, just get a

12   reporter, oh, what time do we start, what time do we

13   go to, well we go to 11:00 at night. It doesn't,

14   that's a practical problem, I hope that's responsive.

15           THE COURT:  Oh, I see, that would be a

16   practical problem.

17           MR. ZAUDERER:  Yes.

18           THE COURT:  That perhaps could be alleviated

19   if the deposition were taken during business hours in

20   France.

21           MR. ZAUDERER:  Yes, and I have to do it at 4

22   a.m.

23           THE COURT:  With me taking no position whether

24   counsel is in New York or Paris, right?

25           MR. ZAUDERER:  Right, I mean I'd have to get

1

2  to the office at 2 a.m. after a full day, prepare, and

3  take a seven or eight hour deposition. You know, I'm

4  as old as the, one of these defendants here, my birthday

5  is tomorrow.

6          THE COURT:  Happy early birthday.

7          MR. ZAUDERER:  Thank you.  One of the

8  plaintiffs, I should say.

9          THE COURT:  Okay, just a minute.  So, Mr.

10 Reda, you've tendered or you proffered some a sworn

11 affidavit or undertaking that your clients would not

12 pursue?

13         MR. REDA:  Yeah, we put in our papers that

14 they would sign whatever affidavits that the, we told

15 them this, that they feel comfortable to protect them

16 that he would not be bringing, neither of them would

17 be bringing any criminal proceedings or any

18 proceedings, whatsoever, in France, in regards to the

19 deposition.  They could even have sanctions built into

20 the affidavit if they violate that, I just don't, I

21 think the chances of it happening are so slim because

22 the ultimate sanction here would be you dismiss their

23 case and I think that --

24         THE COURT:  There could be more than that.

25         MR. REDA:  Yes, exactly, and that, in and of

1

2     itself, would be enough to make sure that they never

3     do that because, you know, they put a lot of time,

4     energy and money into this case and, therefore, to

5     have some lawyer that they don't know somehow

6     frivolously arrested and risk the case being dismissed

7     and then being financially sanctioned, I think is

8     farfetched and the chances of that are slim to none.

9            THE COURT:  Okay, any other -- all right.

10           MR. ZAUDERER:  I think I've, I don't want to

11    repeat myself but I think I've made the point in

12    conclusion that I don't believe that the plaintiff,

13    based on the record which I've asserted I think

14    fairly, is trustworthy and will not be deterred in

15    France by anything that's done here.  But I've made

16    that point, Your Honor, and I'd just repeat it.

17           THE COURT:  And you've made it again.

18           MR. ZAUDERER:  Thank you.

19           THE COURT:  And you need not make it further.

20           MR. ZAUDERER:  I'm sorry?

21           THE COURT:  And you need not make it again.

22           MR. ZAUDERER:  Very well, I'm guided by what

23    you say.

24           THE COURT:  All right, although everything

25    that I had issued in this case concerning the

1
2  plaintiffs' depositions were -- concerning the
3  plaintiffs' depositions was aimed to get the parties
4  and their counsel to find a mutually acceptable path
5  forward for depositions, I am concerned that counsel
6  in this case are unable to reach agreement on much of
7  anything.  So as to Mr. Saulnier, if there are medical
8  reasons why, to be proffered as to why Mr. Saulnier
9  should not or cannot attend a deposition in New York
10 in person I direct you to provide them to counsel no
11 later than February 3rd.  They are not to be filed on
12 the docket, they are not to be sent to chambers.
13         All right, and I expect that the lawyers
14 should meet and confer on a process and attempt one
15 last time to agree on a deposition process and
16 location for Mr. Saulnier after that has been, that
17 medical proffer has been provided.
18         MR. REDA:  Yes, Your Honor.
19         THE COURT:  Okay.  As to Mr. Sillam, I
20 regretfully feel that we would not even resolve the
21 first issue of the, whether what Mr. Sillam has
22 already proffered constitutes good cause without
23 further evidentiary hearings and further discovery. I
24 do not think that is practical, or helpful or an
25 efficient way to resolve the issue of Mr. Sillam's

1  deposition.

3        Accordingly, my ruling with regard to Mr.

4  Sillam's deposition is that defendants may elect

5  whether to conduct a deposition of Mr. Sillam remotely

6  or in person with Mr. Sillam in France.  That is

7  defendants' election. The parties are to work together

8  in good faith to agree to the particulars and

9  logistics of the deposition, including but not limited

10  to providing affidavits or other statements or

11  agreements from Mr. Sillam to address the concerns

12  raised by defense counsel about frivolous proceedings

13  brought in France, or potential frivolous proceedings

14  brought in France.  The Court takes no position on

15  whether defendants should proceed under the Hague

16  convention. That is at their election, I'm not going to rule

17  one way or the other.

18        I am going to caution counsel because you're the

19  ones that are here, that I expect you to behave and conduct

20  yourselves in the deposition and insure that your clients

21  also, to the extent that they're present, conduct themselves

22  appropriately. If there are motions to compel or motions to

23  continue the deposition or motions for sanction that arise

24  out of the deposition, they will be briefed, they will

25  include the full transcript as well as the video which can

1

2  be filed provisionally under seal, and if I need to decide a

3  motion I will apportion costs under 37(a)(5). I'm telling

4  you right now, all right, I will make this a loser pays

5  situation if there are further motions concerning Mr.

6  Sillam's deposition. I take to heart, I am concerned by the,

7  by what you have told me, Mr. Zauderer, about what Mr.

8  Sillam has done in the past about criminal proceedings, I am

9  listening to that, okay.  Maybe I'm like Charlie Brown with

10  a football, but I have faith and hope that Mr. Reda and the

11  representations that he's made and the work that he has done

12  with his client will make that a nonissue, all right?  If it

13  becomes an issue, I do want to hear about it, okay?

14          All right, the other thing that I wanted to

15  raise, I know that that was the only issue that you

16  all had raised, but we have been getting snail mail

17  from a lawyer in France concerning subpoenas served by

18  plaintiffs on Degroof Petercam Wealth Management, does

19  anybody have, can anybody tell me what these letters

20  are about?  And I, we did have them put on the docket

21  and if you don't have copies my deputy can hand you

22  clean copies of what we received?

23          MR. ZAUDERER:  I had seen something that was

24  filed on the docket just about twenty minutes before

25  Court so I obviously haven't had attention, a chance

to explore it thoroughly.  But from our point of view,

these are, the plaintiffs gave us notice weeks ago

that they were planning to serve a bunch of document

subpoenas on financial institutions in France that

allegedly once had a relationship with Labaton.  This

wasn't done under any valid procedure I'm aware of,

you can't just show up in France and start serving

American depositions so it's not surprising that some

of the nonparties have problems with that. I don't

know that those nonparties are actually before this

Court, but from our point of view that's what this is.

      These are not documents that the, that the

plaintiffs actually need.  Labaton has produced all of

its records relating to any income that it received

from these institutions during the relevant time

period, but plaintiffs, these are plaintiffs'

subpoenas so that's all I have to say.

      THE COURT:  Okay, are these, are these

subpoenas seeking documents or documents and

depositions?

      MR. REDA:  Just documents, Judge, and they,

and I told the lawyer, he said that they weren't going

to provide documents for a couple of reasons, but one

was that they don't have any, second of all, it's not

1

2  the right entity, and we said fine, end of discussion,

3  you don't have the documents, don't, you know, we're

4  not doing anything further.  And for some reason, I

5  think this is the second time he's filed the same

6  letter to the Court explaining why he's not providing

7  documents that we're not, no longer asking him to

8  provide because he says he doesn't have them. And that

9  it's not the right entity and we should subpoena an

10  entity in the United States, not in France, fine.  We

11  accepted his representations and I thought the matter was

12  completed because we're not doing anything further.

13          We did it properly through the way you're

14  supposed to serve subpoenas in France but he said that

15  they're not, you know, they're not complying and we

16  said fine, so don't comply. I don't know why he, that

17  wasn't good enough for the lawyer that he felt that he

18  had to let the Court know that he wasn't going to

19  comply, but I think now it's just a nonissue because

20  we're not going any further with it, as I told the

21  lawyer.

22          THE COURT:  All right, I'm going to direct

23  that you file a joint status letter by February 17th.

24  The status letter will, will describe the status of

25  plaintiffs' depositions. In other words, you're going

1

2  to tell me what you decided to do with regard to Mr.

3  Sillam's deposition and also let me know if there are

4  any disputes coming up with Mr. Saulnier's deposition,

5  or if you're able to schedule it. I will give you a

6  little heads up, obviously not binding, it's not a

7  ruling, but if, if there is a dispute on Mr.

8  Saulnier's deposition, we're going to go through the

9  same discussion and the same articulation. So you can

10 save your clients a lot of expense by cutting to the

11 chase and exploring whether an in person deposition in

12 France, a remote deposition with the witness in France

13 or a deposition in New York, which of these is

14 possible or amenable. But I would hope not to have to

15 see this as a full blown motion again. If it is I'll

16 address it but I will address it with 37(a)(5), Rule

17 37(a)(5) in the back of my head.

18         And then the other item to be discussed

19 specifically in the joint status letter is whether,

20 whether there is a dispute about these third party

21 subpoenas, okay, or whether it's no longer an issue.

22 And then, of course, whether there are any new

23 disputes and if there is anything else that the Court

24 needs to address, all right?

25         So anything else that anybody needs to raise

1   at this time, Mr. Reda?

2        MR. REDA:  Not raise, is it possible to, I now

3   you said 2/3 for the medicals, is it possible to get a

4   couple of more days to get those only because he's in

5   France, I've got to, you know, make sure that, and

6   then once we get them I've got to have them translated

7   into English because no one here is going to be able

8   to read them in French and the doctor isn't going to

9   read them in French, but we'll have them translated

10  into English as we did with Mr. Sillam's medical.

11       THE COURT:  All right, February 10th.

12       MR. REDA:  Thank you, Judge.

13       MR. ZAUDERER:  Nothing -- I'm sorry, nothing

14  on our side.

15       THE COURT:  Okay. All right, thank you very

16  much. I had another question, I see a gentleman

17  sitting in the back, is he one of your lawyers?

18       MR. ZAUDERER:  He's with Labaton, in-house

19  counsel.

20       THE COURT:  Oh, okay. All right, what's your

21  name?

22       MR. MICHAEL KENT:  Michael Kent, Your Honor.

23       THE COURT:  Okay.  You're welcome to sit at

24  counsel table, even if you're, you know, not speaking

1
2   or anything like that as the client. I have plenty of

3   cases where the clients, you know, if they choose to

4   attend a conference are welcome to come and sit at

5   counsel table.

6           MR. KENT: Thank you, Your Honor.

7           THE COURT: Okay? All right, thank you. All

8   right, so medical proffer for Mr. Saulnier, February

9   10th, joint status letter by February 17th to talk

10  about plaintiffs' depositions, whether any issue

11  remains with the third party subpoenas and also any

12  other disputes on the horizon.

13          All right, is there anything we need to do

14  about the discovery end date or is that still far

15  enough out that we can leave it?

16          MR. ZAUDERER: May I have a moment?

17          MR. REDA: I think, Judge, the only

18  outstanding discovery is the depositions. The

19  depositions. I believe all paper discovery has been

20  completed is my understanding.

21          THE COURT: Okay, what's the discovery end

22  date?

23          MR. REDA: Right now it's February 28th for

24  fact witnesses?

25          MR. ZAUDERER: Yeah, we're going to need an

1                              PROCEEDINGS                          56

2   extension if we go through these hoops.

3               THE COURT:  Yes, so why don't you in the

4   February 17th letter also propose a new discovery end

5   date.

6               MR. ZAUDERER:  Thank you, we will.

7               MR. REDA:  Yes, Judge.

8               THE COURT:  All right, the last thing is I'm

9   going to request the parties order a copy of the

10  transcript, share the cost 50/50.

11              MR. ZAUDERER:  Sure.

12              THE COURT:  All right, thank you very much, we

13  are adjourned.

14                  (Whereupon the matter is adjourned.)

15

16

17

18

19

20

21

22

23

24

25

57

C E R T I F I C A T E

      I, Carole Ludwig, certify that the foregoing transcript of proceedings in the case of Sillam, et al. versus Labaton Sucharow LLP, Docket #21cv6675, was prepared using digital transcription software and is a true and accurate record of the proceedings.

Signature   _____

              Carole Ludwig

Date: February 1, 2023