UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

ALDRIC SAULNIER,

      Plaintiff,

  -against-                                   21 Civ. 6675 (CM)(OTW)

LABATON SUCHAROW, LLP, and
GARRETT J. BRADLEY, *as Preliminary Executor
of the Estate of Christopher J. Keller,*

      Defendant.

------------------------------------------------------------X

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND
GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

McMahon, J.:

This long and unsavory dispute arises out of a fee-sharing arrangement that appears to skirt ethical boundaries. Only three litigants remain: Plaintiff Aldric Saulnier, and Defendants Labaton Sucharow, LLP ("Labaton") and Garrett J. Bradley, as preliminary executor of the Estate of Christopher J. Keller. Plaintiff and Defendants have cross-moved for summary judgment (Dkt. Nos. 184, 186).

To date the Court has stayed its hand in ruling on those cross-motions. The reason is that, on April 3, 2025, the Court was notified that Keller, a named Defendant, had died (Dkt. No. 192). The claims against Keller individually have, therefore, abated.

However, pursuant to Fed. R. Civ. P. 25, Plaintiff has 90 days from the date of the notice of suggestion of death to move to substitute a dead party's estate for the decedent as a party to the case.

1

On June 30, 2025 – 90 days after the suggestion of death was filed – Plaintiff moved to substitute the "Estate of Christopher J. Keller" for Christopher Keller as a defendant (Dkt. Nos. 199, 199-1). He so moved because he was unaware of the identity of Keller's executor.

On July 7, 2025, counsel for Defendants advised the Court that no executor or administrator of Mr. Keller's estate had yet been appointed (Dkt. No. 200). Magistrate Judge Wang thus denied Plaintiff's motion for substitution "without prejudice to renewal when a personal representative for Mr. Keller's estate has been appointed" (Dkt. No. 202). The Magistrate Judge further ordered the parties to file a joint status letter by August 29, 2025, informing the Court whether such representative has been appointed. *Id.* On August 20, 2025, Labaton moved to substitute Garrett J. Bradley, as preliminary executor of the Estate of Christopher J. Keller, as a defendant in place and stead of Mr. Keller (Dkt. No. 204). I granted that motion on September 3, 2025 (Dkt. No. 206). It is now appropriate for the Court to rule on the outstanding motions.

For the reasons stated below, Plaintiff's motion for summary judgment on his sole remaining claim of fraudulent inducement is DENIED, and Defendants' motion for summary judgment dismissing this action is GRANTED.

## BACKGROUND

Unless otherwise noted, the following facts are undisputed.

### A. Origin of the Dispute

In April 2006, Labaton entered a questionable fee-splitting arrangement with French businessman Gérard Sillam (Dkt. No. 184-5). Pursuant to the "consulting agreement," Sillam agreed to "draw upon his personal contacts" at certain European investment funds in order to "directly or indirectly facilit[e]" Labaton's representation of those clients (Dkt. No. 184-5 at 2). In

exchange, Labaton agreed to pay Sillam a "success fee" for each referred investment fund "if an exclusive engagement letter" were obtained in favor of Labaton to monitor a referred client's portfolio, "an additional success fee" in the event that the client were appointed "Lead Plaintiff" and Labaton "Lead Counsel" in a securities class action, as well as a $6,000 monthly fee to be credited against any success fees (Dkt. No. 184-5 at 2-3).

Around the time that this agreement was memorialized, Labaton also entered into an agreement with French attorney Jean Marc Descoubes (Dkt. No 184-6). The parties characterize Descoubes' role in their arrangement differently. (Dkt. No. 190 at 2). Labaton alleges that it engaged Descoubes to assist the firm with legal work if any European investment funds were to retain Labaton to represent them. *See* Declaration of Christopher Keller dated March 7, 2025 ("Keller Decl."), Dkt. No. 188, ¶ 4. Saulnier alleges that Descoubes was brought into the fold because Labaton instructed Sillam to engage a lawyer who could collect fees on Sillam's behalf. *See* Affirmation of Gérard Sillam in Support of Plaintiff's Motion for Summary Judgment dated February 14, 2025 ("Sillam Aff."), Dkt. No. 184-2 ¶ 4.

In any event, Labaton sent Descoubes a letter agreement that provided "that Descoubes would receive 15% of the net attorneys' fee" Labaton ultimately earned in a case in which a referred client was "appointed as the Lead Plaintiff" (Dkt. No. 184-6).[1] In 2008, Descoubes assigned his rights, title and interest under his agreement with Labaton to another French attorney, Plaintiff Aldric Saulnier (Dkt. No. 184-7).

By 2007, the relationship between Labaton, Sillam and Saulnier had soured, following allegations that Labaton was withholding referral fees. *See* Dkt. No. 185 at 82-86. Tensions

---

[1] Labaton claims that it does not know whether Descoubes ever signed the letter agreement (Dkt. No. 187 at 4).

exchange, Labaton agreed to pay Sillam a "success fee" for each referred investment fund "if an exclusive engagement letter" were obtained in favor of Labaton to monitor a referred client's portfolio, "an additional success fee" in the event that the client were appointed "Lead Plaintiff" and Labaton "Lead Counsel" in a securities class action, as well as a $6,000 monthly fee to be credited against any success fees (Dkt. No. 184-5 at 2-3).

Around the time that this agreement was memorialized, Labaton also entered into an agreement with French attorney Jean Marc Descoubes (Dkt. No 184-6). The parties characterize Descoubes' role in their arrangement differently. (Dkt. No. 190 at 2). Labaton alleges that it engaged Descoubes to assist the firm with legal work if any European investment funds were to retain Labaton to represent them. *See* Declaration of Christopher Keller dated March 7, 2025 ("Keller Decl."), Dkt. No. 188, ¶ 4. Saulnier alleges that Descoubes was brought into the fold because Labaton instructed Sillam to engage a lawyer who could collect fees on Sillam's behalf. *See* Affirmation of Gérard Sillam in Support of Plaintiff's Motion for Summary Judgment dated February 14, 2025 ("Sillam Aff."), Dkt. No. 184-2 ¶ 4.

In any event, Labaton sent Descoubes a letter agreement that provided "that Descoubes would receive 15% of the net attorneys' fee" Labaton ultimately earned in a case in which a referred client was "appointed as the Lead Plaintiff" (Dkt. No. 184-6).[1] In 2008, Descoubes assigned his rights, title and interest under his agreement with Labaton to another French attorney, Plaintiff Aldric Saulnier (Dkt. No. 184-7).

By 2007, the relationship between Labaton, Sillam and Saulnier had soured, following allegations that Labaton was withholding referral fees. *See* Dkt. No. 185 at 82-86. Tensions

---

[1] Labaton claims that it does not know whether Descoubes ever signed the letter agreement (Dkt. No. 187 at 4).

culminated with Sillam and Saulnier initiating a criminal proceeding in France against Labaton. *See* Dkt. No. 188-3.

### B. The 2009 Settlement Agreements

In 2009, Labaton entered into Settlement and Full Waiver and Release agreements with Sillam and Saulnier ( the "2009 Settlement Agreements"). The agreement with Sillam (the "Sillam Settlement Agreement") provided a payment of $400,000 to Sillam (Dkt. No. 184-9). The settlement agreement with Saulnier (the "Saulnier Settlement Agreement") provided Saulnier with a limited interest of "15% (15 percent) of the gross fees paid to Labaton in any matter in which Labaton was engaged to represent any of the 'Potential Clients'....either in pre-litigation or in litigation." It further provided that, "Such interest will exist if any of the Potential Clients retain Labaton within five (5) calendar years" (Dkt. No. 184-8 § III.C). The Saulnier Settlement included an attachment referred to as "Exhibit 1," which contained a list of the "Potential Clients" who the parties agreed had been introduced to Labaton through the efforts of Sillam and Saulnier. The Saulnier Settlement also gave Saulnier a 30% interest in the gross contingency fees earned by Labaton in connection with *In re Vivendi Universal, S.A. Securities Litig.*, Case No. 02 Civ. 5571 (S.D.N.Y.). *See* Dkt. No. 184-8 § III.B..

In the Saunier Settlement Agreement, Labaton further undertook to semiannually produce "a verified declaration disclosing whether any of The Potential Clients has/have retained Labaton regarding any potential litigation or actual litigation anywhere in the world" (Dkt. No. 184-8 § III.C.3). If Labaton failed to report retention by a Potential Client two or more times, the Saulnier Settlement provided a penalty for the representation not so reported (Dkt. No. 23-6 § III.C.4.b).

### C. The 2015 Settlement Agreement

Relations between the parties soured yet again. Over the course of the five-year term, Christopher Keller, a partner at Labaton, submitted five declarations on behalf of the firm, each declaring that Labaton had "not been retained by any 'Potential Clients'" (the "Keller Declarations") (Dkt. No. 188-8). Beginning in July 2015, Saulnier expressed concern that the declarations signed by Keller were untruthful. Sillam wrote to Labaton in an email dated July 22, 2015, that Saulnier "believes that the affidavits signed by Chris [Keller] do not reflect the truth" and threatened legal action against Labaton (Dkt. No. 188-8). In particular, Sillam believed that Labaton was withholding fees generated in the *Vivendi* litigations, despite Labaton's insistence that those cases had been dismissed without payment of fees. On July 29, 2015, Sillam wrote to Labaton, "it seems highly not probable that all the clients that retained Labaton in the US Vivendi case have decided to retain another US law firm in the same Vivendi case in Paris" (Dkt. No. 184-17 at 5). "We don't believe you…that none of the clients on the Potential Client List in Exhibit No. 1…has [sic] retained you to bring an action in Europe, because the informations [sic] that we have do not match that statement" (Dkt. No. 184-17 at 4). *See also* Transcript of Volume II of Gérard Sillam's Deposition, Dkt. No. 189-3 at 9-10 ("We therefore concluded that Labaton must have received some former fees in the Vivendi case…We have—of course, did not have the certainty of this, but we had doubts…").

On August 15, 2015, Labaton, Sillam, and Saulnier entered into a new global settlement agreement (the "2015 Settlement Agreement"), pursuant to which Saulnier and Sillam agreed to relinquish their rights under the 2009 Settlement Agreements in exchange for payment in the amount of $99,999.99. *See* Dkt. No. 184-11. The 2015 Settlement provided the following:

> This Universal Settlement includes a release by [Saulnier and Sillam], not just for any and all claims or potential claims which either or both could possibly bring under The Settlement [of 2009], but also includes a release and waiver by [Saulnier and Sillam] regarding any claim or potential claim [Saulnier and Sillam] have or could possibly have

5

against Labaton or any of its partners, agents or representatives.... The Parties to this Universal Settlement understand, acknowledge and agree that upon the timely satisfaction of "The Consideration" made by Labaton as set forth herein, [Saulnier and Sillam] shall universally and forever release and waive any claim or potential claim which could possibly be brought in any jurisdiction or potential claim which could possibly be brought in any jurisdiction anywhere in the world for all time arising out of or in any way related to The [2009] Settlements...

(Dkt. No. 184-11 § II.A).

This agreement ended the relationship between the parties.

### D. Current Dispute

But the end was not, as it turned out, the end.

In 2019, Saulnier learned, through Sillam, that Labaton had represented two Potential Clients in filing proofs of claims in class actions. *See* Dkt. No. 185 at 122-28. Saulnier argued that, under the Saulnier Settlement Agreement, he would have been entitled to a share of those legal fees. Labaton disputed this, arguing that the filing of post-settlement claims forms was not part of Saulnier's interest under that agreement. Saulnier asserts that these representations would have generated at least $14 million in fees. *See* Dkt. No. 1 ¶ 78. Labaton asserts that the fees earned for these ministerial tasks would not have amounted to more than a few hundred thousand dollars. *See* Dkt. No. 187 at 10.

Saulnier and Sillam filed this lawsuit on August 6, 2021, asserting, *inter alia,* claims of fraudulent inducement against Labaton and Keller.[2] They alleged that Labaton intentionally withheld the knowledge of these proofs of claims representations and that—had Saulnier known of them—he would not have consented to the terms of the 2015 Settlement Agreement. *See* Dkt. No. 1 ¶¶ 82-88.

---

[2] Plaintiff's claims for negligent misrepresentation against Labaton and Keller and aiding and abetting fraudulent inducement against Sucharow were dismissed on April 5, 2022 (Dkt. No. 28).

Discovery is completed and two litigants have been dismissed from the case, Saulnier has moved for summary judgment on his lone remaining claim of fraudulent inducement against Labaton and Keller (or the legal representative of the deceased). *See* Dkt. No. 184. Defendants opposed and cross-moved for summary judgment dismissing this action in its entirety, on the grounds that Saulnier released his claim in the 2015 Settlement Agreement. *See* Dkt. No. 186.

## LEGAL STANDARD

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering cross-motions for summary judgment, "all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

Summary judgment is appropriate where there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–50 (1986). A dispute concerning material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992) (quoting *Anderson*, 477 U.S. at 248).

## DISCUSSION

This is hardly a novel fact pattern: parties to a commercial relationship experience a breakdown in trust; the plaintiff suspects the defendant is withholding material information yet proceeds with a transaction to unwind the relationship and knowingly agrees to a broad release of all known and unknown claims—only to discover facts that make the deal appear one-sided or improvident in hindsight.

As fraudulent inducement is a state common law claim, we apply New York law, *see Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006). New York law is clear on how to assess such situations:

> Generally, a valid release constitutes a complete bar to an action on a claim which is the subject of the release. If the language of a release is clear and unambiguous, the signing of a release is a jural act binding on the parties. A release should never be converted into a starting point for litigation except under circumstances and under rules which would render any other result a grave injustice. A release may be invalidated, however, for any of the traditional bases for setting aside written agreements, namely, duress, illegality, fraud, or mutual mistake.
>
> …
>
> Notably, a release may encompass unknown claims, including unknown fraud claims, if the parties so intend and the agreement is fairly and knowingly made. … [A] party that releases a fraud claim may later challenge that release as fraudulently induced only if it can identify a separate fraud from the subject of the release. Were this not the case, no party could ever settle a fraud claim with any finality.

*Centro Empresarial Cempresa S.A. v. Am. Movil, S.A.B. de C.V.*, 17 N.Y.3d 269, 276 (2011) (cleaned up), *accord Dantas v. Citigroup, Inc.*, 779 Fed. App'x. 16, 20-21 (2d Cir. 2019).

In *Centro*, 17 N.Y.3d at 272-74, the plaintiffs—sophisticated minority shareholders—suspected that the defendant was concealing material tax and financial statements during the buyout of their shares, yet proceeded with the transaction and signed a broad release of all claims. When the plaintiffs later learned that they had sold their shares for far less than the shares' true value, they filed suit alleging fraudulent inducement. *Id.* at 274-75. The New York Court of Appeals held that, under New York law, a party who executes a general release with actual or constructive knowledge of potential claims cannot later assert fraud simply because those suspicions were borne out. In this case, the Court emphasized that the alleged fraud fell "squarely within the scope of the release," and declined to relieve the plaintiffs of a bargain they had knowingly struck. *Id.* at 277.

This case is in many ways remarkably similar to the case that the Court of Appeals decided in *Centro*. Saulnier and Sillam suspected that Labaton was withholding Saulnier's share of fees that were due under the Saulnier Settlement Agreement. Saulnier questioned the truth of the Keller Declarations, including specifically their representation that the *Vivendi* litigations had not resulted in fees that were subject to fee sharing under the parties' agreement. *See* Dkt. Nos. 184-17, 188-8, 189-3 at 9-10. But rather than initiate arbitration for breach of contract, Saulnier and Sillam signed the 2015 Settlement Agreement, which included a broad release of all potential claims. Several years later, Saulnier allegedly learned that Labaton had not disclosed the receipt of fees for filing proofs of claim for two Potential Clients who were allegedly covered by the Saulnier Agreement. Saulnier claims that, had he known, he would not have accepted the terms of the 2015 Settlement Agreement. But the fraud he alleges is not "a separate fraud from the subject of the release." On the contrary, the fraud he alleges is the precise subject of the release.

Even if this were "a separate fraud from the subject of the release," Saulnier cannot establish the elements of a fraudulent inducement claim. "A plaintiff seeking to invalidate a release due to fraudulent inducement must establish the basic elements of fraud, namely a representation of material fact, the falsity of that representation, knowledge by the party who made the representation that it was false when made, justifiable reliance by the plaintiff, and resulting injury." *Centro*, 17 N.Y.3d at 276. Here, Saulnier cannot possibly establish the element of justifiable reliance on the Keller Declarations when, by his own admission, he believed that Keller had lied when he filed the Keller Declarations, which occurred prior to signing the 2015 Settlement Agreement. *See* Dkt. Nos. 188-8, 184-17 at 4-5; 189-3 at 9-10. At every juncture, Saulnier's claim is foreclosed.

For these reasons, Defendants' motion for summary judgment must be granted, and Plaintiff's motion denied.

## CONCLUSION

As I have said more than once, the allegations in the complaint are unsavory and smack of forbidden fee-shifting. As they have not been adjudicated on the merits, there can be no claim of vindication for the Labaton firm. But some of the conduct complained of took place almost two decades ago, and the attorney principally involved at the time of the 2015 Settlement that is here challenged as fraudulent is deceased. It is time for this matter to end.

Defendants' cross motion for summary judgment dismissing the complaint is GRANTED and Saulnier's motion for summary judgment is DENIED.

This constitutes a written opinion. The Clerk is directed to remove the motions at Dkt. Nos. 184, 185, 186, and 199 from the Court's list of open motions, to enter judgment dismissing the complaint as against all Defendants, and to close the file.

Dated: September 5, 2025

_____
U.S.D.J.

BY ECF TO ALL COUNSEL